Filed 5/5/22  P. v. Bishop CA5
Opinion after recalling remittitur

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TREVOR JIM BISHOP,<br><br>    Defendant and Appellant. | F076745<br><br>(Super. Ct. No. VCF280823A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Trevor Jim Bishop, in pro. per.; A.M. Weisman and Byron C. Lichstein, under appointments by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE DISSENTING OPINION**

Appellant Trevor Jim Bishop appeals following his conviction by jury of second degree murder (Pen. Code, § 187, subd. (a); count 1) and assault on a child under eight years old by means of force likely to produce great bodily injury and resulting in death (*id*., § 273ab, subd. (a); count 2). He was acquitted of first degree murder. He was sentenced to a total unstayed term of 25 years to life in prison and ordered to pay restitution, as well as various fees, fines, and assessments.

In our initial ruling on appeal, we held: (1) the trial court correctly admitted prior bad acts evidence in this case, and the admission of any evidence exceeding that ruling was harmless; (2) there was no improper cross-examination of appellant; (3) the prosecutor did not commit misconduct in opening or closing arguments; (4) the trial court did not improperly admit hearsay evidence; (5) the trial court did not incorrectly admit improper expert opinion through the use of the term nonaccidental; (6) the trial court did not commit reversible error when it appointed conflict counsel in this case; (7) appellant cannot demonstrate conflict counsel provided ineffective assistance of counsel; and (8) the court did not wrongly fail to consider appellant's ability to pay when imposing fines and fees.

On January 14, 2022, appellant filed a motion to recall the remittitur and remand proceedings in light of Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518). This court granted the motion to recall the remittitur and agrees with appellant that remand is necessary so that the trial court may exercise its discretion under Penal Code section 654. Accordingly, we affirm in part but vacate appellant's sentence and remand for resentencing as set forth below. No changes to our initial opinion are otherwise made.

Although there are many aspects of this case, both factual and legal, that can be structured to raise emotional responses, the fundamental issue to resolve here was relatively simple. A young child was left in appellant's care. While in that care, and with no indication there was any external interference, that child suffered a substantial head

injury that was equivalent to a car accident and eventually resulted in his death. Appellant first stated the injury was the result of a minor fall in the bathtub, then gave conflicting stories, before going so far as to say he may have also dropped the child when playing. As one would expect, all of appellant's stories sought to maintain an aura of innocence and imply an accidental injury. None of these stories matched up with the medical evidence. Further, numerous examples of appellant being violent in domestic settings came to light and were offered under various admissibility theories at trial. Appellant's claim of an accidental injury was thus juxtaposed against medical evidence concluding no minor fall could have caused the injury and a long history of aggression and violence toward those closest to him. The jury was asked to determine which explanation to believe and chose to believe the one consistent with the medical evidence and appellant's past history.

While the dissent belabors the extent of the contested character evidence in this case to generate sympathy for a perceived unfairness in appellant's trial, it loses the forest for the trees when justifying such a result. Specifically, the dissent fails to give proper weight to the statutory law adopted to specifically allow certain types of character evidence in domestic violence cases to prove conduct in conformity with past abuse. It then relies on a novel theory of prosecutorial waiver without acknowledging that a direct waiver claim is factually contradicted and without providing any case law for a claim of strategic waiver through focused argument. Ultimately, when the emotional aspects of the case are fairly considered and the law is correctly applied, there is little room for debate. The properly admitted evidence overwhelmingly undermined the multitude of stories appellant gave to hide his actions and the jury reasonably concluded the only logical explanation for the fatal injury and other signs of abuse was appellant's continuing pattern of domestic violence.

# FACTS[1]

## I

### PROSECUTION EVIDENCE

## A.  Family Background

D.H. (Mother) and J.H. (Father) had two children, Jimmy H., who was three years old in March 2013, and Brooke H., who was one year old at that time. The couple, who lived in Fresno, was married in 2008 and separated in June 2012.

After the separation, Mother met appellant when she bought a car at a lot where he was working. At the time, she and the children lived with her parents, but they eventually moved into a house with appellant. Appellant began babysitting the children while Mother worked.

## B.  The Events of March 21, 2013

At approximately 11:48 a.m., appellant, Jimmy, and Brooke were recorded entering a store in Visalia.[2] They proceeded into the store, and appellant eventually purchased diapers and a toy.

As they were leaving, appellant and the two children ran into the children's maternal grandfather. There was a short conversation and Jimmy responded when his grandfather spoke to him. The grandfather testified that Jimmy appeared clean, like he had just taken a shower and did not appear to be in any type of distress. The grandfather did not see any markings on Jimmy and appellant did not mention that anything had

---

[1]  Pursuant to California Rules of Court, rule 8.90 and for clarity, we refer to some persons by first names, initials, or descriptive designations. No disrespect is intended. In addition, we refer to law enforcement personnel by their titles at the time of events.

Unless otherwise specified, dates in the statement of facts are from the year 2013.

[2]  Visalia Police Detective Juan Saenz obtained the store's surveillance video and described it for the jury. The video recording was also played for jurors.

4.

happened to Jimmy.[3]  Appellant and the children drove out of the store parking lot shortly after 12:08 p.m.

At approximately 1:28 p.m., appellant carried Jimmy into an urgent care facility in Visalia.[4]  Jimmy was unconscious.  His pupils were fixed and dilated, and he was posturing, meaning his arms and legs were stiff and rolled in; a response usually associated with a head or spinal injury.  The situation was deemed life threatening and an ambulance was called to immediately transfer Jimmy from the urgent care facility to a hospital emergency room.  Both were different divisions of the same hospital in Visalia.

An ambulance arrived at the urgent care facility at 1:31 p.m.  Appellant provided an injury history to the paramedic.  Appellant stated that Jimmy slipped and fell in the bathtub that morning around 8:30 or 9:00 a.m. but did not lose consciousness and acted normally after the fall.  Jimmy had one episode of vomiting, after which appellant told him to go to his room and change his clothes.  Appellant heard a thud and rushed into the room.  Jimmy was lying on the floor, not responding.  Appellant picked Jimmy up, got Brooke, and rushed to urgent care.

Due to possible head injury, Jimmy was placed in full circle spinal immobilization and on a backboard.  The ambulance departed the urgent care facility at 1:39 p.m. and arrived at the hospital emergency room at 1:42 p.m.

At the hospital, a medical social worker spoke to appellant after security notified her about a person demanding to speak to someone about the child who had just arrived by ambulance.  She stated appellant was annoyed because the doctor did not come and talk to him.

---

[3]    The grandparents saw Jimmy the night before.  He was eating dinner and he sang a song. Everything seemed fine.

[4]    Cell phone extraction subsequently performed on appellant's phone revealed no calls to 911 during the relevant timeframe.

The social worker asked appellant what happened. Appellant related at 9:00 a.m. that morning, Jimmy was taking a bath. He fell and hit his head in the bathtub. Later, Jimmy started throwing up, so appellant took him to the urgent care facility. Appellant said they went to the store, and Jimmy was sick to his stomach there, so appellant took him home and told him to change his clothes and clean up. Because Jimmy still was not feeling well, appellant tried to make him feel better, so he tossed Jimmy in the air. When the social worker asked why appellant did not call 911 if he was so concerned, appellant responded that he just did not know what to do, so he took Jimmy to urgent care.

Appellant was also seen at the hospital by the children's grandparents. Mother called about the incident and told the grandfather that appellant said Jimmy slipped in the bathtub. When the grandfather saw appellant, he was told that Jimmy slipped on the tile. When the grandmother saw appellant, she was told that Jimmy fell in the bathtub.

Visalia Police Officer William Brokhoff was dispatched to the hospital around 2:00 p.m. in response to a "suspicious circumstances" call. Brokhoff took photographs of Jimmy in the emergency room. The photographs, which were shown to the jury, showed bruising to Jimmy's right cheek area just below the eye; a cut on his forehead between the eyes; bruising to his right triceps area; and bruising to his lower right abdomen, around the genital area.

Jimmy was then taken by ambulance to the regional hospital in Fresno for surgery. Visalia Police Detective Daniel Ford responded to the regional hospital around 4:00 p.m. After surgery, Ford and an evidence technician photographed Jimmy's injuries.[5] While some of the bruises on Jimmy's legs were consistent with the types of bruises Ford would expect to see on a child that age, others appeared to be inconsistent with a child's normal injuries. There was a bruise on Jimmy's right shin, just above the ankle. There were three linear bruises on his inner right thigh that all seemed to point toward the central area

---

[5] The photographs were shown to the jury.

6.

of his right leg. There was a bruise (a red mark with a dark mark) just above and to the right of his penis, as well as some trauma to the tip of the penis itself and a small abrasion or laceration. There was a bruise just underneath Jimmy's right eye that was swollen and very red. On Jimmy's left hand was a series of bruises and red marks, basically between the web of the thumb and the index finger. There were also a couple of bruises on Jimmy's lower back.

## C. Appellant's Statements to Police

Visalia Police Detective Ramona Whaley was tasked with interviewing appellant. There were three conversations. The first, a formal interview, occurred at the Visalia Police Department. Whaley then gave appellant a ride to his house, where a search warrant was being executed. The second was a conversation while in her vehicle, although she did not necessarily consider it an interview. The third, another formal interview, was conducted back at the police department around 7:00 p.m. that evening.[6] Whaley also reviewed appellant's cell phone and did not find anything, such as a text to Mother, about Jimmy falling in the bathtub and hitting his head.

### 1. The First Interview

The first interview contains a detailed accounting of what appellant alleged occurred. There were, at times, inconsistencies in his explanation.

Appellant related that he was then between jobs, so he was watching Jimmy and Brooke while Mother was at work. While they were eating breakfast, Jimmy urinated on himself, so appellant took him to the bath. Normally, appellant would take Brooke out of the bath first and let Jimmy "chill" for a minute while appellant dried Brooke off. This morning, while appellant was holding Brooke, Jimmy went to step out of the bathtub.

---

[6] All three conversations were recorded, but only the recordings of the first and third, the interviews, were played for the jury.

Jimmy slipped and hit the back of his head. He was getting up as appellant helped him up.[7] Jimmy was talking and seemed all right. This happened around 10:00 or 10:15 a.m.

Brooke needed diapers, so appellant loaded the children into the car. Before they left, Jimmy threw up.[8] Appellant asked if he was okay. Appellant had promised Jimmy a new toy the day before, and Jimmy said he wanted to see his "prize." He was talking and seemed fine. They went straight to the store and got diapers and the toy. As they left the store, they ran into the grandfather, who talked to Jimmy. Appellant noticed that Jimmy was not as excited as usual to see his grandfather.

After leaving the store, they drove around for a bit, looking for a recycling place. Appellant discovered Jimmy did not have his sunglasses, so they returned to the store to see if they were left there. They pulled into the store, did not find them, and got back into the car, at which point Jimmy threw up.

Appellant then decided to get lunch and go home. He went through a fast-food restaurant drive-thru to get Jimmy a soda, but Jimmy could not drink even though he said he was hungry. Jimmy threw up again just before they reached home.

Once at home, appellant stripped Jimmy down, asked how he was feeling, gave him some shorts, and told him to go to his room, stating that appellant would come in and

---

[7]     Appellant first said Jimmy did not cry. A short time later in the interview, when Whaley was seeking a step-by-step description of what happened and specifically asked if Jimmy was crying, appellant said that he was. Appellant said he took Jimmy to his room, held on to him, and told him to stop crying. Appellant asked if he was okay, and Jimmy said yes. Still later in the interview, appellant said he immediately picked Jimmy up, took him into the bedroom, and sat and held him for a while. He could feel Jimmy moving. Appellant did not know if he had to pick Jimmy up; he just did. Jimmy was holding his head and crying. Appellant felt Jimmy's head, but stated his head was "weird shaped as it is." There may have been a lump on the back of his head from the fall.

[8]     Later in the interview, appellant said he put the children in front of the television while he took a shower and got ready to go to the store. When appellant was dressed, he called for the children to come and get their shoes on, Jimmy threw up in the toilet. He also already had a little bit of vomit on his shirt, but there was none on the floor. Appellant did not "jump to … conclusions" because Jimmy "randomly" threw up a lot more than most children. Jimmy said he felt better, so appellant got him and Brooke a sippy cup of juice.

get him dressed. Appellant then put Brooke in front of the television, got a towel and some cleaner, and went out to clean the car seat.

Appellant went back inside and started getting the food. He realized Jimmy had not come back out of his room. Appellant found Jimmy in the room, lying on his back with one leg in his shorts. Jimmy was breathing through his nose but was "locked up"— "flexed real tight"—like he had a seizure. Appellant called Mother. He did not know what to do and took Jimmy straight to the urgent care facility nearby.

During the interview, appellant provided explanations for certain injuries on Jimmy. He explained that before leaving for the store, appellant put concealer on Jimmy's face to cover a bruise from a couple of days before. Appellant used the concealer because he did not want it to look as if Jimmy had a "gigantic" bruise when they went into the store. He and Mother also exchanged texts about whether the concealer worked.

According to appellant, Jimmy bruised very easily—"touch him and he bruises"— and he and appellant wrestled a lot.[9] Mother was told this particular bruise occurred after she made the children swords and the children had sword fights with them.[10] The bruise appeared the day before the interview and occurred when appellant and Jimmy were wrestling two days earlier. Appellant claimed that, without realizing Jimmy was behind him, he twisted and unintentionally elbowed Jimmy, hard, in the eye. Appellant did not tell Mother he accidently struck Jimmy.

---

[9] Appellant said Mother had a disease or something that caused her to bruise very easily. He said Jimmy was "the same way."

[10] A search warrant was executed at appellant and Mother's house the evening of Thursday, March 21. A homemade sword made out of cardboard and tinfoil, a second homemade sword made out of particle board and tinfoil, and a plastic dagger were found. Visalia Police Detective Scott Nelson, who assisted in the search, described the play swords as "flimsy." A video recording from appellant's or Mother's cell phone of Jimmy and Brooke playing with the swords was shown to the jury.

Appellant told Whaley that he knew he wrestled too roughly with Jimmy.  As an example, a day or two earlier when they were wrestling, Jimmy tried to perform a "rear naked choke" on appellant.  Appellant explained that when Jimmy would try wrestling moves, appellant would show him how.  Appellant said he might have squeezed Jimmy's neck a little hard without realizing, but he never tried to hurt him.

Appellant had photographs of Jimmy on his cell phone that showed various injuries.  One photograph, taken without the concealer, showed bruises and scrapes throughout Jimmy's face.  There was also a photograph of Jimmy's bottom and penis area.  There were multiple bruises on the backs of his legs.  Another photograph appeared to show a handprint from a slap on Jimmy's cheek.

Appellant told Whaley he was "way too hard" with Jimmy, but at the same time, Jimmy was "clumsy."  Appellant explained a mark on Jimmy's forehead by saying Jimmy would put his head on appellant's head and they would push each other.  He claimed another bruise was caused by a tree branch when Jimmy was running around outside.  In addition, Jimmy recently fell off his bicycle.  Further, Jimmy told appellant that he tripped on one of appellant's dumbbells.  Also, Jimmy had "an issue with a zipper," so there was a mark on his penis.  Finally, three days earlier, Jimmy fell off the couch and hit his back and head.

Appellant also discussed a prior occasion where he claimed Jimmy was riding on appellant's back and fell off.  Appellant tried to catch him, but Jimmy landed on the hard ground and got a bruise.  Appellant claimed Mother was really angry at appellant about it and that Father threatened her daily and called all the time.  Appellant alleged that until a month earlier, Father did not want the children.  Mother would have to beg him to take them for a weekend, but now he suddenly wanted them.  Appellant related that during the 10 years Mother and Father were together, Father physically and verbally abused Mother.  Appellant claimed that a couple of days earlier, Father found out the children were with appellant, and he made threats against appellant.

2.  The Third Interview

The third interview delved further into Jimmy's injuries. When asked about photographs showing hand or slap marks on Jimmy's face, appellant insisted he did not hit Jimmy. Appellant stated Jimmy was on appellant's back and fell off, contacting appellant's hand. Appellant stated that while he could not remember every second of what happened, Jimmy was urging him to go faster and started getting off balance. Appellant did not know if he was trying to catch Jimmy, but Jimmy ended up hitting the floor. Appellant thought that was where the mark came from.

Appellant was asked about photographs on Mother's cell phone of Jimmy bruised in a straight line up and down the back of his ribcage. Appellant explained that those photographs were taken when Jimmy returned from being with Father. Appellant did not know why he and Mother did not get the police or CPS involved. Appellant was asked about another picture that showed a large blister or burn on Jimmy's big toe. Appellant could not remember the whole incident, but said Jimmy was in the kitchen while appellant was cooking and got burned. Appellant thought it was from boiling water. Another photograph—again allegedly taken when Jimmy got back from being with Father—showed Jimmy's bruised bottom. Appellant took the photographs while he, Mother, and the children were camping.[11] Appellant claimed that a few days before the interview, Jimmy and appellant were talking, and Jimmy said that Father spanked him really hard, with a belt. Appellant also related that he saw Jimmy trip and fall into the fireplace. And that sometimes, Jimmy would run down the hall and straight into the wall. According to appellant, these sorts of things happened daily.

Appellant again claimed that Mother had a genetic disorder that caused her to bruise easily. Appellant said he and Mother talked about getting Jimmy checked to see if

---

[11]  Nelson, who had already interviewed Mother, subsequently related that Mother said the bruises on Jimmy did not happen at Father's house, but rather while appellant, Mother, and the children were together camping. Appellant said, "they could have."

he had the same thing, because Jimmy would bruise if barely touched. Appellant also reiterated that Jimmy frequently threw up. However, appellant stated that as far as he knew, Jimmy had never been diagnosed with any medical problems and did not take any medications.

In the course of the interview, Nelson told appellant he was not being honest about something that happened that day. Nelson asked if appellant threw Jimmy up in the air and tried to catch him and dropped him, because, Nelson noted, that was an accident. In response, appellant again insisted Jimmy slipped in the bathtub. However, appellant added that when they got home, Jimmy was "down"—not depressed, but "he just wasn't Jimmy." Appellant said he lifted him up and was kind of swinging him to try and make him happy. Appellant did this two or three times and Jimmy was laughing. The last time, appellant did not have him like he should, and Jimmy slipped and hit his head on the ground.

Appellant said this happened in Jimmy's bedroom and that Jimmy hit somewhere on the back of his head "really hard on the ground." Appellant claimed that when Jimmy slipped out of appellant's hands, appellant caught Jimmy's leg, but Jimmy still came down "really hard." Jimmy immediately went rigid and "got tight." Appellant tried slapping him, but Jimmy's eyes were not normal. Appellant knew it was "not something to mess with," and he took Jimmy to get medical help within 10 minutes. He called Mother while on the way. Appellant did not tell Whaley this earlier because he was afraid that he would get in trouble and because he promised Mother that he was going to be "ultra-careful."

Asked again about the use of concealer, appellant explained that the purpose of putting concealer on Jimmy's face was because Mother was concerned someone would call CPS. She was hesitant about taking him places when he had bruises in the past. Appellant never saw Mother strike Jimmy, except for spankings.

**D.    Father's Testimony**

Father considered Jimmy to be very well behaved, even compared to Brooke. Jimmy was an obedient child who was healthy, coordinated, athletic, and active. He did not bruise easily. He was not sickly and did not suffer from frequent vomiting. Father claimed he rarely had to discipline Jimmy and when he did, the discipline consisted of placing Jimmy in time out. Father said he never spanked either child and never used a belt. Father stated he never returned Jimmy to Mother with bruising on him.

In December 2012, Mother informed Father that she was moving into her own home in Visalia. Once Mother moved into the new home, Father had substantial difficulty seeing the children and Mother would not give him the address. Father thought this was odd, considering there had not been any problems with custody before. Father stated he never voluntarily went weeks without seeing the children.

Father claimed he never met, spoke with, or threatened appellant. Father claimed he never threatened Mother or appellant with bodily harm.

Father last saw Jimmy on March 10. He detailed an incident in February where Jimmy seemed reluctant to go to Mother's house. Although Jimmy typically did not throw tantrums, he started acting out when Father said it was time to go home. Jimmy threw himself on the floor and cried. When Father put him into the car, Jimmy stared down and looked away from Father. Father repeatedly asked what was wrong, but Jimmy would not answer, which was very unusual. When they got to Visalia, Father did not know the location of Mother's house, so he took the children to the grandparents' home. Jimmy perked up immediately when he recognized the neighborhood and realized he was going to his grandparents' home and not Mother's house.

During the last couple of months before the injury, the only thing Father noticed in terms of bruising was a faint bruise on Jimmy's lower back. Mother had already warned Father about it. She said Jimmy fell off a rock while they were camping. Because what Mother said was a camping trip happened at a time when Father was supposed to pick up

13.

the children and there was increased time between visits, Father felt Mother was keeping the children from him so he would not see that bruise and another faint one on Jimmy's face.

On March 21, Father received a phone call directing him to go to the emergency room. Father saw Jimmy wheeled out on a gurney. Medical personnel were cutting his clothes off. Father could see multiple bruises on Jimmy's face, arms, legs, and penis. Father had never seen those injuries before.

Jimmy was immediately transferred by ambulance to the regional hospital in Fresno for surgery. Jimmy remained at the regional hospital in Fresno for 10 days. He did not regain consciousness. He was then transported to a children's hospital in Madera.

Jimmy was at the children's hospital for two months. He did not improve. Father was urged to think of Jimmy's quality of life and to put him in some kind of hospice care. Father initially declined. He took Jimmy home, and he and his parents took care of him for nine months.

Jimmy's condition never improved. Father saw that Jimmy's quality of life was not good, and eventually talked to the doctors about options. Jimmy began hospice care at Father's house until a bed was available in the hospice facility. He was admitted to the hospice facility on February 10, 2014. His feeding tube was removed, and he passed away on February 19, 2014.

### E. **Expert Testimony**

#### 1. Dr. Hightower

Dr. Daniel Hightower was the on-call radiologist at the hospital emergency room on March 21. He reviewed and interpreted a CT scan that was performed on Jimmy's head at 2:01 p.m. The imaging showed a moderate to large left subdural bleed.

Hightower explained that blood has a certain characteristic, in terms of density, depending on how recently the bleed occurred. Jimmy's CT scan showed areas of blood that were subacute, at least past an hour in time. There were other areas where the blood

14.

looked almost like water, meaning it was hyperacute, and within an hour or a couple of hours. These differences could have resulted from an earlier or second bleed, or it could mean the bleeding had been occurring for several hours from whatever caused it to start. Hightower saw nothing outside the skull to cause a skull fracture or soft tissue swelling.

### 2. Dr. Ramirez

On March 21, Dr. Veronica Ramirez, a pediatrician, was an attending physician at the regional hospital in Fresno. She was part of the pediatrics team that treated Jimmy.

Ramirez examined Jimmy after surgery. Jimmy was comatose and nonresponsive. In its assessment, the pediatrics team treated Jimmy's injuries as nonaccidental trauma. His injuries were very suspicious for nonaccidental trauma. Jimmy had bruising in the groin area and inner thighs, which is not a normal place for bruising in children and "[r]aise[d] red flags." The extent of the head injury was also suspicious, as the gravity of the head bleed did not seem to match the history the resident obtained from Mother and Father, who came in with Jimmy.[12]

### 3. Dr. Johnson

Dr. Ian Johnson, a neurological surgeon, was the on-call neurosurgeon in the trauma unit of the regional hospital in Fresno on March 21. Jimmy came to him with a diagnosis of a closed head injury and an acute subdural hematoma.

Johnson determined Jimmy had a sizeable acute subdural hematoma. Johnson testified a child with a subdural hematoma of the size seen in Jimmy would not be able to walk around. Johnson explained that because the brain in a child fills the intracranial cavity, when something is put inside the cavity that does not belong there—in this

---

[12] The story Ramirez received was that Jimmy fell while taking a bath. Ramirez saw a lot of falls. The imaging report described a large subdural hematoma causing rightward midline shift. That type of injury was not common and was not seen with falls in a bathtub. Ramirez had never personally treated a short fall that was fatal, although she supposed it was possible, depending on the mechanism of the fall.

15.

situation, an acute subdural hematoma—typically "bad things are gonna happen pretty quickly."

Johnson described a "lucid interval" as a time period that someone may have after that person has a blood clot in the epidural space, i.e., the space between the skull and the lining of the brain. Someone with an epidural hematoma may have a lucid interval, in which the person feels bad, then good, then bad again. But Jimmy's hematoma was subdural—below the lining of the brain. Acute subdural hematomas are not associated with lucid intervals.

Johnson's job was to focus on Jimmy's brain. Thus, he did not inspect the rest of Jimmy's body until the day after the surgery. Johnson was told Jimmy had fallen. Johnson did not see the external signs of a fall that would generate the clinical scenario, however. Johnson informed Nelson that the story he was told through the emergency department did not fit with what he saw.

According to Johnson, Jimmy's subdural hematoma was not consistent with someone who fell in a bathtub. Johnson found it "extraordinarily unlikely" for Jimmy to fall in the bathtub from a standing position at 10:00 a.m., have that sizable of a subdural hematoma, and not slip into a coma within half an hour to an hour. In addition, it would not be consistent to fall from standing, have that type of brain injury, and not have any type of external signs, no matter when the fall occurred. At a minimum, there should be bruising on the scalp where the head was hit, because a child would have to hit his or her head with a lot of force to cause a subdural hematoma.

Johnson stated that if Jimmy suffered a subdural hematoma from a fall in the bath, he would not have been able to go to the store, be conscious, and be able to talk to people. It would make more sense that the subdural hematoma occurred closer to the time he was actually brought to the emergency room. The veins that were bleeding came off the superior sagittal sinus, a large vein. A torn vein there causes "bad things" to happen within half an hour to an hour.

16.

Jimmy's CT scan showed different blood densities. Johnson agreed with Hightower that this indicated some areas of blood were older, since, as hemoglobin breaks down, it appears darker on the scan. However, he stated it was impossible to look at the scan and determine, for example, that an area of blood was an hour old and another area was four hours old. Johnson explained there was a caveat, however. Hyperacute blood, meaning the blood is very recent (possibly half an hour to an hour), looks dark on a scan. A regular radiologist likely would interpret the dark blood on the outside of the bright area as being old blood, but a neuroradiologist might opine that it was hyperacute blood that had not yet had time to become bright on the scan.

Johnson found it "extraordinarily unlikely" that what was shown on the CT scan was consistent with an injury occurring just under four hours before the scan, and a second injury occurring less than an hour before the scan. Johnson declined to give a time range for the injury based on the scan. From a clinical scenario, however, Johnson could say that a person could not walk around with an injury like that. The person would be very sick and, if left alone, would die in that situation. A three-year-old who developed a tear in his or her superior sagittal sinus or the veins originating from the sinus would by lying on the ground, vomiting on him-or herself in a coma, within 15 minutes to a maximum of half an hour. There would be no going to a fast-food restaurant. Although anything was possible, it would be "extraordinarily rare."

Since Johnson did not see an external injury, he did not know what accounted for the hematoma. What is routinely seen in someone Jimmy's age is someone who has been shaken. The force of shaking someone back and forth causes no hematoma on the scalp, but, if done hard enough, it will tear a bridging vein. Johnson did not know if that happened here.

Johnson further opined the subdural hematoma could not have resulted from a short fall. He was asked whether it could have been from an accelerated fall, if a child had fallen farther or someone dropped him. Johnson responded that if the child stood at a

17.

height of six to eight feet and dove head-first with his hands at his side and unable to protect himself from the fall, it would still be unlikely given the weight of a three-year-old. Normally, a subdural hematoma in a child is caused by some type of generated force. It is normally only seen in a three-year-old when there is a car accident or abuse. To generate the necessary force in a three-year-old, the person would have to be concentrating and shaking the child.

### 4. Dr. Walter

Dr. Gary Walter, a medical doctor with a specialty in pathology, performed an autopsy on Jimmy on February 25, 2014. Walter concluded the cause of death was acute encephalopathy due to blunt force trauma to the head. Because he did not examine the brain in fine detail, he did not look for and did not see any origins of the subdural hematoma.

### 5. Dr. Bruhn

Dr. Frederic Bruhn, a pediatrician who was mostly retired but remained board-certified in pediatrics and child abuse, reviewed the records of this case to form an opinion.

Based on birth and childhood records, Jimmy appeared to be a healthy child. He had a few minor problems but nothing serious and they resolved. In the store video, portions of which Bruhn viewed, Jimmy appeared normal and alert.

Based on the CT scan, Bruhn described Jimmy's subdural hematoma as acute, meaning anything from immediate to several days old.[13] There was no evidence of skull fracture or impact/swelling on the scalp.

Bruhn noted that at both hospitals, a number of doctors noted and commented on the fact Jimmy had some very suspicious-looking bruises. Bruhn explained that people,

---

[13] Bruhn explained that "acute" was a very inexact term that meant different time ranges to different people.

including children, get bruises all the time, particularly over certain bony prominences and that these happen during normal, daily living. Children tend to have bruises over things like the shins and anywhere bones stick out, such as the elbows. Thus, bruises in protected areas and soft, fleshy parts, such as the buttocks or around the genitals, look suspicious.

Jimmy had an abrasion on his forehead, which Bruhn did not consider suspicious because the forehead sticks out. Jimmy also had a fairly large bruise on his right cheek, along with bruises on the back parts of his legs and in the groin area that were suspicious.[14] On the back part of his right thigh were three bruises that looked like they could be fingerprints. There were areas on Jimmy's right groin that looked like they could have come from poking. Although it was conceivable the injury to Jimmy's penis could have resulted from him catching his penis in a zipper, the bruises in a row in the groin area, above the right inguinal ring, could not have been caused by a zipper. They probably were an inflicted injury, as they were in a very protected area. The bruise on Jimmy's buttocks was characteristic of a paddling. It was an inflicted, abusive injury.[15]

Bruhn also reviewed Johnson's surgical report. Bruhn was "totally in agreement" with Johnson that the reported bathtub fall could not have caused Jimmy's subdural hematoma. That type of injury would not produce the amount of damage Jimmy had. There had to be significantly more force than a simple fall. The only accidental way to get a subdural hematoma the size Jimmy had would be a high-velocity car wreck or a fall

---

[14] One of the photographs Bruhn reviewed, which, he was told, was taken about a month earlier, showed a very suspicious bruise and swelling on Jimmy's left cheek. According to Bruhn, it was what is called a pattern bruise. It showed the outline of fingers and was a typical slap mark seen in child abuse. Bruhn opined that it should have gotten CPS involved, as it was "clearly" abuse.

[15] Bruhn opined that the second degree burn on Jimmy's toe could be inflicted, but it would be very unusual. It definitely could have been caused by oil or something hot dropping off the stove. It was possible bruising on Jimmy's spine and back that was photographed after surgery resulted from him being placed on a backboard earlier that day.

from many, many feet. Bruhn disagreed with Johnson about whether there should be some external sign of blunt force trauma. Bruhn opined that there could be fairly significant head trauma without any bruising.

Bruhn opined that Jimmy's subdural hematoma was inflicted by nonaccidental trauma. He explained that "shaken baby" is not used anymore, because it presupposes that the exact mechanism is known. Unless someone is present, that cannot be known, because the severe injuries are very complex. They involve acceleration/deceleration and rotation, particularly rotation in a certain dimension. In addition, young children can suffer injury to the lower part of the brainstem, which causes them to stop breathing. When they stop breathing, all sorts of damage can occur to the brain.

Bruhn did not believe that what appellant described during his third interview, where he swung Jimmy up in the air and Jimmy slipped out of his grip and hit his head on the carpeted floor, would generate enough force to cause Jimmy's subdural hematoma. There had to be an element where Jimmy was slammed onto the floor in order to produce such an injury so quickly. Even on a carpeted floor, sudden deceleration and, presumably, rotation, could produce the injury Johnson saw, but "it would have to be a good slam on the floor to do that."

Bruhn did not believe a lucid interval explanation was applicable here. He explained that a lucid interval usually is seen with epidural, not subdural, hematomas, and there was no evidence of a lucid interval here. An epidural hematoma results from a different anatomical defect. There is an artery that runs outside the dura. With a blow usually to the side of the head, the artery may get cut. The patient is knocked unconscious or is dizzy, but there is not yet enough bleeding to cause swelling in the whole brain. As a result, the patient wakes up and is lucid for a short period of time, usually 10 or 15 minutes. The patient then lapses into unconsciousness when the pressure builds up. Children tend to get subdural hematomas. It would be rare for a three-year-old to have a subdural hematoma and a lucid interval.

According to Bruhn, something happened to make Jimmy's subdural hematoma "real large in a hurry." With such an injury, Jimmy would not have been able to do anything such as go to the store. Bruhn opined that Jimmy's actions in the store video ruled out anything significant earlier that morning.

In Bruhn's opinion, Jimmy's head injury was not caused by what appellant said happened. Bruhn next ruled out a birth-related injury, given Jimmy's age. And because appellant said Jimmy bruised easily, Bruhn contacted Ramirez regarding a series of blood tests. All were normal. Metabolic diseases were ruled out and Jimmy was deemed a heathy boy. Jimmy's injury was thus deemed nonaccidental.

Bruhn acknowledged nothing was impossible. The odds of a child falling down, hitting his or her head, and developing Jimmy's type of injury were extremely small, however. The entire picture had to be considered. There were abusive injuries, a bit of a delay in bringing him in for help, and a changing story that started with a simple fall and then expanded, when not believed, to swinging above the head and falling down. When everything was put together, it resulted in "some serious conclusions." In Bruhn's opinion, this was a case of abusive head trauma with blunt force trauma.

## F.    **Prior Bad Acts Evidence**

### 1.    Katie O.

In May 2009, Katie O. and appellant began dating. Their relationship lasted about eight months.[16] She stayed with appellant at appellant's house on weekends.

Katie testified that after they had been dating about three or four months, she noticed the first sign of aggression from him. She described an incident where she did not move laundry from a washer to a dryer. Appellant got upset and started hitting the doors. He slammed the door of the washing machine, threw the laundry in the dryer, and

---

[16]    Appellant's laptop contained photographs of him and Katie that were taken at a professional football game. The metadata showed the photographs were taken on the afternoon of January 2, 2011.

21.

slammed the door of the dryer.  Appellant said something along the lines of, "It's not that fucking hard.  I can't believe you didn't.  It's just a transfer of clothes."

Appellant subsequently apologized, but the relationship grew "rocky."  There were days when everything was good, then all of a sudden, appellant would get really angry and upset.  It was "scary," because Katie never knew what was going to set him off.

During this time, appellant had first one and then two boxers.  Katie detailed appellant's treatment of the dogs as poor.  When the dogs did something such as dig in the backyard, appellant would go outside, yell, grab the dog, throw it down in the dirt, kick it, and punch it repeatedly.  He would tie the dogs in the garage and beat them.  He would then return to the house for 15 or 20 minutes, then go and beat the dogs some more.  Even though Katie was in the house, she could hear him punch the dogs repeatedly.  When Katie suggested it was a little bit much, appellant responded that they did not learn, no matter how hard he hit them.  Although appellant often was aggressive toward the dogs, he showed "a lot of love" toward them otherwise.

Katie also described a physical altercation.  On that occasion, Katie went over to appellant's house and an incident occurred.  Katie attempted to leave, but appellant picked her up and took her back into the house.  While there, she discovered a long, black, curled hair on the floor and another hair under the pillowcase.  The hairs were not hers.  When she confronted appellant, he "got really angry" and came at her, wanting to slap her.  He grabbed a phone from her hand and threw it against the wall and broke it.  He threw shoes and anything else he could grab and hit things.

Katie was terrified.  When appellant slapped her across the face, she grabbed him, put him in a choke hold, and started choking him.  When he started to go limp, she got scared and let go; then "all hell broke loose."  Appellant grabbed Katie and threw her against the wall.  When he reached for her again, she ran into the hallway.  He tackled her and shoved her to the ground.  She got away and ran into the kitchen.  She did not

remember what happened, but the next thing she knew, she was on her back. He was straddling her, yelling at her and deliberately spitting in her face.

Appellant got up and started to apologize. He sat on the couch and started to cry. Katie decided to sit by him and try to tell him the relationship needed to end. Although terrified for her life, she stayed with him because he manipulated her.

Appellant never became physical with Katie after this incident. Rather, Katie testified appellant directed his anger toward Jason T., a friend of his.[17] Katie detailed an incident that arose over a bicycle. Appellant was letting Jason stay at appellant's house, and Jason left the bicycle on the lawn. Appellant became angry because someone could have stolen the bike.

When Jason came inside, appellant asked Katie to wait in his room while he spoke to Jason. Katie went into the other room, then heard yelling and punching and Jason screaming at appellant to stop. Katie opened the door and also yelled at appellant to stop. She saw appellant on top of Jason, punching him on the face and side of the head. Terrified and not knowing what to do, Katie went back into the room, closed the door, and cried.

Katie walked out when it was quiet. Appellant said Jason had gotten up and run off. When Katie asked why appellant did that, appellant did not really have an answer other than that he was mad about the bicycle. Katie never saw Jason again, and appellant never brought up his name.

Katie also described appellant's conduct toward another roommate's dog. She stated appellant had a roommate, Dan N., who owned a little pug. The dog mostly stayed in Dan's room, but sometimes it wandered around the house.

---

**17** Early in her relationship with appellant, appellant and several other men lived in a house in the Shasta Dam area. Jason was at the house, and Katie assumed he was one of the men who lived there with appellant. There was a large hole in one of the walls. When Katie asked about it, appellant said they were roughhousing.

Katie saw appellant act aggressively toward the pug at least three times. The first time, the dog defecated in the house. Appellant got really upset, smeared the dog's face in the feces, and repeatedly punched the dog. When the dog ran, appellant found it, threw it on the ground, and kneed it, making it yelp. This went on for a while. Katie was afraid and told him the dog was too little to take what appellant was doing, but appellant did not respond. The dog was about a foot long and probably weighed 10 pounds. The same thing happened the other two times, only appellant grew more aggressive. Katie thought she was going to see appellant kill it. She later learned the dog had died.

Toward the end of their relationship, about seven months after they started dating, Katie asked appellant to remove the belongings he was keeping in the house she co-owned with her parents in Redding. He agreed to do so. When he met Katie at the house, he started loading his belongings into his pickup. He also apologized and kept asking why she would not give him a chance and why they could not work things out. He grew irritated, threw his golf clubs, and started hitting things. When Katie followed him into the house, he grabbed her clothes and personal belongings and threw them in the back of his pickup. Katie's mother, who had accompanied Katie to Redding that day, arrived at the house, but Katie asked her to give them more time, so she left. Appellant then stormed back into the house. He pulled a handgun from the back of his pants, held it up to his head, and then pointed it at Katie. He was yelling.

Appellant lowered the gun and started to sob. Katie took him into the bedroom, and they talked. She got him to hand over the gun, and she immediately unloaded it. Katie's mother arrived, and appellant "snapped." He pinned the mother against a wall and yelled at her and called her a bitch. The mother got him to calm down and start gathering up his belongings, but then he grew aggressive again. He started throwing things, then ran into a spare room and started punching the walls. Katie and her mother ran. Katie grabbed the key out of appellant's pickup, then she and her mother drove off.

The mother called 911. When the police arrived, Katie declined to press charges and did not mention the gun for fear it would make things worse.

2.     Cherilynn O.

Cherilynn O. and appellant were in an exclusive dating relationship in 2006. The relationship lasted about five months. At the beginning, and for about a month, appellant was charming and polite.

At some point, appellant moved in with Cherilynn and her roommate. When he moved in, Cherilynn stated his demeanor changed. He was very agitated all the time over little things, such as cooking dinner and not cleaning the kitchen fast enough. He would grab Cherilynn's arms to restrain her, scream at her, and call her names. Sometimes he would pin Cherilynn against the wall or throw her back on the bed, although he never hit her. This type of behavior happened a couple times a week, whenever appellant was agitated. During the three months appellant lived with Cherilynn, he also damaged the apartment by throwing dishes at the wall or punching the wall.

Cherilynn described appellant as having a quick temper. She stated he was violent and had a large ego, and everything that set him off was minor. Once, Cherilynn cooked dinner for appellant and three of his friends. She testified that when she did not clean up the kitchen fast enough, he restrained her, screamed in her ear that the house was a mess and it was embarrassing, and threw dishes at the wall. The friends were watching, but none tried to intervene.

Cherilynn stated appellant owned four guns that were always loaded. She claimed that one night, when Cherilynn would not have sex with him, appellant pointed a gun at her and said that if she would not have sex with him, then neither one of them needed to be alive. She was able to leave and go to her mother's home. Appellant later sent her an email regarding uncontrolled behavior and how sorry he was. She believed he was referring to this incident.

25.

On another occasion, Cherilynn stated appellant rented a houseboat for his birthday. While Cherilynn was sleeping downstairs, appellant slept with another woman upstairs. The next morning, Cherilynn asked appellant to get his stuff out of the house. He looked at her and spit in her face.

During the course of the relationship, Cherilynn called the police on appellant three times. She said he always ran off before officers arrived. Cherilynn stated that during the relationship, appellant tried to pick a number of fights with people and was very angry. Wherever he and Cherilynn were, if he did not like someone or someone looked at him wrong, he was agitated. Cherilynn never saw him fight, however.

After the relationship ended, appellant attempted to contact Cherilynn for a few weeks. On one occasion, he came to her apartment around 3:00 a.m. He screamed her name and tried to kick in the front door. He broke the door jamb, but did not get in. Cherilynn called the police, but appellant was gone by the time they arrived.

3.      Dan N.

Dan N. used to live and work with appellant, and also played rugby with him. At some point, Dan moved into a house with appellant. No one else lived there, although appellant's girlfriend, Katie, was often there. Dan had a pug dog that weighed about 20 pounds. Appellant had two boxers.

When Dan first moved in with appellant, the two got along well. They socialized together and were on the same rugby team. Appellant would get into an altercation with someone from time to time. On one occasion, appellant helped out someone who was getting beat up. This was the only fight Dan personally saw.

When Dan first moved in with appellant, his pug was three or four years old. While he was at work, she would stay in his room. She was house broken. She was not able to jump up on Dan's bed because it was too tall, and she weighed too much. Appellant was unemployed at the time. When Dan came home one day, appellant said the pug was acting funny and did not seem to feel well. Dan found the dog sitting on top

26.

of Dan's bed. Appellant said the dog had jumped up there by herself. He said he never laid a hand on her. The next day, her side started swelling up more. In another day, it was very bad, and her breathing was very labored. Dan took her to a veterinarian, where surgery was performed. The dog was at the veterinarian's office for just under two days. She did not survive.

Dan did not confront appellant, but immediately moved out of the house. He received a number of phone calls from appellant, asking for money to pay the rent and bills. When Dan refused, he was threatened multiple times with physical violence if he did not pay. Dan told appellant that he thought appellant killed the dog, but appellant denied it.

Dan never saw appellant beat his own dogs. They roughhoused and had fun. On one occasion, appellant and Dan were very intoxicated. Appellant confronted Dan in the garage and accused Dan of abusing appellant's dogs. Appellant was screaming and throwing things around.

When Dan saw appellant get mad, it was not a progressive process. Instead, it was like a light switch—on and off. Appellant would be having a good time one minute and punching holes in the wall the next.

Dan and appellant were on the same rugby team for less than a season. Dan described rugby as physical rather than violent. At some point, appellant was removed from the team by team vote, as his attitude was voted to be not in line with the team's views.

Katie was appellant's girlfriend the entire time Dan lived with appellant. Dan, who mostly stayed in his room, heard altercations between them, with hollering and things getting smashed. Appellant treated everyone, including Katie, with a demeaning attitude. During the eight months or so Dan lived in the house, three or four photographs were hung at random places to cover holes in the wall.

27.

# II

## DEFENSE EVIDENCE

### A.    Expert Testimony

Dr. Robert Rothfeder was an emergency physician who, before he left active practice, specialized in traumatic injuries.  Rothfeder reviewed Jimmy's medical records from birth through his stay at the children's hospital.

Rothfeder explained that Jimmy suffered a closed head injury, meaning the scalp and skull were not wounded and the brain was not open to the outside.  How such an injury presents to a layperson depends on the nature of the injury.  Some injuries would result in a loss of consciousness, while others would not initially.  Some would involve a loss of consciousness and regaining of consciousness.  If the person remains awake, a change of mental status will typically be seen.  The person will be less alert.  He or she might become confused, sleepy, or lethargic.  Vomiting is a common result of this type of injury.  If a subdural hematoma is present and continuing to bleed, eventually there will be loss of consciousness and abnormal neurologic motor signs.  There will be what is called posturing—an involuntary contraction of muscles that is an ominous diagnostic sign—and there may be seizures.  By the time it is apparent the person is not behaving normally, the observer typically will realize medical attention is needed.

Rothfeder explained that emergency medical technicians have training in CPR, transport, and the like.  The training assumes that someone with a head injury may have a broken neck.  If someone with a broken neck is not handled correctly, paralysis may result.  Protocol is to put the patient on a backboard, which is a rigid piece of plastic or plyboard, and to restrain the person and immobilize the neck, then transport as quickly as possible to the destination at which treatment will be provided.  Because time is of the essence, it is not a gentle process and minor bruising will often occur.  It would not be unusual to see bruising along the spine from a backboard.  Moreover, someone who is critically ill may bruise more easily than under normal circumstances.  In addition,

28.

grabbing Jimmy the way appellant described when when Jimmy fell in the bathtub could have caused bruising, as could catching Jimmy by the leg when Jimmy slipped when being swung up in the air.

From the CT scan, Rothfeder opined Jimmy had a mixed density subdural hematoma, meaning there was a suggestion that blood in the hematoma was of different ages. In his opinion, this was consistent with a bathbtub fall around 10:00 a.m., then a trip to the store, and then the swinging event sometime after 1:00 p.m. That Jimmy was sitting up on his own and looking around at things during the store trip was not inconsistent with a head injury. Rothfeder explained that there is a phenomenon called a lucid interval. A lucid interval is one in which a head injury takes place but the patient remains lucid, i.e., awake and responsive, for a period of time until the accumulation of blood reaches a sufficient volume and exerts an amount of pressure on the brain, because there is nowhere for it to escape, to cause a deterioration of brain function. He claimed a lucid interval could occur with subdural as well as epidural hematomas.

Rothfeder observed that a short fall is defined as a fall from two to three meters (approximately 6 to 10 feet), while a long fall is a fall from a second or third floor. He disagreed, to an extent, with Bruhn's opinion that a person Jimmy's size falling backwards and hitting his head on the edge of the bathtub was not significant enough to cause an injury. Rothfeder had seen very serious injuries in bathtub and shower falls. While there was no dispute that the majority of short falls, whether in bathtubs or somewhere else, do not result in serious injury, some do if all of the variables are adverse such as by having rapid movement against an unyielding surface with the impact occurring at a point of the head that is particularly vulnerable. Thus, while it was not typical, it was also not impossible.

In Rothfeder's opinion, Jimmy's bruises did not allow a doctor to determine the head injury was intentional. Jimmy's bruises predated the head injury. It was not known when or how they occurred, or who might have been involved. Even if a slap or bruise

29.

was determined to be child abuse, that would not affect any conclusions regarding what caused the head injury. They were completely separate events, and one did not contribute to the other.

**B.** **Appellant's Testimony**

Appellant and Mother met in 2012 at a car lot where appellant was a salesperson. They became friends and started dating within about a month. Mother and appellant ultimately decided to move in together. They got a house in December 2012, prior to Christmas.

Appellant identified photographs of Mother throwing Brooke up in the air and appellant throwing Jimmy up in the air; appellant making spaghetti with Jimmy standing to his right on the same side as the pot in which water was boiling for the noodles; and Jimmy and appellant putting their foreheads together. There were also photographs of Jimmy and appellant and/or the family doing things together. One photograph was from a camping trip during which Mother told appellant Jimmy slipped on some rocks and fell. Another photograph showed Jimmy with a bag of frozen vegetables on his head. Appellant said Jimmy had stood up underneath a table and hit his head. Appellant and Mother put the vegetables on him to stop the swelling.

Appellant also discussed photographs showing a bruise on Jimmy's face. Appellant stated there was a room at the house that was dedicated to Jimmy's train set. Jimmy and appellant were playing in there, and Jimmy slipped. When questioned by Whaley, appellant could not remember whether Jimmy struck appellant's hand or fell on the train tracks, but appellant stated the picture was taken to keep a record of everything because Mother was going through her divorce.

Appellant described the day of Jimmy's injury. He stated Jimmy slipped in the bathtub after breakfast. Appellant helped Jimmy out of the bathtub. Jimmy was crying, but it just seemed like a typical fall and Jimmy calmed down after drying off. Appellant then took the children to the living room to watch cartoons while he got ready to go.

30.

Appellant and the children then went to the store to buy diapers for Brooke and another piece for Jimmy's train set. As they left the store, they ran into the children's grandfather. They then went to a recycling facility that was shown on appellant's cell phone, but the facility was not there. They returned to the store parking lot to look for Jimmy's sunglasses, then drove to a fast-food restaurant, which was next to the parking lot. Jimmy threw up while they were in line at the fast-food restaurant. Appellant got drinks and food and decided they would just go home. Jimmy threw up once again on the way home.

Once at the house, appellant took the children inside. Appellant removed Jimmy's clothes, threw them in a laundry hamper, and told Jimmy to get dressed. Appellant went back to the car to clean up the vomit in the car.

Appellant spent 10 or 15 minutes cleaning. When he finished and went inside, Jimmy was not back. Appellant went to see what was taking him so long. Jimmy seemed "really down." Appellant gave him a pair of shorts to put on. Because Jimmy still seemed really upset, appellant picked him up and tried to make him happier. Appellant did not throw Jimmy high in the air but was lifting him up and coming back down like a swing. Brooke stepped in, and Jimmy slipped. Appellant tried to catch Jimmy's leg, but it happened so fast he could not.

Jimmy tensed up while on the floor and his eyes did not look right. Appellant thought he was having a seizure. Appellant phoned Mother, who told him to go to urgent care and she would meet him there. Appellant rushed out the front door and put Jimmy into the car. He went back for Brooke, but the front door had locked automatically. Appellant ran into the garage and shouldered open the door. It was also locked, and he broke the door jamb. He grabbed Brooke, returned to the car, and drove to urgent care. He was scared and in shock.

At some later point, Whaley contacted appellant. He voluntarily accompanied her to the police station and answered her questions. Appellant agreed that the police could

31.

look in his house.  He was trying to help any way he could.  When the police left, they had appellant's cell phone, as he had surrendered it during the first interview.  When the police returned around 8:00 or 9:00 p.m., they said they had some more questions to ask.  Appellant said he had nothing to hide, and he returned to the police station with them.

Appellant reiterated that when Jimmy fell in the bathtub, appellant did not think it was anything more than just a slip and fall.  Appellant stated that he did not do anything to intentionally hurt Jimmy that afternoon in the bedroom.  With respect to the second incident in which appellant was swinging Jimmy, appellant said he thought Jimmy was feeling better, and he was trying to cheer Jimmy up.  Appellant described it as "a horrible decision."  He did not initially tell anyone, whether medical personnel or police, about that incident, because he wanted to explain it to Mother.

Appellant stated he never met or communicated with Father, and that Mother was the primary source of information for what he told the police and what he knew about Mother's relationship with Father.

**ANALYSIS**

**I**

**EVIDENCE OF UNCHARGED PRIOR BAD ACTS**

**A.      Summary of Parties' Positions on Review**

Pursuant to Evidence Code section 1101, subdivision (b),[18] the trial court admitted evidence of uncharged prior bad acts committed by appellant against former intimate partners, former roommates, and household dogs to show a common plan or scheme, which requires the evidence " 'demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 25, quoting *People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

---

[18]      Subsequent statutory references are to the Evidence Code unless otherwise specified.

32.

In his opening brief, and again in supplemental briefing, appellant contends the trial court committed prejudicial error when it allowed the People to introduce testimony from various witnesses reflecting on his character for assaulting intimate partners, roommates, and household dogs. He attacks the admission of the evidence as error under both section 1101, subdivision (b) and section 352, and he argues the error raises due process concerns that warrant application of the standard of review under *Chapman*,[19] applicable to federal constitutional claims.

The People argue the evidence was admissible under two theories. First, admission was proper not to show a common plan or scheme, but to demonstrate a lack of accident under section 1101, subdivision (b). Second, most but not all of the evidence was also independently admissible as evidence of a propensity to commit domestic violence under section 1109. The People further argue that if any evidence was impermissibly admitted, it was subject to the state law standard under *Watson*[20] and should be deemed harmless error.

In supplemental briefing, appellant argues that these new theories of admissibility under section 1101, subdivision (b) to show lack of accident and under section 1109 as propensity evidence may not be relied upon to uphold the verdict. He contends the uncharged prior bad acts are not admissible to demonstrate his intent because the underlying act was contested rather than conceded or assumed,[21] and, relatedly, the

---

[19] Under *Chapman*, "the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

[20] Under *Watson*, "a 'miscarriage of justice' [requiring reversal] should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

[21] The premise of appellant's argument is that "evidence [of intent] may be used 'in cases where the proof of [the] defendant's intent is ambiguous, as when he admits the acts and denies the necessary intent because of mistake or accident.' [Citation.] Indeed, the standard framework for admission of evidence of other crimes is if there is no doubt that [the] defendant has

uncharged bad acts were so dissimilar and remote in time to the charged offense that it could not be probative of intent.

Appellant further argues the evidence cannot be admitted under section 1109 under a propensity theory because, one, he relied on admission under section 1101, subdivision (b) in forming his defense strategy and it would be unfair for us to rely on a different theory to uphold the verdict on review; and two, the prior bad acts evidence offered wholly fails to show he has a propensity toward child abuse. Appellant reasserts that the evidence should have been excluded under section 352 and claims that the error is reversible under either *Chapman* or *Watson* because there is more than a reasonable probability that the evidence impacted the jury's verdict.

Appellant also alleges that additional error arose when the prosecutor elicited uncharged prior bad acts evidence that fell outside the bounds of the trial court's admissibility determination. Appellant states this constituted prosecutorial misconduct and any failure to object during trial constitutes ineffective assistance of counsel.

For the reasons set forth below, we find no merit to appellant's unsupported assertion that it would be unfair for us to consider the admissibility of the uncharged prior

committed an act, but some question as to his intent in doing so." (*People v. Guerrero* (1976) 16 Cal.3d 719, 726, italics omitted (*Guerrero*).) However, the relevant principle is that " 'admission of other crimes evidence cannot be justified *merely* by asserting an admissible purpose.' " (*People v. Thompson* (1980) 27 Cal.3d 303, 319, italics added, quoting *Guerrero*, at p. 724.) "Evidence of intent is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 394, fn. 2, italics omitted.)

The California Supreme Court has explained that *Guerrero*, on which appellant relies, concerned evidence of a prior rape improperly admitted to show that the defendant murdered the victim while attempting to rape her, despite the absence of *any* evidence that sexual activity occurred during the charged offense. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 17.) The court stated that the prosecutor " 'may not conjure up an attempted rape [in the charged offense] … in order to introduce evidence of [prior] rape.' " (*Ibid*., quoting *Guerrero*, *supra*, 16 Cal.3d at p. 728.) Here, the prosecutor did "not conjure up" evidence of appellant's involvement in Jimmy's injury. Most obviously, in one version of events related by appellant, he claimed that on the day of the injury, he dropped Jimmy while throwing him or swinging him in the air to make him feel better. Thereafter, Jimmy appeared to have a seizure, according to appellant.

bad acts under section 1109. (See *People v. Turner* (2020) 10 Cal.5th 786, 807 (*Turner*).) Viewed through the lens of section 1109, we conclude that appellant was accused of an offense involving domestic violence (see § 1109, subd. (d)(3)), and that it was not an abuse of discretion for the trial court to admit other uncharged prior acts of domestic violence committed by appellant (see §§ 1109, subd. (a), 352). These conclusions foreclose appellant's claim of error and therefore, we need not determine to what extent the evidence was also cross-admissible on any theory under section 1101, subdivision (b), or reach the issue of prejudice. (*People v. Jones* (2012) 54 Cal.4th 1, 50–51 & fn. 12 (*Jones*).) Additionally, although we agree that some prior bad acts evidence adduced by the prosecutor exceeded the bounds the trial court's in limine rulings, defense counsel did not object, thereby forfeiting appellant's claim of error on appeal, and the admission of that limited evidence was harmless in any event. Based on this latter conclusion, we do not reach appellant's related ineffective assistance of counsel claim.

## B.     <u>Standard of Review</u>

"[W]e presume that a judgment or order of the trial court is correct, ' "[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown." ' " (*People v. Giordano* (2007) 42 Cal.4th 644, 666.) We review a trial court's ruling on the admission or exclusion of evidence for abuse of discretion. (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; *People v. DeHoyos* (2013) 57 Cal.4th 79, 131.) Under this standard, " ' "a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Jones* (2013) 57 Cal.4th 899, 924; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

"Our task is to review the trial court's *ruling*, not its reasoning. ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not

35.

be disturbed on appeal merely because given for the wrong reason. If right upon any theory of law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." ' " (*Turner*, *supra*, 10 Cal.5th at p. 807; accord, *People v. Brooks* (2017) 3 Cal.5th 1, 39; *People v. Zapien* (1993) 4 Cal.4th 929, 976.)

## C. Analysis

### 1. In Limine Rulings

Prior to trial, the prosecutor filed a motion in limine seeking admission of uncharged prior bad acts committed by appellant as evidence of his "intent, common scheme, plan, and motive to murder Jimmy" under section 1101, subdivision (b).[22] Appellant opposed the motion. Subsequently, both parties filed additional motions in limine the day before trial, including a motion by the prosecutor to admit the prior bad acts evidence under section 1109, which provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).)

---

[22] Section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.

"(c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

During the motions in limine hearing, the trial court heard extensive argument on the prior bad acts evidence. For reasons unclear from the record, neither the trial court nor the parties discussed section 1109. The trial court stated it was aware that the evidence could not be used to show predisposition under section 1101, subdivision (b), but the court considered it relevant to show a common plan or scheme, or intent  The trial court expressly focused on the prior bad acts committed within appellant's home against the people and animals he lived with. The trial court explained, in part, "It shows a pattern of common plan or scheme under [the] theory, I believe, of living with people of the opposite sex and having theses pretty intense outburst[s] that are either actual violence or threats of violence, threats of violence with a gun, actual violence, the slapping, the throwing in of the wall, the dogs."

As discussed in more detail below, the trial court concluded that testimony from Katie, Cherilynn, Dan, and Jason regarding appellant's temper and prior bad acts in the home, including against appellant's two boxers and Dan's pug, was admissible.[23] However, the court excluded evidence that appellant was in a bar fight and that one of his fights with Cherilynn occurred after he urinated throughout the house and she refused to have sex with him; evidence of his infidelity, including his exchange of texts with other women; and evidence of his postbreakup threats, obsessive phone calls, stalking, and peeping into windows. The trial court also excluded evidence of prior bad acts involving Katie's mother; Katie's cousin, Jessica S.; Tambra M., whom appellant threatened, along with her children, for talking to Katie; and Matt D., a manager at appellant's former job. With respect to the admissible incidents, the court warned the prosecutor not to belabor the details of the relationships and to focus on the admissible incidents.

---

[23]    Jason, a former roommate, did not testify at trial, but Katie witnessed appellant beat him and testified about the incident.

## 2. Legal Principles

"[E]vidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is [generally] inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a); accord, *People v. Baker* (2021) 10 Cal.5th 1044, 1088–1089 (*Baker*); *People v. Cottone* (2013) 57 Cal.4th 269, 285.) "The purpose of this evidentiary rule 'is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history.' " (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1176.)

However, "[t]hat general rule does not 'prohibit[] the admission of evidence that a person committed a crime ... or other act' to prove something other than a person's 'disposition to commit such an act.' [Citation.] For example, other-acts evidence may be admissible to prove motive, intent, or that 'a defendant in a prosecution for an unlawful sexual act ... did not reasonably and in good faith believe that the victim consented.' " (*Baker*, *supra*, 10 Cal.5th at pp. 1088–1089.) Furthermore, there are exceptions to the general rule. (*Id*. at p. 1089.) Subject to the constraints of section 352, discussed below, "section 1108 … permits evidence that a defendant accused of a sexual offense has committed another sexual offense, potentially showing a propensity to do so," and, relevant here, "section 1109 applies to certain evidence that a defendant accused of an offense involving domestic violence has committed other domestic violence." (*Baker*, at p. 1089.)

Together, these statutes reflect the Legislature's recognition that sexual offenses and domestic violence cases involve unique attributes. (*People v. Falsetta* (1999) 21 Cal.4th 903, 918 (*Falsetta*); *People v. Johnson* (2010) 185 Cal.App.4th 520, 532; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313 (*Jennings*).) They are "secretive offense[s], shrouded in private shame, embarrassment and ambivalence on the part of the victim, as well as intimacy with and intimidation by the perpetrator. The special relationship between victim and perpetrator in both domestic violence and sexual abuse

cases, with their unusually private and intimate context, easily distinguishes these offenses from the broad variety of criminal conduct in general.  Although all criminal trials are credibility contests to some extent, this is unusually—even inevitably—so in domestic and sexual abuse cases, specifically with respect to the issue of victim credibility." (*Jennings*, at p. 1313.)  The Legislature thus determined that evidence of this type is uniquely probative of a criminal defendant's propensity to commit sex offenses or domestic violence and policy considerations outweigh the general prohibition against propensity evidence.  (*People v. Cottone*, *supra*, 57 Cal.4th at pp. 285–286; *Falsetta*, at pp. 911–912; *Jennings*, at p. 1313.)

        3.      <u>Review of Admissibility Under Section 1109</u>

As an initial matter, we reject appellant's assertion that we should not consider the admissibility of the evidence under section 1109 because the trial court did not admit the evidence or otherwise address it under that statute.  Appellant argues it would be "unfair" to him, and had admission of the evidence been premised on section 1109, he "would have introduced multiple character witnesses to attest to a variety of character traits raised by the other acts evidence, such as his treatment of dogs, kindness to children, and other positive traits."  However, the authority appellant relies on is inapposite and does not support the proposition that it is improper to consider admissibility under section 1109 for the first time on review,[24] a proposition that would eviscerate the longstanding appellate principles governing the task at hand.  (*Turner*, *supra*, 10 Cal.5th

---

[24]    Appellant did not cite any authority for this argument in his second supplemental brief. In his earlier reply brief, he cited *People v. Kennedy* (2005) 36 Cal.4th 595, 612 (claim of coerced testimony not raised in trial court forfeited on appeal); *People v. Tully* (2012) 54 Cal.4th 952, 979–980 (claim that traffic detention was excessive & questioning unjustified forfeited by failure to raise issue in trial court); *People v. Lilienthal* (1978) 22 Cal.3d 891, 896 (to challenge search & seizure on appeal, the defendant must move for return of property or to suppress the evidence in the trial court); and *People v. Hawkins* (2012) 211 Cal.App.4th 194, 203 (same). These and other cases cited by appellant are neither controlling nor persuasive in the context of reviewing a trial court's admission or exclusion of evidence.

at p. 807; *Jones*, *supra*, 54 Cal.4th at p. 50; see *In re Kingsley's Estate* (1892) 93 Cal. 576, 577 ["To justify a reversal, it is incumbent upon the appellant to show an erroneous ruling, and not merely bad reasoning or mistaken views of the law"].)

While appellant is entitled to present a complete defense and to a fundamentally fair trial (e.g., *California v. Trombetta* (1984) 467 U.S. 479, 485; *Strickland v. Washington* (1984) 466 U.S. 668, 684–685), "[t]hat right does not encompass the ability to present evidence unfettered by evidentiary rules." (*People v. Brown* (2003) 31 Cal.4th 518, 538.) Indeed, application of the ordinary rules of evidence does not impermissibly infringe on a defendant's right to present a defense. (*People v. Mincey* (1992) 2 Cal.4th 408, 440.)" (*People v. Thomas* (2021) 63 Cal.App.5th 612, 627.)

Appellant takes the position it is unfair for us to consider admission under section 1109 because he relied on admission under section 1101, subdivision (b) in forming his trial strategy. However, he fails to identify any legal or factual support for a claim of detrimental reliance in this context, and it cannot be reconciled with long-settled, controlling law; namely, that where, as here, the *facts* of the uncharged prior bad acts were known and litigated during motions in limine, and the evidence was then admitted at trial, our task is to consider whether the evidence was properly admitted on any *legal* ground. (See *Turner*, *supra*, 10 Cal.5th at p. 807.) Appellant does not explain how our consideration of the legal basis for admission under a section of the Evidence Code intended to apply specifically to this type of evidence is unusual, let alone impermissible, and we discern no basis for meaningfully distinguishing the routine application of the general rule in this case from the other countless cases applying the rule.[25]

---

[25] We point out that "[c]ounsel is presumed competent and informed as to applicable constitutional and statutory law" (*People v. Barrett* (2012) 54 Cal.4th 1081, 1105; accord, *People v. Blackburn* (2015) 61 Cal.4th 1113, 1123–1124), section 1109 has been in effect for decades, and the prosecutor filed a motion in limine relying on section 1109. Thus, there is no support for a suggestion that defense counsel was unaware of section 1109 in the trial court. Rather, because section 1109 allows for the introduction of evidence showing a propensity to commit domestic violence and child abuse, as we shall discuss, it would have been detrimental to

The California Supreme Court's decision in *Jones* is instructive on this issue. In that case, the court considered a challenge to a prior sex offense admitted under section 1101, subdivision (b). (*Jones*, *supra*, 54 Cal.4th at p. 50.) The trial court, "to 'avoid issues on appeal,' " refused to consider admission of evidence under section 1108 because a challenge to the statute's constitutionality was pending before the California Supreme Court. (*Jones*, at p. 50.) Posttrial, the high court upheld section 1108 as constitutional in *Falsetta*.

In reviewing the admission of the prior sex offenses in *Jones*, the California Supreme Court explained, "Regardless of the admissibility of the challenged evidence under Evidence Code section 1101, subdivision (b), there was no error in the Toni P. evidence being considered by the jury because it was admissible under Evidence Code section 1108 to show that [the] defendant had a predisposition to commit the sexual offenses in this case. (See [*People v.*] *Davis* [(2009)] 46 Cal.4th [539,] 603, fn. 6; *People v. Smithey* (1999) 20 Cal.4th 936, 972 (*Smithey*) [' " ' "[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' [Citation.]" '].) Admissibility under Evidence Code section 1108 does not require that the sex offenses be similar; it is enough the charged offense and the prior crimes are sex offenses as defined by the statute. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41.) That criterion is clearly met here." (*Jones*, *supra*, 54 Cal.4th at p. 50.)

---

the defense to raise the issue of section 1109 in the trial court. Trial counsel was undoubtedly aware of this and may have reasonably concluded that the better strategy was to attempt to limit the admission of prior bad acts evidence under section 1101, subdivision (b), which provides a narrower ground for admission.

Here, as in *Jones*, the facts of the prior bad acts were known and litigated in the trial court, and the shortcoming at issue is merely the trial court's failure to cite or discuss section 1109 as a legal basis for admission. Appellant's contention that we may not consider the admission of the evidence under section 1109 is contrary to binding authority, and we reject it.[26] However, in the interest of making a complete record given appellant's assertion of detrimental reliance, we briefly address his trial strategy.

---

[26] Although not a theory advanced by appellant, the dissent asserts the People knowingly or strategically waived any argument on appeal that the evidence at issue was properly admitted under section 1109. The dissent takes the position that "[t]he record is clear that the prosecutor strategically prioritized admission of the character and prior act evidence under section 1101, subdivision (b), to further her trial strategy, and chose not to obtain a ruling regarding admission of a limited subset of prior uncharged domestic violence offenses under section 1109." (Dis. opn. *post*, at p. 60.) Notably, the dissent neither cites to any authority nor identifies any legal theory supporting this startling proposition, which is contrary to the standards governing appellate review, as we have discussed in depth, and it finds no support in the record. The dissent describes reliance on the doctrine of implied waiver, but we are not persuaded it has any application in this context. (*In re Campbell* (2017) 11 Cal.App.5th 742, 756 ["An 'implied waiver' is '[a] waiver evidenced by a party's decisive, unequivocal conduct *reasonably inferring* the intent to waive.' (Black's Law Dict. (10th ed. 2014) p. 1813, col. 2, italics added.)"].) The prosecutor filed a motion to admit the evidence under section 1109, which is fatal to a claim the issue was knowingly waived, and the dissent fails to explain how focusing exclusively on section 1101 was of any strategic benefit to the prosecutor given that section 1109 specifically provides for the admission of propensity evidence in cases such as this. Thus, we strongly disagree that there is any basis, grounded in law or in fact, for the dissent's representation that the prosecution either actually or "strategically" waived the issue of section 1109 for purposes of appellate review.

The dissent attempts to distinguish the decision in *Jones*, on which we rely in part, because the case did not involve a situation of "strategic waiver" by the prosecution and the trial judge in *Jones* declined to consider admissibility of the evidence under section 1108. (Dis. opn. *post*, at pp. 62–63.) As stated, the dissent's invocation of prosecutorial waiver is not supported by either citation to law or a reasonable reading of the record in this case; and it is unclear why the dissent believes it is of any import that in *Jones*, it was the trial judge who elected to rely on section 1101 rather than section 1108, and here, it was the prosecutor who elected to rely on section 1101 rather than section 1109. Our point stands that on review, where, as here, the facts were known to the parties and the issue is the legal ground for admission, reviewing courts consider the ruling rather than the reasoning and affirm if the ruling is correct under any theory of law. (*Jones*, *supra*, 54 Cal.4th at p. 50.) This principle is deeply entrenched in the law, is foundational to appellate review, and clearly applies in this case, as it did in *Jones*.

Appellant testified in his defense and he called two character witnesses, a former neighbor who knew him in 2009 and his father. The neighbor testified that Dan's pug regularly escaped from the house, and appellant would retrieve her and bring her home. During one incident, appellant tossed his truck keys to the neighbor, told the neighbor to meet him down the road, and diligently pursued the dog through a foxtail-filled ditch in his effort to catch her and bring her home safely. The neighbor, who also had dogs, testified that appellant was good to Dan's pug, loved dogs, and was crazy about his own two boxers.

Appellant's father testified as well. He identified photographs of his wife's mother holding Jimmy and Brooke on Thanksgiving Day, appellant's two boxers with his wife's dog, appellant teaching one of his dogs to shake hands, and appellant with one of his boxers leaning up against him. He also identified several photographs of appellant with Katie, including one taken with appellant's brother, who has Down Syndrome, and one taken in 2011 after appellant and Katie broke up. He stated that he saw appellant with appellant's dogs "[a]ll the time"; appellant would train his dogs, and he never saw appellant act abusively toward them. Appellant's father did not know Cherilynn, but he knew Katie and testified that she never told him appellant was stalking her or asked him for any help with appellant.

During Katie's testimony, she, too, stated that appellant "really cared about" his dogs and that aside from the incidents of abuse, he "showed a lot of love towards them." She also stated that appellant was good with his brother and cared for him.

Thus, appellant introduced some evidence to refute the prior bad acts evidence, and the record expressly reflects that the trial court and defense counsel were concerned over allowing in evidence of appellant's good character that would inadvertently open the door to the introduction of additional prior bad acts evidence against him. Critically, the trial court did not preclude appellant from introducing additional evidence. To the contrary, the court specifically informed appellant prior to trial that if he wanted to

43.

proffer testimony other than that discussed during the in limine hearing, the court would entertain the issue and give appellant a ruling. As such, appellant's argument that he would have pursued a different defense strategy had the trial court expressly admitted the evidence under section 1109 is unpersuasive.

4. Prior Acts of Domestic Violence Admissible Under Section 1109

a. Relevant Definitions

We first consider whether the testimony by Cherilynn, Katie, and Dan was admissible under section 1109 in a criminal action stemming from the death of a child. Appellant argues it is not, but we disagree. Given the statutory definitions set forth below, appellant was charged in this case with an offense involving domestic violence and, therefore, evidence of his prior acts of domestic violence was admissible under section 1109, subject to section 352. (§ 1109, subds. (a)(1), (d)(3); see *People v. Wang* (2020) 46 Cal.App.5th 1055, 1076–1077 (*Wang*) [murder of the defendant's wife's parents was an offense involving domestic violence that allowed for admission of a prior act of domestic violence against wife]; *People v. Megown* (2018) 28 Cal.App.5th 157, 166 (*Megown*) [crime committed against cohabitant's mother in presence of cohabitant an offense involving domestic violence where it caused cohabitant to fear injury to her mother]; *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1144 ["Section 1109 applies if the offense falls within the Family Code definition of domestic violence even if it does not fall within the more restrictive Penal Code definition"]; *People v. Dallas* (2008) 165 Cal.App.4th 940, 952–953 & 956 [under section 1109, evidence of prior acts of violence against women and children admissible against a defendant charged with child abuse because statutory definition of domestic violence applies both to the evidence admissible and the type of prosecution]; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1237 [murder of the defendant's ex-girlfriend an offense involving domestic violence, and "[a] defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder"].)

As previously stated, section 1109 provides, in relevant part, that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."[27]  (§ 1109, subd. (a)(1).)  " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code.  Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."  (§ 1109, subd. (d)(3).)

Under the narrower definition set forth in Penal Code section 13700, domestic violence is abuse, defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another" (*id*., subd. (a)), that is "committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship.…'[C]ohabitant' means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship.  Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties

---

**27**     Although we are concerned here with domestic violence, the statute also applies to offenses involving, and prior acts of, child abuse and abuse of an elder or dependent person. (§ 1109, subd. (a)(2)–(3).)  Child abuse "means an act proscribed by Section 273d of the Penal Code" (§ 1109, subd. (d)(2)), which is the willful infliction "upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition" (Pen. Code, § 273d, subd. (a)).

45.

hold themselves out as spouses, (5) the continuity of the relationship, and (6) the length of the relationship" (*id.*, subd. (b)).

Under the broader definition set forth in Family Code section 6211 and subject to a five-year time limitation, domestic violence is defined, in relevant part, as "abuse perpetrated against … [¶] … [¶] … [a] cohabitant or former cohabitant, as defined in Section 6209." (Fam. Code, § 6211, subd. (b).) Family Code section 6209 defines a cohabitant as "a person who regularly resides in the household. 'Former cohabitant' means a person who formerly regularly resided in the household." (Fam. Code, § 6209.)

Thus, while this was a prosecution for an offense involving child abuse under section 1109, as appellant claims, it was *also* a prosecution for an offense involving domestic violence, allowing for the introduction of other evidence demonstrating appellant's propensity to commit domestic violence, subject to the constraints of section 352. (See § 1109, subd. (d)(2)–(3); Fam. Code, § 6211; *Wang*, *supra*, 46 Cal.App.5th at p. 1077; *Megown*, *supra*, 28 Cal.App.5th at p. 166; *People v. Ogle*, *supra*, 185 Cal.App.4th at p. 1144; *People v. Dallas*, *supra*, 165 Cal.App.4th at p. 953.)

b.     Incidents Involving Cherilynn and Katie

Turning to the admission of the challenged evidence, Cherilynn and Katie were cohabitants[28] in intimate relationships with appellant and therefore, the prior acts of abuse committed against them constitute domestic violence under the narrower definition in section 1109, which is not subject to the five-year time limitation. (See § 1109, subd. (d)(3); Pen. Code, § 13700.) The People, without elaboration, concede that Cherilynn's testimony is inadmissible under section 1109. A reviewing court is not bound by a party's concession, however (*People v. Vivar* (May 3, 2021, S260270) 11 Cal.5th 510, __ [2021 WL 1726827, at*12], quoting *Desny v. Wilder* (1956) 46 Cal.2d

---

[28]     Although Katie only lived with appellant on weekends, the extent of her cohabitation is not material given that she and appellant were in a dating relationship at all relevant times.

715, 729), and to the extent there is a question as to the admissibility of Cherilynn's testimony under section 1109, it lies with section 352 rather than with any categorical preclusion under section 1109.

### c. Incidents Involving Jason and Dan

Jason and Dan were platonic roommates of appellant's and therefore, any evidence of uncharged misconduct involving them constitutes domestic violence only under the broader Family Code definition, which applies to nonintimate household members but is subject to a five-year limitation. (See § 1109, subd. (d)(3); Fam. Code, §§ 6211, subd. (b), 6209.) As the fatal injury to Jimmy occurred in March 2013, and Jason and Dan lived with appellant in 2009, any incidents of abuse involving them fall within the five-year window and qualify as domestic violence within the broader definition.

### d. Animal Abuse

Finally, with respect to the evidence of animal abuse, domestic violence within the meaning of section 1109, subdivision (d)(3), includes abuse that intentionally or recklessly places the victim "in reasonable apprehension of imminent serious bodily injury to himself or herself, or another," as set forth above (Pen. Code, § 13700, subd. (a)). Under that definition, appellant's abuse of his own dogs and Dan's dog in Katie's presence constitutes domestic violence to the extent it instilled in her a fear of harm, and she testified to that effect. (*Megown*, *supra*, 28 Cal.App.5th at p. 166 [crime against girlfriend's mother domestic violence because it caused girlfriend to fear for her mother].)[29]

In addition, in *People v. Kovacich* (2011) 201 Cal.App.4th 863, 893–895, the Court of Appeal concluded that animal abuse qualifies as domestic violence under the

---

[29]    Katie testified that she did not want to "piss [appellant] off," having seen what he did to his dogs and having been threatened by him. Notwithstanding the dissent's contrary claim, this is sufficient to show that the animal abuse witnessed by Katie qualified as " '[a]buse' … placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

broader definition subject to the five-year limitation. (See Fam. Code, §§ 6211, 6203, subd. (4) [defining "abuse" under the Family Code as "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320," which includes animal abuse].) The animal abuse witnessed by Katie occurred within that window.

### e. No Abuse of Discretion

The crime in this case was committed in 2013 against the young child of appellant's intimate partner, who resided in the same household as appellant and his partner. In admitting the uncharged prior bad acts evidence, the trial court limited the incidents to those acts of abuse that occurred within the confines of appellant's home against people and animals who resided there with him. Although the court failed to cite to section 1109, the record expressly reflects it focused on incidents of domestic violence committed by appellant in secret within the privacy of the home. Appellant asserts that the charged crime and uncharged prior bad acts are not sufficiently similar to qualify for admission under section 1109, but as we have explained, both the charged crime and the uncharged prior bad acts involve domestic violence within the meaning of section 1109.[30] As the California Supreme Court stated in *Jones*, subject to section 352, admission of propensity evidence does not require similarity; "it is enough the charged offense and the prior crimes are" qualifying offenses within the meaning of the statute. (*Jones*, *supra*, 54 Cal.4th at p. 50; accord, *Baker*, *supra*, 10 Cal.5th at p. 1089; *People v. Rhoades* (2019) 8 Cal.5th 393, 412–413 (*Rhoades*).) As such, it was within the trial court's discretion to admit evidence of uncharged prior acts of domestic violence in this

---

[30] Appellant relies on *People v. Earle* (2009) 172 Cal.App.4th 372 for support. We note that, one, the decision predates the California Supreme Court's decision in *Jones* and, two, the Court of Appeal in *Earle* did not reach the question of "whether Evidence Code section 1108's exception to the rule against propensity evidence extends to proof of a *wholly different crime*…." (*Earle*, at p. 396.) Instead, the court concluded, in the context of probative value versus prejudicial impact, that the defendant's prior commission of indecent exposure was irrelevant to the charged assault. (*Id*. at pp. 397–400.) Finally, as the People point out, in this case, the charged crime and the uncharged prior bad acts all involve assault.

prosecution for domestic violence, and we find no abuse of that discretion under section 1109.

### 5. Section 352

#### a. Trial Court Conducted Section 352 Analysis

In accordance with due process considerations, section 352 limits the admissibility of domestic violence evidence under section 1109. (*Baker*, *supra*, 10 Cal.5th at pp. 1089, 1090, fn. 6; *Jennings*, *supra*, 81 Cal.App.4th at p. 1314.) The statute provides: "The court in its discretion may exclude evidence if its probative value is *substantially* outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create *substantial* danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352, italics added.)

"In the context of Evidence Code sections 1108 and 1109, a defendant's propensity to commit sexual offenses or domestic violence is not an extraneous factor; it is relevant to the guilt of the accused—and evidence tending to show that propensity has probative value." (*Baker*, *supra*, 10 Cal.5th at p. 1089.) Propensity evidence may not be deemed prejudicial per se, but trial courts have a duty to carefully consider the admission or exclusion of evidence under section 352. (*Falsetta*, *supra*, 21 Cal.4th at pp. 916–917.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence[, however]. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638; accord, *People v. Johnson* (2019) 8 Cal.5th 475, 521; *Wang*, *supra*, 46 Cal.App.5th at pp. 1075–1076.)

"[A]lthough the record must affirmatively show that the trial court weighed prejudice against probative value in admitting evidence of prior bad acts [citations], the trial judge 'need not expressly weigh prejudice against probative value—or even expressly state that he has done so [citation.].' " (*People v. Padilla* (1995) 11 Cal.4th 891, 924, overruled in part on another ground by *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 344.) Rather, we may "infer an implicit weighing by the trial court on the basis of record indications well short of an express statement." (*Padilla*, at p. 924; accord, *Rivera*, at p. 344.)

In this case, the record expressly reflects that the trial court conducted the requisite balancing under section 352. In addition to the parties' written motions in limine addressing the issue, the parties and the trial court referred to section 352 and probative value versus prejudice during the hearing. Finally, the trial court expressly excluded some of the evidence proposed by the prosecutor because it fell outside the scope of domestic abuse and because its probative value was outweighed by its prejudicial impact under section 352.

In particular, the court excluded testimony by Katie's cousin, Jessica, who lived with Katie and reported that after Katie broke up with appellant, he stalked them, peeped in the windows of their house, beat on the door, took a swing at Jessica, and called Jessica at work in his pursuit of Katie, to the point that Jessica was frightened. The court also excluded evidence that appellant threatened "to end [Tambra]" and "make [her] kid disappear" after she met up with Katie; evidence that appellant was terminated from his job due to his violent temper; evidence that appellant verbally abused Katie's mother, charged her, and spit in her face; and other evidence of acts that occurred after appellant's relationships ended or did not occur within a domestic setting. Thus, the record reflects that the trial court carefully considered the prior bad acts evidence and excluded a sizeable portion of it, which more than suffices to demonstrate that the trial court

discharged its duty under section 352.  (*People v. Padilla*, *supra*, 11 Cal.4th at p. 924; accord, *People v. Rivera*, *supra*, 7 Cal.5th at p. 344.)

        b.      <u>No Abuse of Discretion</u>

Cherilynn and appellant dated and lived together for approximately five months in 2006, and the incidents involving Katie, Dan, Jason, and the dogs occurred in 2009.  The trial court admitted various incidents of abuse that occurred during appellant's relationships with the victims, including his acts of screaming, spitting, hitting, throwing them, and threatening them with guns.  The court also admitted evidence that appellant screamed, hit, kicked, and threw his and Dan's dogs in 2009, and that Dan's dog died several days after being abused.

Under section 352, the trial court " 'must consider such factors as [the prior act's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other … offenses, or excluding irrelevant though inflammatory details surrounding the offense.' "  (*Baker*, *supra*, 10 Cal.5th at p. 1098, quoting *Falsetta*, *supra*, 21 Cal.4th at p. 917.)

We find no abuse of discretion under section 352.  The charged crime in this case involved a fatal, closed head injury to a young child.  The prosecution introduced evidence that the head injury was inconsistent with appellant's initial story that Jimmy slipped in the bathtub and hit his head in the morning, and it was inconsistent with his subsequent story that he dropped Jimmy in the afternoon while trying to make him feel better by throwing or swinging him in the air.  Further, when Jimmy was brought to the hospital, he had other "highly suspicious" injuries on his body consistent with abuse, and photographic evidence of some of Jimmy's injuries was found on appellant's phone.

51.

Like the charged offense, the prior bad acts evidence also involved acts of physical abuse inflicted on people and animals residing in appellant's household, the result of appellant's explosive temper. The prior bad acts differed from the charged offense only in the sense that the target differed: intimate partners, roommates, and household animals versus a resident child. However, the evidence of appellant's prior acts clearly demonstrates a pattern of domestic violence, hidden within the privacy of the home and involving the perpetrator's uncontrolled temper, physical abuse, and dominance over household members, be it intimate partners, roommates, animals, or, in the case of the charged crime, a child. (E.g., *Baker*, *supra*, 10 Cal.5th at p. 1099 [trial court did not err in admitting evidence of physical and sexual abuse under §§ 1101, 1108, & 1109 to show " 'very demonstrable pattern of escalating violence towards women that he's been romantically involved with, tending to control these women, assaulting them physically, and sexually assaulting them particularly when they break up with him or rebuff him' " & to show " 'his motive, his intent, his common scheme or plan, lack of consent with regard to the sexual offenses' "]; *Rhoades*, *supra*, 8 Cal.5th at pp. 411–413 [in case involving sexual assault & murder of eight-year-old boy, no abuse of discretion under section 352 in admitting evidence the defendant molested his four-year-old step granddaughter *and* sexually assaulted a female acquaintance]; *People v. Merchant* (2019) 40 Cal.App.5th 1179, 1193 [no abuse of discretion under section 352 where the record reflected "the trial court carefully weighed relevant factors to admit acts that bore a reasonable similarity to the charged offenses"].) As the Court of Appeal explained in *People v. Kerley*,

> "[T]he Legislature concluded that, in domestic violence cases in particular, a history or pattern of domestic violence is very probative. [¶] ' "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If

52.

we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all." ' " (*People v. Kerley* (2018) 23 Cal.App.5th 513, 535–536.)

Further, the appellate court recognized in *People v. Kerley*, *supra*, 23 Cal.App.5th 513, that evidence of multiple incidents of abuse is more probative than evidence of only one or two incidents, and "it is the frequency, regularity, and severity" of the abuse "that infuses [the] propensity evidence with probative strength." (*Id.* at p. 536.) Here, intermingled with periods of calm and loving behavior, appellant engaged in a pattern of rage-driven physical violence against people and animals he lived with and otherwise cared for. This constitutes a domestic violence pattern, and the probative value of the uncharged prior bad acts evidence was substantial given that the charged offense involved assaultive domestic violence committed against Jimmy.

In addition, the prior bad acts evidence was independent of the crime committed against Jimmy, and the acts were not particularly remote. The incidents involving Katie, Jason, Dan, and the dogs occurred only four years before the charged crime, and the incidents involving Cherilynn occurred only seven years before the charged crime. (See *Baker*, *supra*, 10 Cal.5th at p. 1091 [21 years not too remote]; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1099 [30 years not too remote].) Nor was the evidence confusing, misleading, distracting, or unnecessarily cumulative.

The trial court took care in this case to limit the evidence admitted. In addition to excluding witnesses and testimony that related to appellant's postrelationship behavior and other prior bad acts that occurred outside the walls of the home, the trial court precluded the prosecutor from getting into the general details of appellant's domestic relationships and directed her to focus on the incidents themselves. The court also precluded the prosecutor from getting into some of the seamier details, such as the

allegation that one of the incidents involving Cherilynn occurred after appellant urinated throughout the house and she then refused to have sex with him.

We recognize that trial courts must take great care in weighing the admission or exclusion of evidence under section 352, and that certain types of evidence, including animal abuse, can be particularly sensitive in nature. However, none of the evidence admitted here, including the animal abuse, was more inflammatory than the charged crime involving the death of a young child whose body bore other "highly suspicious" injuries indicative of abuse.

In sum, the charged crime was one of domestic violence, the uncharged prior bad acts were highly probative of appellant's propensity to commit acts of domestic violence, and the probative value of the evidence was not "substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice .…" (§ 352.) Accordingly, we find no abuse of discretion under section 352.

6.     Prosecutor's Violation of In Limine Rulings

At times, the prosecutor in this case overstepped the bounds of the trial court's in limine rulings, both in direct questioning and, arguably, by failing to control her witnesses to the extent their answers touched on issues excluded by the trial court. For example, the prosecutor asked Dan during direct examination if appellant was removed from their rugby team and why, and she inquired into a bar fight appellant was involved in and what happened after Dan moved out of the house, including whether appellant threatened him.[31] During cross-examination of appellant, she asked appellant if he got voted off the ruby team for being too aggressive and violent. The prosecutor also inquired into appellant's postbreakup behavior with Cherilynn during direct examination,

---

[31]     Appellant's contention that the prosecutor impermissibly elicited evidence he was demeaning and disrespectful is meritless, however. This evidence came out when the prosecutor was properly questioning Dan about what he saw and heard in the house as related to appellant's treatment of Katie.

54.

and Katie's testimony regarding the incident when appellant was removing his belongings arguably became too detailed with respect to appellant's behavior toward Katie's mother. Although the rugby team incident was not addressed during the in limine hearing, that line of questioning went beyond the bounds of the trial court's in limine rulings because it pertained to bad acts outside of appellant's immediate household, and the trial court expressly precluded other such evidence concerning bar fight situations, the threats to Katie's mother, and appellant's postrelationship behavior.

The trial court also precluded the prosecutor from going into details of appellant's infidelity. Subsequently, some evidence that appellant was unfaithful to Cherilynn and Katie, including that he received a text of another woman's breasts, came in during their testimony on direct examination, but it was raised in the context of what precipitated admissible incidents of violence against them by appellant. Trials are often unpredictable, and it is not reasonable to expect the attorneys trying the case to anticipate every potentially problematic witness response. It is also not reasonable to require the parties to pare their evidence down to such a point that it becomes meaningless in isolation or confusing to the jury. Viewed in context, we are not persuaded that the mention of appellant's infidelity violated the trial court's in limine ruling.

Regardless, appellant advanced no objections to any of the testimony on the ground it violated the trial court's in limine rulings. "It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853.) An objection allows " 'the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' " (*Seumanu*, at p. 1328; accord, *Daveggio and Michaud*, at p. 853.) The failure to object is excused if an objection would have been futile or if an admonition

55.

would not have cured the harm.  (*Seumanu*, at p. 1328; *Daveggio and Michaud*, at p. 853.)

Here, a timely objection would have allowed the trial court to limit the testimony and admonish the jury, as appropriate.  Appellant was aware of the bounds of the in limine rulings and nothing in the record suggests an objection would have been futile or the harm incurable.  Appellant may not now complain about questions or testimony that did not prompt his objection in the first instance during trial.[32]  (§ 353; *People v. Lightsey* (2012) 54 Cal.4th 668, 719.)

Forfeiture notwithstanding, the evidence that contravened the in limine rulings was brief in nature and was significantly less inflammatory than either the charged crime or the propensity evidence properly admitted.  For example, the evidence that appellant was removed from the rugby team was limited to a single response during the prosecution's case-in-chief.  Dan stated, "[Appellant's] attitude was unanimously voted to be not in line with the team's views.  So he had been asked to be removed by a couple of the—the president of the club or whatever.  Then a number of us, myself included,

---

[32]    The dissent describes our reliance on this principle as contrary to law.  The dissent is incorrect.  By virtue of the exclusion of some of the evidence pretrial, appellant secured a favorable ruling.  In those instances where the prosecutor later exceeded the bounds of the trial court's in limine rulings and introduced verboten evidence, appellant could have and should have objected.  The issue is the prosecutor's subsequent introduction of evidence in direct violation of the trial court's in limine rulings, an error which could not have been addressed pretrial and which was not objected to by appellant at the time it arose.  (*People v. Ramos* (1997) 15 Cal.4th 1133, 1172 ["While 'Evidence Code section 353 does not exalt form over substance' [citation], it does require sufficient specificity of evidence and legal grounds for the opposing party to respond if necessary, for the trial court to determine the question intelligently, and for the appellate court to have a record adequate to review for error"].)  This situation is readily distinguishable from that in which a defendant moves in limine to exclude evidence on a specific ground, the trial court denies the motion, and the evidence, having already been ruled admissible by the trial court, is introduced.  In that instance, depending on the specific circumstances of the case, further objection may not be required to preserve the claim.  (*Id.* at p. 1171; *People v. Morris* (1991) 53 Cal.3d 152, 189 ["[M]ere repetition of the same objection advanced on the motion *in limine* would serve no useful purpose"], disapproved on another ground by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

actually had [his] back and asked if that was a good idea. He was a good player. A lot of us liked him at the time. So we ended up having a vote. A number of us, myself included, voted for him. But he was ultimately voted off the team." Not only did this evidence include some information favorable to appellant, but the reason for his removal was never specified, either during Dan's direct testimony or during appellant's later cross-examination.

Evidence of the bar fight similarly included information favorable to appellant in that Dan testified appellant became involved in the defense of someone being "jumped," and the evidence was benign regardless. With respect to the postbreakup behavior, it was relatively brief and not particularly detailed. In view of the record as a whole, we conclude that any evidence admitted in violation of the trial court's in limine rulings was comparatively minor and its admission resulted in no prejudice to appellant under either standard of review.[33]

In reaching this conclusion, we note that contrary to appellant's arguments, this was not a particularly close case. The foundational issue in this case was whether Jimmy's injuries and, therefore, death were caused by domestic violence related abuse. There was no meaningful dispute that if abuse caused the injuries, appellant was the perpetrator of that abuse.

The jury was ultimately presented with partially overlapping explanations for Jimmy's injuries both as given by appellant to various medical or law enforcement personnel and as he described at trial. Essentially, the explanation given was that Jimmy slipped and fell in a bathtub that morning, threw up later that day, and was subsequently

---

[33] "Prosecutorial misconduct requires reversal when it 'so infect[s] a trial with unfairness [as to] create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury.' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 795; accord, *Rhoades*, *supra*, 8 Cal.5th at p. 418.)

dropped by appellant as they were playing.  Appellant also alleged Jimmy bruised easily and they wrestled a lot.[34]

This explanation was contrasted with, among others, the bruising below Jimmy's eye, on his legs, and near his groin, all of which were inconsistent with normal play but consistent with abuse.  It was further contrasted with the medical opinions offered that the injury Jimmy suffered to his head was equivalent to a car accident or intentional shaking and not to a slip and fall.  And it was strongly contradicted by testimony that periods of lucidity after injury were not associated with the type of head injury Jimmy suffered, further calling into question appellant's explanation, as a fall before heading to the store was not likely.

In an attempt to downplay the evidence presented, appellant focuses heavily upon a claimed contradiction between the expert testimony presented by the prosecution.  Specifically, appellant contrasts the testimony from Bruhn that there "had to be an element where Jimmy was slammed onto the floor to produce this injury this quickly," and Johnson, who ultimately stated he had "no earthly idea how the subdural hematoma got there.  What [he did] know is that it didn't get there from an external trauma."  Appellant argues this conflict demonstrates that the prosecution had failed to present a viable theory as to what actually caused Jimmy's injuries.  We do not agree.

Appellant's arguments essentially manufacture a conflict by taking the experts' testimonies out of context.  When Bruhn testified there had to be an element where

---

[34]  The dissent downplays appellant's varying explanations for the injury.  In doing so, the dissent concedes that appellant provided "sharply inconsistent descriptions of the events" but overlooks these inconsistencies because "he never confessed to deliberately hurting Jimmy or slamming him into the ground with the *type of force* required to cause a subdural hematoma." (Dis. opn. *post*, at p. 91.)  It would be a rare case indeed where a defendant would claim an accident but confess to the crime.  Regardless, appellant's "many changes of story were inherently incredible and the evidence of his guilt overwhelming."  (*People v. Boyette* (2002) 29 Cal.4th 381, 429.)  As further discussed below, the extreme disparity in explanations that the jury resolved eviscerates the dissent's prejudice analysis.

Jimmy was slammed to the floor, he was discussing his impression of appellant's demonstration of the injury using a stuffed animal. He explained that the mechanics demonstrated wouldn't work to cause the injury seen because you would need sudden deceleration to cause the ripping and tearing associated with such an injury and, thus, a good slam, not a drop while swinging, would be needed. Bruhn's ultimate opinion did not disclose a mechanism by which Jimmy suffered an injury. Rather, he opined the injury was nonaccidental. His overall opinion was not a statement of how the injury occurred, but an analysis concluding the injury was consistent with abuse and inconsistent, both in result and behavior, with appellant's explanation.

When Johnson stated he knew the injury did not come from external trauma, he was responding to questions asking whether he would describe the mechanism causing the injury as shaken baby syndrome. Johnson explained he had purposefully refrained from using that term and simply agreed the injury was not trauma, before stating, "Now if you're going to ask me to keep asking me, I'm telling you that's [shaken baby syndrome] when we would routinely see it. [¶] Did that happen here? I have no earthly idea how the subdural hematoma got there. What I do know is that it didn't get there from external trauma." In explaining his opinion, Johnson made clear that a fall, car accident, or direct strike would cause external trauma, which he did not see on Jimmy. To Johnson, this meant that the bathtub fall explanation was not plausible. Extreme shaking, however, would not leave such marks and thus would align more closely with the extreme internal injury and lack of bruising than a fall. As with Bruhn, Johnson was not opining on what caused Jimmy's injury. Rather, Johnson opined specifically that the injury would not have been caused by a fall and would have occurred shortly before Jimmy reached the emergency room.

Ultimately, both experts were in complete agreement on the critical opinion that they were providing, specifically that the injury in question was nonaccidental. Neither was asked specifically to identify the mechanism that caused the injury and neither

opined they specifically knew. Thus, questioning suggesting a lack of specificity on the mechanism causing injury does not show a conflict or failure in the People's case.

Even if such a conflict could be shown, however, we would not conclude the case was as close as appellant suggests. With both experts opining the injury was nonaccidental, the jury could believe either expert's opinion and still convict appellant. Appellant identifies no law or principle that would prevent the jury from choosing which witness to believe. Trials are full of meaningless, and sometimes meaningful, contradictions between witnesses. In all instances, " '[t]he jury remains free to choose the witness or witnesses it believes and what part of a witness's testimony it finds believable.' " (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1191.) We see no basis in this case for relying on alleged conflicts, particularly ones that make no difference in outcome, to find reversable prejudicial error.

## II

### ALLEGED IMPROPER CROSS-EXAMINATION

Appellant next contends his constitutional rights were infringed when the prosecutor was permitted, over objection, to cross-examine him on issues not raised during his direct examination. Appellant contends his testimony at trial did not touch upon any issues that would permit cross-examination on the prior bad acts evidence discussed above, but that the judge improperly permitted just that type of questioning despite appellant's objections.

### A.  Standard of Review and Applicable Law

As appellant notes, discretionary rulings such as those regarding the proper scope of cross-examination are subject to an abuse of discretion review. (*People v. Lancaster* (2007) 41 Cal.4th 50, 102.)

Under section 773, "A witness examined by one party may be cross-examined upon any matter within the scope of the direct examination by each other party to the action in such order as the court directs." (§ 773, subd. (a).) " 'A defendant who elects

to testify does not give up his Fifth Amendment rights nor his corresponding California privilege against self-incrimination (Cal. Const., art. I, § 15) *except as to matters within the scope of relevant cross-examination.*' " (*People v. Wilson* (2008) 44 Cal.4th 758, 799.) It is well settled that issues such as bias, interest, or motive to falsify are commonly used factors to attack the credibility of a witness. (*People v. James* (1976) 56 Cal.App.3d 876, 886.) Moreover, when one makes a general denial of guilt in their testimony, they may open themselves to cross-examination on points which "imply that [they] lacked criminal intent [citations] or that [their] association with a codefendant was innocent [citation] or that [they] did not commit similar offenses, whether charged or uncharged [citations] and thus render [themselves] subject to cross-examination on the subject impliedly denied." (*People v. Tealer* (1975) 48 Cal.App.3d 598, 605.)

**B.** **Discussion**

We readily reject appellant's assertion that questions regarding the admitted prior bad acts conduct were outside the scope of appellant's direct examination. In appellant's testimony, he provided a full accounting of the day Jimmy was injured. This included assertions that Jimmy slipped and fell in the bathtub and that he later unintentionally dropped Jimmy while playing. It further included general testimony supporting his claim that the injuries were not his fault and that he had been cooperative with the police because he had nothing to hide. This testimony directly raised the argument the injury was not the result of an accident, impliedly raised the specter that it was a continuation of appellant's prior domestic violence, and raised questions whether appellant was, in fact, acting to hide conduct from the police. The court's determination that questions regarding the uncharged prior bad acts evidence were within the scope of the direct examination was thus not an abuse of discretion, as that evidence was appropriately raised to rebut appellant's general denial of guilt and the factual scenario he presented to the jury.

## III

### <u>PROSECUTORIAL MISCONDUCT CLAIMS</u>

Appellant contends that the prosecutor committed misconduct in making six different types of comments during opening and closing arguments. Although we detail those comments as we discuss them, they are generally categorized as predisposition arguments, sympathy arguments, improper vouching, disparaging comments, introduction of unpresented evidence of guilt, and burden-shifting statements.

Appellant concedes that no objection was raised to any of the contested comments but contends there was no plausible justification for that failure and, thus, urges us to not consider the issue waived or to consider the issue under an ineffective assistance of counsel rubric. Even were we not to consider the issue waived, however, we would find no error.

### A.      <u>Relevant Law and Standard of Review</u>

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " ' [Citations.] In addition, ' "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' [Citation.] Objection may be excused if it would have been futile or an

admonition would not have cured the harm." (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

Where properly preserved, allegations of prosecutorial misconduct are reviewed, on the merits, de novo. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 681.)

**B.      Discussion**

As an initial matter, we note that appellant failed to object to any of the comments now contested on appeal. Appellant's arguments have thus been forfeited. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219–1220.) However, as noted, we also find the arguments meritless. We take each category in turn.

        1.      Predisposition Arguments

Appellant identifies several arguments as examples of instances where the prosecutor improperly argued appellant was predisposed to violence. Two of these alleged arguments fairly summarize the type of complaints appellant raises. In the first, the prosecutor argued, "When you think about it, something happened that set him off. Based on the other testimony, it doesn't take much to set this guy off. His anger is instantaneous. It's from zero to a hundred. There's nothing in between. He could be sitting there laughing with you, and the next thing, boom, on the turn of a dime he is angry. [¶] So if you think about with Jimmy, the pants were wet, the little shorts. Something happened. He's always complaining, he's a crybaby, he's this, he's that, always getting in his way, always hurt. He could take him and it's within that very short period of time when he finally—he's got him and then he decides, goddamn, you know, and then slams, bam. That's all it takes for first-degree murder." In the second, the prosecutor argued, "We know that he's beat dogs. He's beat a man. He beats women. There's no—there is no boundaries with him. It doesn't matter. He's going to do whatever he wants to do."

With respect to these arguments, appellant contends the uncharged prior bad acts evidence admitted in this case and discussed previously was only allowed for the limited

purpose of demonstrating a common plan or scheme, but that the People specifically argued it demonstrated a predisposition to committing the charged offense. As discussed above, however, the prior bad acts evidence was properly admitted under section 1109 as prior incidents of domestic violence, admitted to show predisposition. Section 1109 specifically permits predisposition evidence that would normally be excluded under section 1101, subdivision (a) to be introduced. As the evidence was admitted for this purpose, it was not erroneous for the People to claim it was proper to conclude a murder occurred in part because of the evidence of predisposition introduced to combat the claim Jimmy's injuries were accidental.

Prosecutors have wide latitude in their closing arguments, provided the argument " ' " ' "amounts to fair comment on the evidence," ' " ' " including reasonable inferences or deductions drawn therefrom. (*People v. Gamache* (2010) 48 Cal.4th 347, 371.) And prosecutorial misconduct will not be found unless there is a " 'reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Dykes*, *supra*, 46 Cal.4th at pp. 771–772.) Ultimately, given the proper admission of the evidence in this case, we see nothing in the arguments raised here that exceed a fair comment on the evidence and certainly no indication that the jury would understand or apply the prosecutor's comments to convict based solely on a propensity to commit violent acts and not evidence that appellant did, in fact, cause Jimmy's injuries.

2.      Sympathy Arguments

Turning to the allegations the prosecutor sought to influence the verdict by creating sympathy for Jimmy and Father, we again find no error. Here, appellant points to statements in both the opening and closing arguments describing Jimmy as "a good little boy" or describing Father as "a man with a broken heart who loved his son." Appellant is generally correct that an " 'appeal for sympathy for the victim is out of place

during an objective determination of guilt.' " (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130.) However, none of the prosecutor's comments rise to this level.

Here, the People detailed the factual evidence concerning Jimmy's end of life and Father's role in those events, along with several facts relating to how Jimmy's interactions with Father were affected by appellant's conduct. As the People note, in this case there was a direct credibility dispute between appellant and Father concerning how certain injuries were caused and about Jimmy's propensity for bruising or carelessness. In this context, the prosecutor's comments were a fair commentary on the evidence designed to demonstrate to the jury that Father was testifying truthfully. None of the comments reached the level found problematic in *People v. Kipp*, *supra*, 26 Cal.4th at page 1130 or *People v. Leonard* (2007) 40 Cal.4th 1370, 1406, where the prosecutor asked the jurors to envision themselves as the victims in the case or otherwise focus upon the loss that occurred because of the crime as a basis for conviction.

3.    Alleged Vouching

Appellant contends the prosecutor improperly vouched for Katie's testimony by arguing she had no reason to lie about the animal abuse allegations she made. The identified portion of the reporter's trial transcript shows counsel asking why Katie would lie and stating there was no reason she would do so. We do not agree this is improper. As the People note, prosecutors may use rhetorical questions when commenting on the evidence. (*People v. Frye* (1998) 18 Cal.4th 894, 972, disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22.) Here, there was simply a question asked regarding why one would lie about their testimony and a comment that there appeared no reason to do so. We see no error in this brief argument. (See *ibid.* [approving comment that witness " 'would have no reason not to tell you that if it were true' " because "[a]lthough the prosecutor's comments invited the jury to consider the witnesses' motives in testifying, there is no impropriety in attempting to persuade jurors to draw inferences based on the evidence"].)

65.

4.     Disparaging Comments

Appellant next highlights five prosecutorial comments that appellant contends violated due process because they "assailed his character by branding him a leech, liar, and narcissist," and because they appealed to the jury's passions and prejudices. These statements included comments such as: "The only person acting here is [appellant]"; "He loved having photos of himself"; and "He's thinking about himself as usual, and what he can do or say to hopefully make the police think that it's an accident." Upon review, it is apparent that each of the complained of comments constitutes a fair commentary on the evidence and remains within the bounds of acceptable conduct. Indeed, far worse comments about a defendant's veracity or character have been upheld when tied to legitimate commentary on the evidence. (See *People v. Friend* (2009) 47 Cal.4th 1, 32 [noting that "the use of derogatory epithets to describe a defendant is not necessarily misconduct" in response to commentary the defendant was " 'living like a mole or the rat that he is' " where supported by evidence and further explaining " '[w]hen a defendant's testimony contradicts the strong evidence of his guilt, it is not improper to call him a liar' "].)

5.     Unpresented Evidence of Guilt

Appellant objects to a comment from the prosecutor that "as far as that police report, you know, when the defendant, you know, was daring me the other day about, Well, do you have a police report? Well, yeah. I have—you know, I've got it right here. [¶] There's a lot of things that can't come in in a courtroom. I have some limitations." Appellant contends the prosecutor implied there was additional unpresented evidence of guilt and thereby argued guilt based on facts not in evidence. We do not agree.

As the People explain, the prosecutor's comments were directed to a specific exchange that occurred during appellant's cross-examination. During that exchange, appellant specifically asked the prosecutor to show him the police report of a specific encounter when asked about details of the event. The next day, the prosecutor brought

the police report and cross-examined appellant on its contents but did not move it into evidence. Thus, the jury had already seen that the document exists and heard appellant's testimony regarding the document. In closing, the prosecutor made no reference to the contents of the report, but rather made a fair commentary on the cross-examination exchange, essentially noting appellant's dare to produce the document and the fact the prosecutor had complied. As the prosecutor went no further in terms of arguing the meaning of the document, we conclude no error arose.

6.      <u>Burden-shifting Statements</u>

Finally, appellant identifies three statements he contends show the prosecutor attempted to shift the burden of proving all elements beyond a reasonable doubt by arguing the jury would have to disbelieve the entire prosecution case to find appellant credible. Appellant also alleges one of the comments improperly stated the reasonable doubt standard. The People contend the comments were all valid argument that appellant's testimony was not credible, and that the prosecutor correctly stated the burden of proof on uncharged prior bad acts evidence rather than misrepresented the reasonable doubt standard.

The three statements were: (1) "As far he's concerned, everybody's a liar but him except that he did have sex with that other girl."; (2) "The police come. You saw him up there. He's denied everything. Everybody up there is a liar."; and (3) "He's sitting there saying they're all lying, but there's a pretty good common scheme and plan. There's a jury instruction on that. It's the preponderance of the evidence."

We agree with the People. In context, each of these arguments were made in a manner that fairly presented the prosecutor's contention that appellant was lying in order to protect himself. Indeed, the second statement is particularly clear on this, as the complained of statement only arose as the prosecutor again reminded the jury that appellant had been denying various facts until confronted with a police report on the incident. Further, we see no error in the prosecutor's statement that there is a jury

67.

instruction discussing the preponderance of the evidence standard. As the People note, there was such an instruction, and the prosecutor's comments went on to explain in the context of the uncharged prior bad acts evidence that "[i]f you—based on what you heard and saw from the evidence, if you believe these offenses happened, you can apply that when you're deliberating on these—on Count[s] 1 and 2." Nothing in the exchange suggests the prosecutor was telling the juror's they could convict appellant of the charged offenses based on anything other than proof beyond a reasonable doubt. Accordingly, we find no error in the identified statements discussed.

## IV

### HEARSAY CLAIM

Appellant alleges reversible error occurred when the trial court permitted the introduction of hearsay testimony concerning Jimmy's reaction after being told he was going to Mother's home in February 2013. Because we conclude the actual evidence entered does not qualify as hearsay, we find no error.

### A.     Factual Background

As appellant notes, the People filed a pretrial motion in limine to introduce allegedly spontaneous statements by Jimmy that he did not want to go to Mother's house. The trial court deferred a final ruling on this motion stating a section 402 hearing would be needed before introducing the statements. This hearing never occurred. Rather, during trial the prosecutor and Father had the following exchange without objection:

"Q.     Okay. Now, around February 201[3], was there a change in Jimmy's demeanor with you, or just his demeanor in general?

"A.     Yes, he started to be a little bit more reluctant when I said it's time to go to [Mother]'s house. He didn't want to go to [Mother]'s house. And he typically wouldn't throw a tantrum, but he started acting out in certain ways like that. That was very unusual of him.

"Q.     What did he do?

68.

"A.    Well, for one instance that I can remember very well, is I told him, I'd say in February, it was in February, the second to the last times I had my children, I said it's time to go home, and he threw himself on the floor and cried.  And when I put him in the car, he stared down and looked away from me.  I asked him repeatedly, "What's wrong, buddy?"  And he wouldn't answer me, which is very unusual.  All this from me stemming to say we're going back to [Mother]'s house.  I have to take you back to [Mother]'s house.

"We got to Visalia.  Of course I don't know where [Mother]'s house is.  I took them to [Mother's] parents' house.  He realized it was in that neighborhood.  His attitude perked up immediately when he realized he was going to his grandma and papa's house rather than his [Mother]'s house.

"Q.    So he was happier?

"A.    He was happier after that, yes."

## B.    Relevant Law and Standard of Review

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).)  Nonverbal conduct constitutes a "statement" that was made for purposes of the hearsay rule only if it was "intended by [the person] as a substitute for oral or written verbal expression." (§ 225, subd. (b).)

We review the admission of evidence for an abuse of discretion.  (*People v. Thompson* (2016) 1 Cal.5th 1043, 1120.)

## C.    Discussion

Although appellant notes the original dispute involved allegations Jimmy made statements to Father that he did not want to go to Mother's home, the testimony at trial did not include any such allegations.  Rather, the testimony at trial detailed Jimmy's physical actions in response to statements made by Father, the person testifying, and Father's impressions of the meaning in those actions.  While such impressions may be

69.

speculative, no objection was raised on that point and it is not argued here. Considering the scope of the testimony from a hearsay perspective, there is no indication in Father's testimony that Jimmy was attempting to convey any unstated meaning by his conduct or trying to substitute his conduct for any statement. Rather, the testimony conveyed "nonverbal, nonassertive, emotional behavior" and was therefore not hearsay. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1162.)

**V**

**N<small>ONACCIDENTAL</small> L<small>ANGUAGE</small> C<small>LAIM</small>**

In supplemental briefing, appellant raises an additional claim that the trial court erred by permitting the People's experts in this case to describe Jimmy's injuries as "nonaccidental." Appellant contends this language was an inadmissible legal conclusion, a matter not beyond the jury's common knowledge, and an improper opinion about the credibility of appellant's statements. We do not agree.

**A.      Factual Background**

Prior to trial, appellant filed a motion in limine seeking to "exclude medical opinion testimony characterizing [Jimmy]'s injuries as having been the result of non-accidental trauma, abusive head trauma, or any similar terminology." The trial court heard the motion and rejected the request, explaining its understanding that the terms objected to were the actual medical nomenclature utilized by doctors in their normal course of work. The court explained it resolved this same issue in a prior case and "allowed them to use those terms because—and it needs to be established—those are medical terms that they use. And I will tell the jury that those are medical terms, which is different than what the jury has to determine." The court further stated, "But I will tell the jury that when they use this terminology—I might just interject when the doctor says it's my belief it's a nonaccidental. You can go in and explore what he means by that. And I'm gonna tell the jury this is a medical term, not a legal term. And they alone must decide whether it was nonaccidental or not."

70.

At trial, the parties' experts testified out of turn, with appellant's expert, Dr. Rothfeder, testifying first. In the course of describing the basic facts underlying Jimmy's injuries, Rothfeder noted other doctors had described the injury as nonaccidental. Counsel later specifically asked Rothfeder what it means from "a strictly medical standpoint" when that term is used. Rothfeder used that opportunity to explain that the term is "most frequently used to allege child abuse," but that "how we deal with it doesn't have anything to do with whether it was accidental, homicidal, or attempted homicide or self-inflicted for that matter." Rothfeder went on to specifically note that one cannot determine whether an injury was intentional or accidental by just looking at the injury, stating you "can't determine from the injury whether the head was moving and struck something stationary or whether the head was stationary or something struck the head." Further discussion of the term "nonaccidental trauma" occurred during Rothfeder's testimony. In one instance, he specifically equated the term with the concept of shaken baby syndrome. And in a later cross-examination exchange, confirmed that the name "shaken baby syndrome" had been changed, claiming the biomechanics of the term were invalidated.

When the prosecution's witnesses testified, the term was frequently used, particularly in discussions where a diagnosis regarding the injury had been made. Indeed, in one example, Dr. Ramirez explained that during treatment, "when we're suspecting nonaccidental trauma, we always will correlate what's being told to us with what the mechanism of the injury is with what is actually in front of us." In another example, Dr. Bruhn testified that a diagnosis of nonaccidental injury would result in the use of an assessment team to treat the injuries.

Notably, relevant to this dispute, the trial court did not admonish the jury or otherwise provide a statement consistent with its pretrial suggestion that it would remind the jury of the medical nature of the term. However, appellant's counsel also never

71.

objected to the use of the term at trial or requested the court provide the statement it suggested it would.

**B.      Relevant Law and Standard of Review**

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (§ 805.)  However, to be admissible, the opinion must be "sufficiently beyond common experience that [it] would assist the trier of fact."  (§ 801, subd. (a).)  " '[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' "  (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547.)

"The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful."  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82.)  However, an expert may, relying on reference to their expert knowledge, identify facts or aspects of behavior that are inconsistent with claims presented at trial.  (*Ibid.*)

"A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion."  (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

**C.      Discussion**

Appellant's argument on this point turns upon a contention that the trial court correctly concluded the nonaccidental injury language was an impermissible expert opinion and thus erred when it failed to provide the jury with the proposed admonishment it had discussed during motions in limine.  Appellant contends both that the term constituted a legal opinion and that the opinion was not beyond a juror's common

72.

knowledge, and thus improper. Relatedly, appellant argues the language constituted opinions on both appellant's guilt and appellant's credibility. Indeed, appellant spends extended pages discussing changes in the scientific theories behind accidental trauma in children and case law limiting expert opinions in gang and child sexual assault cases, positing that, ultimately, the experts here provided improper opinions worthy of reversal.

Upon review of the record here, we do not agree with appellant's positions. A review of the trial court's statements shows not that the court found the opinion to be improper, but rather that it believed the language was generally permissible because it constituted a legitimate medical diagnosis. The record confirms this fact, showing that appellant's expert acknowledged other treating doctors had used the terms to describe the injuries and that the term was associated with the former concept of shaken baby syndrome. Similarly, the prosecution's expert testimony generally discussed the use of the term in a diagnostic sense based on a comparison of the injury with the purported mechanics alleged to have caused it.

Based on this record, we see no basis for appellant's argument that the opinion was legal in nature, not beyond a juror's understanding, an assessment of appellant's guilt, or an assessment of appellant's credibility. The diagnostic nature of the term demonstrates not that the doctors were providing a legal opinion on whether the injury was, in fact, intentionally caused but, rather, that the doctors were able to make certain medical deductions based on the nature of the injury and the mechanism of harm presented to them. Not only is this a factual opinion, but it is certainly one that goes beyond the general understanding of a lay juror.

Further, that appellant's defense raised issues of accidental injury does not preclude the introduction of the opinion. As noted above, an opinion is not improper merely because it goes to an ultimate issue of fact. Here, while appellant's actions and purported intent may have been a critical point of dispute, that dispute did not preclude a general medical opinion applying the purported facts to the injury identified and

concluding the diagnosis satisfied the term nonaccidental injury. For similar reasons, the fact that the opinion conflicted with appellant's defense or appellant's testimony does not modify the opinion to a statement on appellant's guilt or credibility. Rather, it remains a credible medical opinion that creates a conflict the jury must resolve.

As the opinion offered was legally proper, we find no error in the trial court's failure to ultimately provide further instruction to the jury regarding how to treat the opinion. We note in this context, first, that appellant never raised a specific request for the instruction when the term was used and, second, that appellant was the first to introduce the term through his own expert's testimony. It appears from that testimony that counsel may have found no need for further instruction, as there was a full opportunity and attempt to discredit the term at the outset. And there is no argument that the jury was improperly instructed on how to consider expert opinions. Regardless, however, as the court had no obligation under the law to provide an instruction, its failure to do so cannot be reversible error. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1224 [court not required to provide instruction specifying not to consider factors when, under reasonable understanding of instructions, jury would know factors were improper].) Appellant is entitled to a fair trial, not one with errors in his favor, and the lack of error in failing to further instruct the jury on the meaning of the expert's opinion shows a fair trial occurred.

# VI

## APPOINTMENT OF CONFLICT COUNSEL

Appellant's next allegation of error arises out of the trial court's conduct postconviction, after it appointed conflict counsel to investigate and potentially file a new trial motion based on an ineffective assistance of counsel claim. After conflict counsel determined no motion was proper, and upon a motion by the People, the court reappointed trial counsel for sentencing. Appellant contends it was wrong to reappoint trial counsel, alleging the appointment of conflict counsel was an all-or-nothing

74.

proposition and that conflict counsel should have been appointed for all purposes, if at all. We do not agree. Although the appointment of conflict counsel for a limited purpose is disfavored, it is only expressly prohibited as a substitute for proceeding under the requirements for relieving trial counsel set forth in *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). Although we disapprove of the trial court's procedures in this case, this does not mean the trial court's conduct was erroneous. Regardless, even assuming error, we are confident the trial court's actions were harmless.

## A.    Factual Background

Following appellant's conviction, but prior to sentencing, he provided his trial counsel with a 14-page request for a new trial based primarily on assertions that his trial counsel had been ineffective. Trial counsel provided this letter to the court and indicated his belief that a *Marsden* hearing was required to resolve it. The court reviewed the letter and discussed its points with appellant and his counsel, recognizing during the process that it was considering whether counsel should be relieved. The court found no grounds to replace trial counsel but suggested a different counsel could be appointed for a new trial motion. Appellant's counsel noted case law counseled against this idea but also stated a belief that ineffective assistance of counsel claims had to be raised at the trial stage. The court "having rethought the issue," stated it would "appoint conflict counsel, then, to represent [appellant] on any motion for a new trial. And if the motion for new trial is denied, then [trial counsel] would still be there for sentencing." Trial counsel responded, "I think that's incorrect, but I'm not objecting." At this point, the court reiterated it was not finding an issue under *Marsden* and determined it would proceed with its plan.

At a later hearing, newly appointed conflict counsel informed the court that she could find no legal ground to pursue a new trial motion. The court attempted to proceed to sentencing at that point. Conflict counsel pointed out she was not appointed for sentencing but noted, "[a]fter our discussion in chambers, it is now my belief that the

Court is appointing me for sentencing." The court confirmed that was its plan, but noted it was not ready to proceed with sentencing. It set a new sentencing date and relieved trial counsel from the case.

Following this hearing, the People filed a motion to reappoint trial counsel for sentencing purposes. The court convened and noted it was reconsidering its decision to relieve trial counsel based on that filing. In response, conflict counsel informed the court she was able to proceed with sentencing if the court wanted, but that she had reviewed the papers and felt the People's position correctly argued trial counsel should be reappointed.

Trial counsel objected to this plan, arguing the case law required the appointment of conflict counsel for all purposes and, thus, precluded the reappointment of trial counsel after he had been relieved. The trial court, however, concluded it was not acting contrary to the case law and reappointed trial counsel to represent appellant at sentencing.

## B.   Applicable Law

The decisions made by the trial court in this case create a situation that falls in the space surrounding two seminal cases concerning how to handle ineffective assistance of counsel complaints raised prior to sentencing, *People v. Dickey* (2005) 35 Cal.4th 884 (*Dickey*) and *People v. Sanchez* (2011) 53 Cal.4th 80 (*Sanchez*). We thus first outline these cases.

Both *Dickey* and *Sanchez* consider a court's obligations when a defendant, alleging ineffective assistance of counsel, seeks to rescind a guilty plea or seek a new trial prior to sentencing. Each case turns on whether the trial court has properly complied with its obligations under *Marsden*. Relatedly, each also touches upon an historical practice in the courts of appointing conflict counsel for the limited purpose of reviewing mid-case allegations of ineffective assistance of counsel while retaining trial counsel for all other purposes, including sentencing if a motion to withdraw the plea is not filed or is ultimately denied.

76.

In *Dickey*, prior to the penalty phase and sentencing, the defendant raised concerns with his trial counsel's tactical decisions during the guilt phase of his murder trial. (*Dickey*, *supra*, 35 Cal.4th at p. 918.) Aware of these concerns, his trial counsel requested the court appoint separate counsel to review those decisions and potentially file a motion for new trial. In discussing this request, the trial court asked the defendant about his trial counsel and the defendant responded that he disagreed with certain tactical decisions. In response, the trial court proceeded with the case, eventually appointing new counsel after the penalty phase for the limited purpose of reviewing the defendant's claims. Notably, the trial court neither conducted a *Marsden* hearing nor relieved the defendant's trial counsel of their duties in the case. (*Id*. at pp. 918–920.)

Upon review, our Supreme Court concluded that the trial court did not commit a *Marsden* error by not holding a hearing to relieve the defendant's trial counsel because the defendant did not specifically ask for his counsel to be relieved. As part of its discussion, the court noted that the defendant's request for separate counsel was ultimately granted, eliminating any claims of error on that front. (*Dickey*, *supra*, 35 Cal.4th at pp. 920–921.)

In *Sanchez*, a similar issue arose when a defendant sought to withdraw his guilty plea prior to sentencing. (*Sanchez*, *supra*, 53 Cal.4th at pp. 84–85.) In this instance, the defendant's trial counsel recognized that a *Marsden* hearing might be required, and additional time was granted to research the point. However, the court ultimately appointed substitute counsel for the limited purpose of investigating and filing a motion to withdraw the plea without holding the *Marsden* hearing. When substitute counsel found no basis to withdraw the plea, the court returned the case to the defendant's trial counsel and proceeded to sentencing. (*Id*. at pp. 85–86.)

Under these facts, our Supreme Court found the trial court had wrongly appointed substitute counsel without determining that substitute counsel was required under *Marsden* and wrongly appointed counsel for only a limited purpose, as opposed to for all

77.

purposes. (*Sanchez*, *supra*, 53 Cal.4th at p. 92.) In the course of its analysis, the court looked specifically at its prior decision in *Dickey* in response to an argument that *Dickey* specifically approved the appointment of counsel to review limited issues. The court was clear that *Dickey* stood for no such premise and should be viewed only as a confirmation that a *Marsden* hearing is not required if it is not specifically requested. (*Sanchez*, at pp. 90–91.)

The *Sanchez* court also recounted its opinion in *People v. Smith* (1993) 6 Cal.4th 684 (*Smith*), which considered the drawbacks of appointing counsel to determine whether a defendant's trial counsel was ineffective. As the court noted there, "[a]ppointment of counsel for the purpose of arguing that previous counsel was incompetent, without an adequate showing by [the] defendant, can have undesirable consequences." (*Id*. at p. 695.) One of these consequences was the resulting serial attorney appointments that would follow, where each would claim the prior was incompetent. (*Sanchez*, *supra*, 53 Cal.4th at p. 88.) The court noted it could find no authority that would support " 'the appointment of simultaneous and independent, but potentially rival, attorneys to represent [the] defendant.' " (*Ibid*.) Indeed, the court ultimately explained that " '[t]he proper procedure does not include the appointment of "conflict" or "substitute" counsel to investigate or evaluate the defendant's proposed new trial or plea withdrawal motion.' " (*Id*. at p. 89.) Rather, the court should hold a *Marsden* hearing and either fully relieve counsel for all purposes or permit trial counsel to proceed in all remaining matters. (*Id*. at p. 90.)

Comparing this conclusion to the process employed in *Dickey*, our Supreme Court explained the difference in result arose from the nature of the request made. Because the defendant in *Dickey* did not request substitute counsel at that time, but rather additional counsel for a future motion, there was no error in the court's refusal to follow the *Marsden* requirements. (*Dickey*, *supra*, 35 Cal.4th at pp. 920–921.) Further, because that defendant had requested additional counsel and received the purported benefit of the

78.

request, he had no grounds to complain about the procedure employed to determine whether he had grounds to seek a new trial. (*Ibid.*)

When it came to determine the proper way to resolve the *Marsden* error arising in *Sanchez*, the court's resolution demonstrated that the error was not so pervasive as to require a retrial. Rather, the court approved a three-step resolution that sought to resolve the *Marsden* error. It explained the matter should be remanded with the following directions: " '(1) the court shall hold a hearing on [the defendant]'s *Marsden* motion concerning his representation by the public defender's office; (2) if the court finds that [the defendant] has shown that a failure to replace his appointed attorney would substantially impair his right to assistance of counsel, the court shall appoint new counsel to represent him and shall entertain such applications as newly appointed counsel may make; and (3) if newly appointed counsel makes no motions, any motions made are denied, or [the defendant]'s *Marsden* motion is denied, the court shall reinstate the judgment.' " (*Sanchez*, *supra*, 53 Cal.4th at pp. 92–93.)

## C.    Discussion

In this case, the trial court held a *Marsden* hearing, found no basis for relieving trial counsel, yet appointed conflict counsel to analyze whether a new trial motion would be appropriate. When that task was done, and at the People's request, the trial court reappointed trial counsel to handle sentencing.

Appellant contends that this reappointment was improper. He argues that the initial order creating simultaneous representation between trial counsel and conflict counsel was unauthorized and that the trial court was required to appoint conflict counsel for all future purposes. Appellant states this is constitutional error requiring reversal. The People respond this is merely a *Marsden* issue and that the trial court's determination no substitute counsel was required under *Marsden* means there was no error in failing to relieve trial counsel for all future purposes. Regardless, the People claim any alleged

error was harmless as appellant's sentence was statutorily mandated and thus a change in counsel could have had no effect on the case.

The trial court's colloquy when relieving trial counsel is informative on this dispute. Upon receiving a letter from appellant stating he would like a new trial based on ineffective assistance of counsel concerns, the trial court held an in camera hearing during which it reviewed all of the grounds contained in the letter with appellant and his trial counsel. Appellant was asked his views of trial counsel, to which he responded that counsel did a good job, but he thought more could have been done. Based on this discussion, the court determined there was no basis to relieve trial counsel at that point. However, the court offered the option of having separate counsel review and prepare a motion for new trial.

Notably, trial counsel explained the case law did not permit this procedure. However, when the court then stated he would leave trial counsel in place, trial counsel raised a new concern that ineffective assistance claims had to be raised at the trial level. Based on this assertion, the trial court stated it would appoint conflict counsel to conduct a review for the new trial motion with the understanding that if the motion was denied, trial counsel would handle sentencing. At this point, trial counsel expressed his view that such a procedure was improper but specifically stated, "I'm not objecting." The court then noted it was expressly finding no *Marsden* issues warranting relief of counsel and that its belief was that ineffective assistance claims were different issues. The court explained its final view "that [the public defender's] office and [trial counsel] should not be relieved at this point on the case except for a motion for a new trial based on ineffective assistance of counsel."

Later, when conflict counsel chose not to file a new trial motion, the People requested, and the trial court chose, to reappoint trial counsel for sentencing. In resolving trial counsel's renewed concern that this was not the proper procedure, the trial court stated it found the case law distinguishable because it had held a *Marsden* hearing and

80.

"specifically came out and said [it] was not granting the *Marsden* motion. [It] was just appointing counsel because, obviously, if it's—if the issue is whether or not trial counsel is ineffective—and trial counsel can't make that motion. It's got to be independent counsel." (Italics added.)

The record here shows that the court was aware of its obligations under *Dickey*, *Sanchez*, and *Smith*. It was conscious of its obligation under *Marsden* to permit appellant to air any of his complaints regarding trial counsel's efficacy and further representation and was required to determine whether these complaints warranted substituting counsel. Further, it appears the trial court directly acknowledged the fact that if these complaints warranted removal of counsel under *Marsden*, conflict counsel would manage the remainder of the case going forward. Indeed, the court was clear that it had considered its obligations and determined that substituting counsel was not appropriate under *Marsden*. What the court seemed to overlook, however, was the concurrent discussion in *Sanchez* that appointing dueling counsel, one to proceed on the case and the other to determine if the first was ineffective, is a disfavored practice.

In this way, this case falls between the various exemplars in the case law. The trial court did, in fact, hold a *Marsden* hearing. And at that hearing it concluded, in a point not contested here, that there were no grounds to relieve trial counsel. Under the case law, the issue should have stopped here, and trial counsel should have been left to determine whether a meritorious new trial motion could be filed. However, rather than follow these procedures, the trial court continued by appointing conflict counsel for the express and limited purpose of representing appellant on any new trial motion based on ineffective assistance of trial counsel. When that procedure resulted in no motion, the court then reappointed trial counsel for sentencing. It thus followed the disfavored procedures outlined in *Smith*.

No case clearly holds that this disfavored practice constitutes reversible error. Rather, the cases finding error have principally considered whether the procedures

required by *Marsden* were met. Indeed, the appointment of conflict counsel, while causing substantial issues for the judiciary, may in fact work to a defendant's benefit in certain respects by having multiple counsel reviewing the proceedings. Indeed, we have identified no case that considers the specific issue arising here—how to deal with substitute counsel once they have been appointed following a *Marsden* hearing where the court found no grounds to relieve trial counsel—and finds that decision erroneous.

We are thus not convinced appellant's framing of the issue is correct. Appointing conflict counsel in this instance did not bind the trial court to keeping conflict counsel for all future purposes. Such a finding is only mandated by the case law concluding that conflict counsel may only be appointed after a finding of necessity under *Marsden*. Nor, however, are we convinced that the People's view of no error, given no adverse *Marsden* finding exists, is fully correct. Although not raised in these proceedings, appellant was potentially deprived of his trial counsel's advice on a new trial motion.

Regardless of the potential for error, we are convinced by the People's argument that any alleged error was harmless beyond a reasonable doubt. As appellant challenges the reappointment of trial counsel in postconviction proceedings, the nature of the error affects whether trial counsel was properly a part of appellant's sentencing proceedings. Since the trial court found that there was no conflict arising from the ineffective assistance of counsel claims that would warrant relieving trial counsel of his duties in the case generally, we see no basis for concluding that the appointment of conflict counsel to review those allegations would trigger any greater conflict that could preclude trial counsel from proceeding in the future. Nor do we see trial counsel's statement that the case law does not support his reappointment affecting this conclusion. Trial counsel's attempt to properly describe the law does not demonstrate an inability to adequately proceed as appellant's counsel during sentencing. Finally, even if we were to presume some conflict arising from the proceedings, appellant has pointed to no aspect of the sentence he received that could have been affected by the existence of different counsel.

As the People properly note, the terms of appellant's sentence are statutorily defined and not subject to a discretionary determination by the trial court. (See Pen. Code, § 273ab, subd. (a).) Thus, no counsel could have obtained a better result on sentencing. Although we agree with the guidance of our Supreme Court that the appointment of separate counsel to review ineffective assistance claims is problematic and disfavored, regardless of how one views the alleged error here, it was certainly harmless.

## VII

### INEFFECTIVE ASSISTANCE OF CONFLICT COUNSEL

As can be expected, given the concerns identified in Smith, the appointment of conflict counsel has led to allegations that conflict counsel provided ineffective assistance to appellant. The first claim is that conflict counsel was ineffective by not filing the new trial motion conflict counsel had been appointed to investigate and file and by stating to the judge no grounds to file had been identified. The second claim is that conflict counsel was ineffective by arguing against appellant when agreeing that trial counsel should be reappointed under the law to handle sentencing. We reject both contentions.

### A.    Relevant Law

A defendant claiming ineffective assistance of counsel in violation of his Sixth Amendment right to counsel must show defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and also that it is reasonably probable, but for counsel's failings, the result would have been more favorable to the defendant. (*Strickland v. Washington*, *supra*, 466 U.S. 668 at pp. 687, 694.) The burden rests with the defendant to show inadequate or ineffective representation, and the proof " 'must be a demonstrable reality and not a speculative matter.' " (*People v. Karis*, *supra*, 46 Cal.3d at p. 656.)

On appeal, we look to the record to see if there is any explanation for the challenged aspects of representation. If the reasons for defense counsel's actions are not readily apparent from the record, we will not assume constitutionally inadequate

representation and reverse a conviction unless the record discloses " ' "no conceivable tactical purpose" ' for counsel's act or omission." (*People v. Lewis* (2001) 25 Cal.4th 610, 674–675; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

**B.     Discussion**

At this stage, appellant's complaints fail on several fronts. In attempting to demonstrate a deficiency in conflict counsel's conduct, appellant relies on brief interactions with the court. In the first, when asked about the expected new trial motion, conflict counsel stated: "Judge, after going through the record of the trial, I did not find any legal grounds to file a motion for new trial." Appellant argues this demonstrates conflict counsel conducted no investigation regarding the points raised in appellant's initial letter. But such a sweeping claim cannot be discerned from such a minimal interaction. Conflict counsel's statement could equally be understood to have reviewed those points—as they were contained in the record—and found bases for deciding not to raise them. Indeed, several such tactical decisions have been hypothesized in the People's response. It could also be seen as a general statement that upon a full investigation, none of appellant's grounds warranted a motion. Several of the grounds were discussed on the record before conflict counsel was appointed, with the court asking for and obtaining explanations for trial counsel's actions or noting the letter was raising complaints about adverse rulings.

Appellant fails to show that conflict counsel's tactical decision not to file the new trial motion was improper. His citations to the record only highlight that there was no meaningful on-the-record discussion regarding the basis for her conclusion. Similarly, in relying upon conflict counsel's statements regarding the alleged scope of her investigation, appellant makes no showing that conflict counsel's decision prejudiced appellant. Indeed, upon the record here, there is no indication that appellant's motion could have been successful. Accordingly, appellant has failed to meet his burden to demonstrate error at this stage.

In the second interaction, appellant contends conflict counsel argued against appellant's interests in suggesting trial counsel should be reappointed under the law. Relatedly, appellant contends conflict counsel's statement that no grounds had been identified for the new trial motion worked against appellant's interests. We do not agree. Appellant contends conflict counsel's statements were the equivalent to siding with opposing counsel against the client. But we see no indication this is the case. Rather, conflict counsel provided her take on the record and the law in response to the court's questioning, as counsel does in many instances throughout representation. Conflict counsel's statement she could find no grounds for a motion was not a concession against any point raised, but rather an explanation for counsel's discretionary decision not to file the motion she had been appointed to investigate. Similarly, on the reappointment issue, conflict counsel confirmed she was ready and willing to continue representing appellant. We see nothing in conflict counsel's statements that fell below an objective standard of care or that resulted in any prejudice to appellant's position in the case.

## VIII

### FEE AND FINE CLAIM

In a supplemental letter brief, appellant argues a remand for resentencing is required because the trial court imposed various fines without determining appellant's ability to pay them. The People oppose this request, arguing the issue has been forfeited and that the analysis from *People v. Dueñas* (2019) 30 Cal.App.5th 1157 is inapplicable to this case. The People further contend any allegations here should be reviewed under the excessive fines clause.

We agree with the People that the issue was forfeited. This court has previously concluded that a failure to object to fines where statutory authority to do so exists forfeits any *Dueñas* claim that later arose. In this case, the court imposed a $10,000 restitution fine. Appellant raised no objection to the scope of the fees imposed, despite having the statutory authority to do so when the court imposed more than the minimum restitution

fine. (See Pen. Code, § 1202.4, subd. (c).) Consistent with our opinion in *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073, the claim has thus been forfeited.

## IX

## ASSEMBLY BILL 518

As noted at the outset of this opinion, this court granted appellant's request to recall the remittitur for this case in order to consider changes arising through the passage of Assembly Bill 518, which amended Penal Code section 654, subdivision (a) to read: "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision.…" (Pen. Code, § 654, subd. (a), italics added, as amended by Stats. 2021, ch. 441, § 1, eff. Jan. 1, 2022.) Previously, the law required that one be punished under the provision that provides for the longest potential term of imprisonment. (Former Pen. Code, § 654, subd. (a), as amended by Stats. 1997, ch. 410, § 1.)

Upon briefing the issue of recalling the remittitur, the People concede this change in law should be applied retroactively but argue remand is unnecessary because the record shows the trial court would not have exercised its discretion. We agree with the People's concession that Assembly Bill 518 applies retroactively. (See *People v. Sek* (2022) 74 Cal.App.5th 657, 673.) We do not agree, however, that a remand is futile. A trial court unaware of its discretion is unable to exercise it. (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [noting a court unaware of the scope of its discretion cannot exercise its informed discretion on the matter].) The trial court in this case had no reason to believe it had discretion to choose the lesser of two potential sentences under former section 654. Appellant is thus entitled to the trial court's exercise of that discretion.

## **DISPOSITION**

Appellant's sentence is vacated, and the matter is remanded to the trial court for resentencing to exercise its discretion under Penal Code section 654, subdivision (a), as amended by Assembly Bill 518.  (Stats. 2021, ch. 441, § 1.)  In all other respects, the judgment is affirmed.


                                                              HILL, P.J.

I CONCUR:


MEEHAN, J.

**SMITH, J., Dissenting.**

This complicated case is disturbing on many levels. First and foremost, it centers on the death of a three-year-old child, Jimmy, from a subdural hematoma, an extremely upsetting situation under any circumstance. Bishop was babysitting Jimmy and Jimmy's younger sister, when he noticed something wrong with Jimmy and rushed him to the hospital. Bishop told medical personnel that Jimmy had fallen in the bathtub earlier in the day, hitting his head and had vomited a few times in the ensuing hours. Thereafter, while Bishop was swinging Jimmy in the air, he had slipped from his arms, hitting his head, and appeared to suffer a seizure and lose consciousness. A CT scan of Jimmy's head performed at the hospital detected the subdural hematoma.

Jimmy underwent emergency surgery but unfortunately never regained consciousness. He later passed away in hospice care. The CT scan of Jimmy's head, and later a close examination by the neurosurgeon who operated on Jimmy, showed no bruises, swelling, or injuries to Jimmy's scalp or skull. The radiologist who interpreted the CT scan noted: "Well, if you see an intracranial bleed, you worry that something could have happened outside the skull to cause [a] skull fracture or soft tissue swelling. So I didn't appreciate any of that on there." As to the causal mechanism of the hematoma, the radiologist opined: "It could be [an earlier bleed and a second bleed], or it could be just that the bleeding has occurred for several hours from its initial, you know, whatever accident that happened and it is slowly bleeding. So now some blood is two to four hours old or six hours old or eight hours old and there's still some bleeding going on. It's really hard to speculate what the mechanism was."

This case is also disturbing from an evidentiary standpoint as the prosecution focused to a notable extent on prior bad act and other character evidence of unusually broad scope, in that it described, inter alia, Bishop's prior abusive behavior with girlfriends, male friends and roommates, as well as dogs. The trial court ruled that the

1

character evidence was admissible, under Evidence Code section 1101, subdivision (b),[1] to show that Bishop committed the charged crimes in accordance with a common scheme or plan encompassing both the present incident as well as the prior acts. Pursuant to the trial court's ruling, evidence was introduced showing Bishop kept multiple loaded guns around and had threatened two of his ex-girlfriends, on separate occasions, with a gun, and had stalked and harassed them after the end of each respective relationship. In addition, evidence was presented that Bishop had once beaten up a male friend causing much spattering of blood; kicked and otherwise abused, on multiple occasions, a small dog belonging to one of his roommates, eventually resulting in the death of the dog; viciously beaten and abused, routinely, his own two dogs; and had caused various types of property damage in multiple contexts.

Evidence was also presented showing Bishop had a penchant for picking fights with random strangers and was dropped from his rugby team for aggressive behavior. Witnesses opined that Bishop was not a good person and needed to go to church, as it would take God to fix him; that Bishop was routinely disrespectful to others; that he called other people peasants and said they were lower than him; that he drank a lot; and that he had a horrible, out-of-control temper, among many other descriptions of his temperament and personality traits.

The prosecutor heavily relied on this wide swath of character evidence and highlighted its most irrelevant and inflammatory aspects in examining the character witnesses, in cross-examining the defendant, and in her closing arguments. The prosecutor used the evidence to show that Bishop was a bad, generally volatile, and indiscriminately violent individual, with a criminal disposition, who committed the charged offenses in conformity therewith. (*See People v. Falsetta* (1999) 21 Cal.4th 903, 920 (*Falsetta*).)

---

[1] Undesignated statutory references are to the Evidence Code.

2

I contend the trial court erred in admitting the prior bad act and other character evidence under section 1101, subdivision (b), to show a common plan or scheme, and, for several reasons set forth below, maintain the trial court's ruling cannot properly be affirmed pursuant to section 1109, under the circumstances of this case. Even were it proper upon our review to apply section 1109, most of the character evidence at issue would be inadmissible under sections 1109 and 352, applied in tandem. Section 1109 was found to be constitutional by this state's high court on the assumption that section 352 provided a realistic safeguard that ensures that the presumption of innocence and other characteristics of due process were not weakened by an unfair use of evidence of past acts. In this case the safeguard failed. (See *People v. Harris* (1998) 60 Cal.App.4th 727, 730 (*Harris*).)

Our system of justice guarantees, to all criminal defendants, the right to a fair trial and the right to be tried for the current offense. (*Harris*, *supra*, 60 Cal.App.4th at p. 737.) This is one of those rare cases where those rights were trampled and violated. Too much evidence of bad personality traits, extraneous details regarding defendant's infidelities, possession and use of guns, taste in women, and a wide range of prior, bad conduct was erroneously admitted and improperly used to depict defendant as a despicable person with a generally violent disposition, thereby weakening the presumption of innocence and violating due process. (See *ibid.* [" 'A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is.' "]; *People v. Garceau* (1993) 6 Cal.4th 140, 186 (*Garceau*) [use of prior crimes and other character evidence may violate due process by diluting the presumption of innocence], overruled on other grounds by *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

The erroneous admission of the prior bad act and other character evidence was prejudicial under both the standard of prejudice applicable to federal constitutional error and the standard of prejudice applicable to state law evidentiary error. I am therefore constrained to conclude the defendant's convictions must be reversed, and the matter

3

remanded for a new trial.  In light of this conclusion, I would not reach the other issues raised on appeal.

**I.     People's Evidence of Bishop's Personality Traits and Prior Bad Conduct**

The People presented a large amount of evidence relating to Bishop's character traits and prior bad conduct, for which conduct he had heretofore gone unpunished. Three character witnesses—two ex-girlfriends and an ex-roommate—testified about Bishop's past misconduct with these girlfriends; a bloody beating Bishop gave to a male friend; Bishop's heinous, sadistic abuse of a number of dogs; threats of violence Bishop made against the roommate to collect outstanding rent, once the latter had moved out; Bishop's removal from a rugby team for aggressive behavior; Bishop's ownership of numerous guns and use of guns in the past (a photograph of Bishop and his friends holding guns and standing in front of a confederate flag was introduced in evidence); Bishop's illicit liaisons and contacts with women; Bishop's character traits, including a terrible temper and a penchant for picking fights, among many other sundry details about Bishop's bad personality and behavior.

The evidence is summarized below.  I recognize, since the prior act and other character evidence presented was quite extensive, that this summary is perforce long and laborious.  However, I have included this summary here because it is important for purposes of appreciating (1) the inflammatory details woven into the testimony of the character witnesses, and (2) the prosecutor's focus on those details in questioning the witnesses.

**A. Katie O.**

Katie O. was the People's *first* witness.  She met Bishop in May 2009.  Bishop lived in Redding at the time and Katie lived in McArthur, a town near Redding.  The two started dating.  Katie worked for her parents' agricultural business; she drove to various communities delivering hay to customers during the week.  Katie also had a house in

4

Redding. She would see Bishop on weekends. They dated for about eight months. Katie provided wide-ranging, narrative, and detailed testimony describing a range of incidents, Bishop's personality traits, and details as, for example, that Bishop would frequently receive racy texts from other women and her suspicion that he slept with another woman while in a dating relationship with Katie.

### 1. Washer/Dryer Incident

Katie described a time Bishop acted out with respect to doing laundry. She testified: "I noticed my first sign of aggression from him. We were at his house and he and I were getting ready to go visit his parents. And he was doing a load of laundry. And he asked me if I can switch it over for him to the washer – from the washer to the dryer. And I told him I would. I believe he was [taking a] shower at that time. And I had forgot. I got distracted. [¶] He came out and he started hitting the doors and got a little upset, slammed the door of the washing machine and opened it up, threw it in the dryer, slammed the door. I was just taken aback by it. It made me feel really uncomfortable. I did not see that. I didn't think – I didn't think he would do something like that." Katie continued: "[He said something] along the lines of, 'It's not that fucking hard. I can't believe you didn't. It's just a transfer of clothes.' " Katie added: "I was just in shock. I didn't see him ever being that way. I didn't really know what to do. I was just kind of startled." Bishop later apologized.

### 2. Arguments Over Racy Text Messages Bishop Received

Katie noted the relationship was "rocky" thereafter. "There were signs of temperament issues. [T]here would be days where it would be perfectly good, and then all of a sudden [Bishop] would just get really upset and really mad. It was scary, because [she] never knew what was going to set him off."

Katie explained that arguments over racy text messages Bishop received from other women would escalate into physical abuse. She testified: "Well, it's usually all over a girlfriend or someone else he's talking to. And he would have his phone sitting

5

next to me to where it would go off.  I would see it on his phone and he would be out of the room, like going to the bathroom, and the phone would be sitting there on the coffee table.  And a text would come through and it was some girl's name.  Just a little brief amount of the text you can kind of skim over and read a little bit.  So I grabbed the phone, and I would look, because I didn't like what I saw.  [¶]  Sure enough, there's – for example, one of them was a picture of a girl's boobs.  And so I confronted him about it and asked him, 'What is this?  What's going on?'  And that happened quite often.  And he was – he was a smooth talker.  He made me believe that, no, it's nothing, it's okay, even though I knew better.  It was just the craziest thing."

### 3.  Physical Altercation

Asked about incidents of physical abuse, Katie said:  "One time it got really bad.  I went over there.  He had just vacuumed the carpet.  I went into his room, sat on his bed.  And I went to pick my phone up off the ground, and there was, like, a loose hair.  It was a black hair that had come up, like, obviously a girl must have brushed her hair or something there and it fell on the floor.  [¶]  I looked.  It got me curious.  I looked underneath the pillowcase, and there was another little hair there.  So he walked into the room and I held the hairs up, and I was like, 'Does this look like my hair color?  What's going on?'  And it was long and curled.  So I confronted him about it.  And he got really angry.  He started to come at me.  I got scared.  He wanted to slap me."  Katie continued: "Then it just kind of started to blur.  I was just like what the heck is going on?  He was throwing stuff across the room, grabbing anything and grabbed and throw it."  Katie explained that Bishop grabbed his phone from her hand, "threw it against the wall and broke it."  He also "just was throwing shoes and all kinds of stuff and hitting things."

Katie testified: "I was frightened.  I was terrified.  And when he slapped me across the face, I grabbed him.  I just put him in a choke hold.  And I started choking him.  I was just fearful.  And I was just thinking what do I do?  What do I do?  He started to go limp, and kind of started tapping.  And I was like, what do I do?  I can't just keep sitting

6

here like this. I don't know at what point does he die? I don't know. So I got scared, and I let go. Then all hell broke loose. He grabbed me and threw me against the wall. It was bad."

Katie continued: "He started to come at me. And he was, like, reaching for me, so I ran. He had, like, a little hallway, and I ran out into the hallway. And he tackled me and started, like, shoving me to the ground, and the carpet, and I managed to get away. I ran into the kitchen. And the next thing I know I'm on my back. I don't even remember what happened. It just blurred. He's on top of me spitting in my face, just yelling at me and spitting in my face." Katie continued: "[Eventually], [h]e got up. He started to apologize. He went and he sat on his couch and he started to cry and put his hands – his head in his hands and just kind of like [sat] there. And I was just like I've got to be smart about this. This guy, he just snapped. I've never been in a situation like that. I didn't know what to do."

Katie could not get away. She testified: "Before [he calmed down], [Bishop] threw all my belongings across the room, like all my makeup and everything [that] was in the bag, and he threw it across the room. I went to escape, to go get in my car. He had grabbed me, literally picked me up, packed me back into his house, shut the door, had the key, and sat me on the couch." Katie explained that while Bishop was attacking her, "[she] was terrified for [her] life." She was wondering whether Bishop was "going to kill [her]?"[2]

Katie did not leave Bishop because "he manipulated [her]." Katie said: "He threatened anyone I cared about if I went to leave him. I felt trapped. At that point it wasn't just my life now. It's people I care about and love."[3]

---

[2] On cross-examination, Katie acknowledged that this incident represented the only time Bishop actually got physical with her.

[3] On cross-examination Katie acknowledged she never told anyone that Bishop had threatened her and her loved ones. She said: "Why would I – why would I want to make

7

### 4. Bloody Beating of Jason T.

The prosecutor asked Katie whether Bishop directed his anger towards anyone else. Katie responded: "Yes. He had a friend of his, his name is Jason [T.]. Before we were really starting to, like, really date-date, it was probably just right there in the beginning after we met … [Bishop] had lived in a different house in a different location [then]. And I went over there and I noticed a hole – a big hole in the wall. I asked him about that. And he didn't really elaborate on it."[4] Katie went on: "[Jason] was there. He was at that house – well, I don't know if he was living there. He was at that location. I'm assuming he was living there."

The prosecutor asked about an incident in which Bishop got physical with Jason. Katie responded: "Okay. So Jason was – [Bishop] cared for [Jason] and wanted to help him out. [Bishop] had lent [Jason] money or bought him a bicycle or something, so [Jason] had the bike. And [Bishop] was letting [Jason] stay there at [Bishop's] house, and [Jason] left the bike in the lawn. [Bishop] was really mad because someone could have walked up and stole[n] it. He felt like [Jason] was ungrateful for the bike. So he was waiting for him to come home so he could talk to him or come from wherever he was. He was very upset about that."

Katie explained further: "When Jason came in the home, [Bishop] kindly ask[ed] me, 'Will you … go wait in my room? I'm going to talk to him.' And I was like, okay. So I just thought, you know, he wanted some save face and whatever. So I went into the

---

him more mad? That's just gonna come back to me. The guy has – if you give him a reason, he's gonna come and get you. Like the dogs give him a reason. You see how he treated the dogs. He's not that way, but when you give him a reason, if there's something that makes him upset, something that triggers him, there's hell to be paid. I don't want to trigger him. I don't know what's gonna trigger him. He's unpredictable."

[4] On cross-examination, Katie volunteered: "It was the hole that got created because [Bishop] threw Jason through it." Defense counsel tried to address the basis for this conclusion. Katie simply offered: "Well, [Bishop] obviously has some aggression issues towards Jason."

other room.  The next thing I know I hear yelling and punching.  And I heard Jason screaming, 'Stop, Trevor!  Stop!  Oh, my God!'  I was getting just – it was terrible.  I was freaking[,] I opened the door.  I was desperately [shouting], 'Trevor, stop!  Stop!' "

The prosecutor asked Katie what she saw when she opened the door.  Katie said: "I saw [Bishop] on top of [Jason].  He was just hitting him.  [¶] … Like on his face on the side of his head.  [¶] … [Jason] was screaming."  The prosecutor asked:  "Did you see blood?"  Katie answered, "Yes."  The prosecutor asked:  "Where was the blood?"  Katie answered:  "On his face, on the wall.  I went back into the room, shut the door, started crying.  I was terrified.  I didn't know what to do.  It sounded like he was hitting a wet sponge.  It was just disgusting.  It makes me sick."

Katie went on:  "Then I walked out when it got quiet.  I didn't know what to expect when I walked out.  [Bishop] was standing there.  He had blood on him.  There was blood on the walls, spatter.  And I was like, 'Where's Jason?'  And [Bishop] said, 'Oh, he got up and ran off.' "  The prosecutor returned to the topic of blood and asked what Katie had seen on Bishop's clothes.  Katie responded:  "Just blood."  The prosecutor extended the line of questioning, asking, "Was there a lot of blood?"  Katie responded:  "Decent amount."[5]  Katie never saw Jason again.

The prosecutor asked Katie why she stayed with Bishop after witnessing the incident involving Jason.  Katie answered:  "I was terrified.  He already made threats to me and my family, and I just saw him almost beat a guy to death, and I'm like this is very real.  How am I gonna get away from somebody like this?"

### 5.  Bishop's Pervasive Abuse of His Boxer Dogs

Bishop had two boxer dogs.  Katie testified that Bishop would abuse his dogs.  She explained:  "When the dogs would do something, like, for example, digging in the

---

**5**      On cross-examination, Katie said she did not call the police after the brutal beating inflicted on Jason because she was "not gonna give [Bishop] a reason."

backyard, he would not just go out there like a normal person would[,] and hit the dog and say no, no, no, you know, and leave it at that. He would go out there, yell, grab the dog, throw it down in the dirt, kick it, punch it repeatedly. He would tie them up in his garage, beat them. And then he would proceed to go back into his house, go back out to the dogs 15 or 20 minutes later, beat them again."

Katie continued: "I would be in the house. I would hear him punching them repetitively with his fist on their sides. I don't know. It was behind closed doors at that time. And I heard it. It was loud. It was disgusting. He would punch them over and over and over and over. And go back in the house, take a break. Go back out and continue beating them." Bishop would say, " 'They don't learn. No matter how hard I hit them, they just don't learn.' "

Katie noted Bishop behaved in these ways "[q]uite often."[6] She added: "The first time it was behind closed doors. I've seen him grab the dog right in front of me and throw it against the wall, hit it multiple times over and over, just everywhere." At other times, he "showed a lot of love towards [the dogs]."

### 6. Bishop's Abuse of His Roommate's Pug Dog

Katie testified about Bishop's roommate, Dan N., who "owned a little pug" called Chloe. The pug "stayed in Dan's room for the most part, but it would come out and wander around the house." Katie saw Bishop, who was not working at the time, act aggressively with the pug on multiple occasions—"three times at the least."

The prosecutor asked Katie to describe the first incident. Katie said: "Okay. Well, so I walked into the house and there was a little pile of poop. [Bishop] got really

---

**6** On cross-examination, Katie repeated: "It wasn't normal. You don't do that. It's like – that was his form of punishment. That's how he was trying to teach the dog that you don't do this. It was extremely excessive. He was repeatedly punching the dogs. He was kicking them, and he would go back after a period of time and continue to do it again." She noted this behavior was routine: "This is what he did."

10

mad.  The dog was out.  It was scampering around.  He grabbed the dog, put its face in the poop, literally its whole face, smeared it around, and was proceeding to beat the dog. He would punch it over and over repeatedly.  [¶]  The dog would get out of his clutches, run, try to hide, escape.  He would go find the dog, grab it, shake it, pull its fur, throw it on the ground, put his knee in the little dog.  The dog would yelp, squeal.  [¶]  I was in shock, like wow, this is a little dog, what are you doing?  It would run off.  He eventually would stop, but it went on for a while."  Katie said she would admonish Bishop:  "I was afraid.  I told him that's ridiculous.  It's little.  It can't take that.  What are you doing?"

The prosecutor asked Katie to describe the second incident involving the dog. Katie testified:  "He got more aggressive each time.  He would grab the dog and he threw it down.  He was punching.  I thought I was gonna watch him kill it.  He would proceed to just hit it in the head, hit it in its side, throw it against the wall.  It would run, try to hide.  Same thing."

The prosecutor asked Katie:  "Do you know about how big this dog was?"  Katie answered:  "It wasn't very big.  It was probably about like that.  It's a little pug.  She was probably smaller."  The prosecutor asked:  "About a foot in length or so?"  Katie answered:  "Yeah."  The prosecutor continued:  "Do you know approximately how much the dog weighed?"  Katie answered:  "I think ten pounds probably."

The prosecutor asked Katie to describe the third incident involving the dog.  Katie answered:  "Similar thing, just lasted a lot longer the third time."  The prosecutor continued with her focus on the details:  "What did you see?"  Katie responded: "[Bishop] would grab it and smash its face into the poop and smear it all over the dog. And the dog would squeal, and he would grab it and shake it and throw it down on the ground and sit on it and push his knee into it and punch it.  It would try to escape and he would keep doing that."[7]

---

[7]    On cross-examination, Katie acknowledged she never told anyone about Bishop's abusive treatment of the pug.  She said, "Only I knew that."  Defense counsel asked why

11

The prosecutor turned Katie's attention to yet another incident involving the pug, asking whether Katie was aware that Chloe had died. Katie responded affirmatively, adding that Bishop told her at one point that the dog was not acting right and Dan had to attend to it. The prosecutor continued: "The last time that you saw this defendant beat this little pug, do you know about from that time that you saw that incident … how many days passed that Chloe died?" Katie replied: "It wasn't long, like, three days, four days." The prosecutor asked, "At that point you're seeing him beat this little dog. Did you try to … get away from him at that point?" Katie responded: "Yeah. I would get up and leave, go into his room. I knew better. If I tried to leave – any time I tried to leave, he would just go grab me, pull me into the house, grab my car key. It wasn't gonna work."

### 7. Incident in which Bishop Pulled a Gun on Katie

Katie said her relationship with Bishop eventually "tapered off." The prosecutor asked Katie to describe how it tapered off. Katie explained: "He would call me a lot, text me. I would get a ridiculous amount of missed calls and text messages, voicemails on my phone to the point where my heart would sink when I looked at my phone. I just would ignore him. I wouldn't respond. I just hoped that he would leave me alone."[8]

Some of Bishop's property was stored in the garage of Katie's house in Redding. Towards the end of the relationship, about seven months after Katie and Bishop began dating, she asked him to "come get his stuff" from the Redding house. Katie lived at her parents' house and "wasn't occupying [her] house in Redding." Katie and her parents had bought the Redding house together; it was "just for investment purposes," and was "not necessarily for [her] to ever live in." She explained she had "stayed [at the Redding

---

she never told anyone about this situation. Katie responded: "Why am I going to piss him off? If I talk and tell somebody and someone hears, that might be the very thing that the guy goes, okay, that's it, comes after me. I don't know. I just don't."

[8] On cross-examination, Katie testified: "The guy [i.e., Bishop] stalked me for two years after I broke up with him. It never [ended]."

house] maybe at the most for a couple weeks," noting that she "wouldn't consider that living." In fact, the Redding house was "empty, vacant."

On the day appointed for Bishop to collect his stuff, Katie drove to the Redding house with her mother. She told her mother to drop her off because Bishop had "trigger points and [her] mom happen[ed] to be one of them." Bishop was a "really smooth talker," and started asking Katie to give him a second chance. Katie noted that, around Bishop, she would sometimes second guess herself: "Seeing these girls and knowing better, and he convinced me on multiple occasions that he's not that guy, he's better than that."

Katie said her interaction with Bishop that day escalated into a "nightmare." She testified: "[Bishop] got there, and he started loading up all of his belongings. It was a fridge and he had golf clubs and a coffee pot, maybe some other little random things. He started loading them into the back of his pickup and he just was talking with me." As he addressed their breakup, he became increasingly "irritated" and "aggressive." Katie explained: "[He] grabbed the golf clubs and threw them really hard. Balls went flying everywhere. He started hitting things and just getting more upset. I tried calming him down. He was just getting mad." She went on: "He actually bolted past me and went into my house. The garage has a little side door where you can go from the garage into the house and he bolted into the house." Katie continued: "He ran into my bedroom. He was just yelling. He ran into my bedroom. He started grabbing all the clothes out of my closet and he just grabbed them and threw them into the back of his pickup. And I was like, 'Trevor, what are you doing? What in the hell are you doing?' [¶] Then he ran in the back of the house, grabbed all my shoes, threw them in the back of the pickup. He started grabbing my personal belongings and loading them up in the back of his pickup." Katie added: "[T]his just went on for a while. I was trying to talk him into giving me my stuff. What are you doing? He slammed on the doors, loading things in, grabbing everything while I was trying to get him to stop."

13

Eventually, Bishop started to calm down, but then Katie's mother showed up. Katie said: "I asked her to give us some more time[,] so she drove away." Katie went on: "[Bishop] stormed back in the house. We were in the hallway…. We were standing in there and he was yelling. He pulled the gun that he had on him – I didn't even know he had it on him – from the back, I guess. It was in the back part of his pants. He held it up to his head, and then he held it to me. He was yelling." The prosecutor asked: "He held the gun. He pointed it at you?" Katie replied, "Yes." Katie thought she was going to die. Then, Bishop "lowered the gun" and "just kind of start[ed] to sob." Katie pulled him into her bedroom, into the "master bath area," and "talked him into handing [the gun] over to [her], sat the gun down, and emptied the bullets out of it right away."

The prosecutor asked: "What kind of gun was it, if you know?" Katie responded: "It was like a revolver." The prosecutor asked: "Like a handgun?" Katie replied, "Yeah, a handgun." The prosecutor asked, "And you removed – was it loaded?" Katie answered, "Mm-hmm."[9]

**8. Attack on Katie's Mother and Damage to Katie's Property/House**

Katie then addressed Bishop's assault on her mother. She said that her mother eventually came into the house as she had not seen Katie and Bishop "out there," and "got really scared." She testified: "As soon as my mom walked in, it was she was trying to calm him down and talk with him, and he just snapped. He started getting aggressive, yelling at her, starting to charge at her. [¶] She started to back up and he pinned her against a wall near the kitchen and was yelling at her, calling her a bitch. Because he felt that she had a lot of say in the matter."

Katie did not want to call 911 in front of Bishop because she was worried he would get "extremely pissed" and "might kill" her. Katie's mother "eventually got [Bishop] to calm down" but not for long. Katie explained: "There are a bunch of glasses

---

**9** On cross-examination, Katie noted she had a shotgun in the house.

14

that him and I had.  There were little shot glasses.  Anytime we travel together, we would always pick up a shot glass from a location.  I kept them in my house.  And he reached in [and] just pulled and slammed all the glasses.  Everything went flying across the kitchen.  [¶]  His aggression just perked again.…  And then he started throwing things and ran off into one of my spare rooms where I heard him punching the walls.  [¶]  Me and my mom looked at each other.  We just ran.  I grabbed the key out of his pickup.  We jumped in her car or her pickup, and we just hauled butt out of there.  I took his key, because I didn't want him to leave."  The prosecutor asked, "Why not?"  Katie answered:  "Because it sounded like he was beating the hell out of my house.  And I was like, this is it.  This is – I'm gonna get him."  Katie explained she wanted to "[s]eek justice," and her mother called 911.

The police "took a while" but "finally showed up."  Katie said she did not want to press charges, noting:  "I'm not gonna piss him off.  You see what he does to his dogs.  He threatened me.  I am not going to give him a reason.  [¶]  So out of my safety, and even one of the officers agreed, it only gets worse if you press charges."[10]  The prosecutor asked, "Well, did you ever try to take out a restraining order?"  Katie replied, "Yes, I did.  And that's a joke."  She explained it was impossible to serve people with restraining orders.  The prosecutor asked, "[Did] you have a lot of damage in your home?"  Katie responded:  "Yeah, I had holes in the walls, scuffs.  It looks like he threw a bunch of stuff.  I didn't think I would have an ounce of granite left in my kitchen, but I did.  He broke a broom handle that was metal, so that was impressive."

### 9. Katie's Assessment of Bishop's Temperament

The prosecutor asked Katie to describe Bishop's temper.  Katie answered:  "It was instantaneous.  There were no signs.  With the normal person, you can see, like, okay,

---

**10**     On cross-examination, Katie said she did not tell the police that Bishop had pulled a gun on her.  When asked why, she responded she did not "want to make an issue" of it.

15

they're starting to get a little irritated, maybe I should back off a little bit or whatever, you know, let it kind of cool down.  With him it was like me talking to you, and then I'm throwing stuff, I'm mad, punching the walls.  I mean, it was just insane.  And that's what was so scary about it.  That's why it was hard for me to leave him."

Katie continued:  "Also, he's very charming.  And he has a way of getting me to believe.  And I guess it's the soft part of me who wants to believe it, too.  But there were many times when I tried to leave him where he would say, hey, give me a chance, I'll change, I'll do it.  I understand what I'm doing, I want help.  Will you help me?  Help me be better.  [¶]  So I was like, okay, let's – *I need you to go to church*, *because it's gonna take God.*[11]  I can't help you.  It's gonna be more than that.  And so it kind of was like a lead-on thing.  He was really good at getting me to believe that he was someone he's not or that *he was gonna change and be a good person when it was just a lie*."[12]  (Italics added.)

### B.  Cherilynn O.

Cherilynn O. was also called to testify by the People early in their case-in-chief.  Like Katie, Cherilynn testified in a wide-ranging, narrative, and detailed fashion about Bishop's aggressive behavior, penchant for picking fights, keeping loaded guns around, pulling a gun on Cherilynn, drinking, and sleeping with another woman while in an exclusive relationship with Cherilynn.

Cherilynn dated Bishop in 2006 for about five months, when both lived in Redding.  Cherilynn was 19 years old at the time.  Cherilynn and Bishop were introduced by Cherilynn's mother, who worked with Bishop at a houseboat company.  At some point

---

[11]  On cross-examination, Katie clarified that Bishop attended church for a few months.  Katie testified that Bishop "was being fake."

[12]  On cross-examination, Katie acknowledged she told an investigator from the district attorney's office that she never got any weird vibes with Bishop around kids; in fact, Bishop had a brother with Down Syndrome, whom he looked after really well.

during the relationship, Bishop moved in with Cherilynn and her roommate, Tauni. Cherilynn noted the relationship quickly deteriorated, as Bishop was "very agitated all the time over little things."

Bishop, while initially polite and charming, quickly became both verbally and physically abusive. Cherilynn noted: "[He would] [j]ust hold me and scream at me." She recalled "a lot of yelling," "scream[ing] in [her] ear, "[n]ame calling," (such as "fucking bitch"), "throwing [of] dishes at the wall," and him restraining her and holding her tight by the arms. She estimated Bishop engaged in this behavior on a twice weekly basis over the three months he lived with her.

The prosecutor asked whether Bishop did "any damage to [her] apartment." Cherilynn answered he did, by "throw[ing] things at the wall or punch[ing] the wall." He also "kicked in the door frame to the house."

Asked to assess his temperament, Cherilynn responded: "Just very violent and had a big ego." The prosecutor followed up: "And was it a quick temper? Did it take him a while?" Cherilynn replied: "It was quick." Cherilynn iterated Bishop would flare up over "minor" issues and observed he had even "held a gun at [her]."

### 1. Incident During a Dinner for Bishop's Friends

Cherilynn described a specific instance of abusive behavior by Bishop. She testified: "I cooked dinner for him and three friends, and I did not clean up the kitchen fast enough, and that was embarrassing to him. So he restrained me in the kitchen, screamed in my ear, and started throwing the dishes at the wall." Asked what Bishop was saying when screaming in her ear, Cherilynn said: "That the house was a mess and it was embarrassing." Asked what the friends were doing at that point, Cherilynn responded: "[T]hey were right there watching." The prosecutor asked: "They watched it?" Cherilynn nodded her head affirmatively. The prosecutor followed up: "Did any of them try to come and help you?" Cherilynn answered: "No." The prosecutor continued: "Were you able to get away from [Bishop]?" Cherilynn: replied: "Eventually."

17

## 2. Bishop's Guns and Incident in Which He Pulled Gun on Cherilynn

The prosecutor asked Cherilynn whether, back in 2006 in Redding, Bishop owned any weapons, the type of weapons, and the number of weapons. Cherilynn said Bishop owned four guns; later she noted she believed the guns "were always loaded." The prosecutor asked: "Was there an incident one time with the defendant and one of his guns?" Cherilynn said, "Yes." The prosecutor continued: "Would you tell the jury what happened?" Cherilynn explained: "I would not have sex with him one night, and he held me at gunpoint." The prosecutor and Cherilynn then had a detailed exchange about this incident:

"Q. Okay. Can you describe it a little more what happened?

"A. [Bishop] said that if I wasn't going to have sex with him, that neither one of us needed to be alive."

"Q. And what did he do when he was saying this? Did he have a gun in his hand?

"A. He was holding the gun at me.

"Q. Did you have – did you know what the gun was?

"A. A shotgun.

"Q. Do you know if it was loaded or not?

"A. I believe so. They were always loaded.

"Q. And what was he doing with the shotgun?

"A. Pointing it at me.

"Q. And where were you?

"A. In the living room.

"Q. Okay. And were you scared?

"A. Yes.

18

"Q.    Do you think he was gonna shoot you?

"A.    Yes.

"Q.    And how long did this go on for?

"A.    A few minutes.

"Q.    Okay.  And how did it end?

"A.    I was able to talk him out of it somehow.

"Q.    How did you do that?

"A.    I'm not really sure.  It's all a blur to me.

"Q.    Now, did you call the police?

"A.    Honestly, after the gun was pointed at me, I don't remember much. It was terrifying.

"Q.    Okay.  Did he leave – did he leave?

"A.    I think I left.

"Q.    You left.  And where did you go?

"A.    To my mother's.

"Q.    Okay.  But you don't know if you called the police or not?

"A.    I don't remember.

"Q.    Okay.  Do you know with the four guns that the defendant had in the house, where did he keep them?

"A.    In the downstairs closet.

"Q.    And do you know if they were all loaded.

"A.    He always had them loaded."

### 3.  Photograph of Bishop and His Friends Holding Guns

The prosecutor showed Cherilynn a photograph and asked her to describe it.

Cherilynn said the photograph showed Bishop and his friends holding guns (on a

houseboat at Shasta Lake).  Cherilynn confirmed that, in the photograph, Bishop was holding the gun he had pointed at Cherilynn.  The photograph was introduced into evidence and published to the jury.  The photograph shows Bishop and four other men holding long guns and standing on a boat, which is flying the confederate flag.  After the photograph was published, the prosecutor asked Cherilynn, once again, to describe what it depicted, and again had her identify Bishop.  The prosecutor then circled back to ask, once more, for emphasis:  "And that's the gun that he held to you for about four minutes or so?"  Cherilynn responded:  "I believe so."[13]

### 4. Bishop Slept with Another Woman and Spat on Cherilynn

The prosecutor asked Cherilynn to describe an incident in which Bishop "was spitting in [her] face."  Cherilynn responded:  "We were out on a houseboat for his birthday.  He slept with another woman on top, and the next morning I asked him to get his stuff out of the house, and he spit in my face."  The prosecutor and Cherilynn had the following exchange about this incident:

"Q.    Okay.  How did he spit in your face?  Was he holding you?  What did he do?

"A.    He looked at me and spit in my face.

"Q.    Where did this happen at?

"A.    Right outside the front door.

"Q.    Of your house?

"A.    Yes.

"Q.    And after he spit in your face, what happened?

---

[13]    On cross-examination Cherilynn acknowledged that Bishop and his friends would go out on the lake on houseboats and shoot off the guns, essentially being "knuckleheads," in defense counsel's phrasing.  Cherilynn never saw Bishop do anything else with his guns.

"A.    I asked him to leave.

"Q.    And did he?

"A.    I believe so, yes.

"Q.    Pardon?

"A.    Yes.

"Q.    And did you have to call the police?

"A.    No."

The prosecutor returned to this incident after Cherilynn mentioned, in connection with other questions, that Bishop's work involved "[m]aintenance for houseboats":

"Q.    Is this where you were when [Bishop] slept with another woman?

"A.    He had rented a houseboat that night for his birthday.

"Q.    What happened?

"A.    He slept with another woman.

"Q.    And where were you?

"A.    Downstairs sleeping.

"Q.    How do you know he did this?

"A.    Because I saw it.

"Q.    You went upstairs and saw it?

"A.    Yes.

"Q.    Did he see you?

"A.    Yes.

"Q.    And did he say – is this when he spit in your face?

"A.    The next morning."

### 5. Cherilynn's Roommate Moved Out Because of Bishop

The prosecutor addressed how Cherilynn's roommate, Tauni, reacted to Bishop. The prosecutor and Cherilynn had the following exchange:

"Q. How long did [Tauni] live … with you and the defendant?

"A. Maybe three months.

"Q. Okay. And did she witness anything, any assaults by the defendant on you?

"A. I think just the screaming and yelling.

"Q. And did she at some point move out?

"A. She moved out because of him.

"Q. And why? Did he assault her?

"A. No. He was just drunk and violent.

"Q. Okay. When you used – you used the word "assault" when you were talking to the investigator; correct?

"A. Yes.

"Q. What did you mean by that?

"A. The way that he would restrain me or held me at gunpoint or spit in my face. To me, that's all assault."[14]

### 6. Bishop Would Go Around Wanting to Pick Fights, Generally

The prosecutor asked Cherilynn about Bishop's aggressive or violent tendencies as a general matter. They had the following discussion in this context:

"Q. Now, during your relationship with the defendant, did you ever see him become violent with anybody else?

"A. No.

---

[14] On cross-examination, Cherilynn clarified that Bishop had never hit her; nor did she ever think he was going to hit her.

"Q. Well, did he ever go around picking fights?

"[Defense Counsel]: Objection; leading.

"THE COURT: Overruled.

"A. He wanted to everywhere he was. He was just very angry.

"Q. He was what?

"Q. Angry.

"Q. Okay. So he would go around picking fights?

"A. Yeah, he would try to, but I never saw him fight.

"Q. Where would this happen at?

"A. The bowling alley, baseball field. I mean, anywhere that we were out. If he didn't like someone or they looked at him wrong, he was agitated.

"Q. Okay. Well, what would it take for him to want to pick a fight with somebody that he doesn't he even know?

"A. Nothing. Someone could look at him wrong.[15]

"Q. And what would he do?

"A. Say that they are peasants and they are lower than him."

### 7. Bishop's Drinking

The prosecutor questioned Cherilynn about Bishop's drinking in 2006, in Redding. They had the following exchange:

"Q. During your relationship, was there a lot of alcohol involved?

"A. Yes.

"Q. Who was drinking the alcohol?

"A. Him.

---

[15] On cross-examination, Cherilynn iterated she never saw Bishop in a fight with anyone.

"Q.    And when he was intoxicated, would he become physically abusive with you?

"A.    Restraining me.

"Q.    Okay.  And were there names – did he only do this when he was intoxicated"

"A.    No.

"Q.    Did he become verbally abusive with you or physically abusive when he was sober?

"A.    Yes.

"Q.    Could you tell a difference?

"A.    No.  He just had a bad temper.

"Q.    Okay.  Now, looking back on the relationship, was it a normal relationship?

"A.    No, it was horrible."

### 8.  Cherilynn's Calls to Police During the Relationship

Cherilynn testified that during the period she dated Bishop, she called the police on Bishop three times.  "[Bishop] would run off before [the police] would get there." Cherilynn made reports with the police.  However, Bishop always came back around.

### 9.  Bishop's Harassing Behavior After End of Relationship

At some point, Cherilynn made Bishop leave the house.  That was the end of the relationship.  The prosecutor asked:  "So how do you get him out of the house?" Cherilynn answered:  "I don't remember.  I had people come over and help."  The prosecutor asked:  "What did they do?"  Cherilynn said they were there "for support." The prosecutor and Cherilynn had the following exchange:

"Q.    Did he have a lot of stuff in your house?

"A.    Yes.

"Q.    Did he remove his stuff?

24

"A.   Yes.

"Q.   Did he repair any of the walls that he punched?

"A.   No.

"Q.   When he lived with you, did he help support the household?

"A.   No.

"Q.   Nothing?

"A.   No.

"Q.   Did you ask him for money?

"A.   A couple times.

"Q.   And what was his response?

"A.   That he just doesn't have the money.

"Q.   Did he have a job.

"A.   Yes.  [¶] … [¶]

"Q.   Well, [after] you got him out of your house … would he [still] show up at your house?

"A.   My house or at the bank or if I was shopping.

"Q.   What happened at the bank?

"A.   I was in the drive-thru and he walked up to my car.

"Q.   What did he do?

"A.   Just made it known that he was there.

"Q.   And what other places did he show up at?

"A.   Target.

"Q.   And what happened at Target?

"A.   Nothing.  Just following.

"Q.    He was following you.  Okay.  And anywhere else?

"A.    I'm not sure.

"Q.    Were you scared?

"A.    Yes.

"Q.    Did he ever threaten you?

"A.    I mean, I was threatened with a gun.  I was terrified of him."

For a few weeks after they broke up, Bishop called, emailed, and texted Cherilynn. Cherilynn would tell him to leave her alone but he would not comply.  Cherilynn also discussed a specific incident following her breakup with Bishop.  Bishop showed up at her front door at 3:00 a.m. and "tried kicking it in."  He was "screaming [her] name."  He "broke the doorjamb."  Cherilynn called the police but "he was gone by then."

### 10. Bishop's Post-Breakup Letters and Emails to Cherilynn

The prosecutor showed Cherilynn an email Bishop had sent her in which he apologized for his uncontrolled behavior.  The prosecutor asked Cherilynn whether Bishop wrote this after the incident with the gun and she replied, "I believe so."  The prosecutor also showed Cherilynn a letter in which Bishop apologized for outrageous behavior.  The prosecutor asked what Bishop was apologizing for.  Cherilynn said:  "I think everything that he's put me through."  Cherilynn said she got many such letters.

### 11. Cherilynn Obtained Restraining Order

Cherilynn testified she eventually obtained a restraining order against Bishop. Bishop was served with the restraining order, which was in effect for three years.  Bishop continued to email her even after she obtained the restraining order.

### C. Dan N.

Dan N. testified for the People.  Asked how he knew Bishop, Dan explained he "used to work with him, played rugby with him, [and] lived with him [in a house]" in Redding.  He met Bishop in 2009 and moved in with him around then, in "2010 maybe,"

possibly for six to eight months.  Dan had met Bishop's girlfriend, Katie; Katie had her own place but would visit quite often.

### 1.  Incident Leading to Death of Dan's Pug Dog

Dan had a pug dog at the time; the dog was called Chloe.  She was small and weighed about "20 pounds"; she used to be "happy, full of life."  Dan also noted the dog was "husky" and could not jump onto his bed.

Dan observed that Bishop "treated everybody else with disrespect," including Chloe.  Dan explained:  "[Bishop] would just holler, make threats that if I didn't keep my dog, you know, from being too loud or peeing or whatever, that, you know, he was gonna cause some sort of violence towards me or her."  Bishop was unemployed at the time, while Dan would go to work.

The prosecutor asked Dan to describe an incident involving Chloe.  Dan testified: "I came home and [Bishop] came to me and said that my dog was acting funny.  She didn't seem to feel good.  Came in my bedroom.  She was sitting on top of my bed.  According to him, she had jumped up there herself, and he had never laid a hand on her, and that she wasn't feeling well.  And she was very timid and very tender to the touch. [¶]  I tried to pick her up and let her down off the bed, and she squirmed a little bit, didn't want to be touched.  We walked around.  She followed me everywhere.  She was like a shadow.  And so we walked around, but anywhere we went, she was sure that I was in between her and [Bishop] the entire time.  It was something I had never seen before.  She was definitely acting strange."  Dan went on:  "I just watched her, you know, at first, and [she did not] physically appear, you know, any different, really.  She was just acting different.  I watched her for a day.  And then her side started swelling up more.  And another day, and it was really bad.  Her breathing was very labored."  Dan took Chloe to the vet.  Chloe needed surgery.  Chloe did not survive the surgery.

## 2. Bishop's Threats After Dan Moved Out

Dan testified about subsequent events. He said: "When I left the vet, I was a little upset about the situation. So I went home and started packing my stuff, grabbing golf clubs, paced around the house waiting for [Bishop] to come home." In the meantime, however, Dan's brother drove up from Sacramento, and helped Dan pack up his stuff and move out.

Dan described what happened next: "After I moved out, I received a number of phone calls from [Bishop] asking me for money, [to] pay for the rent and bills, which I refused. I was then threatened multiple times with physical violence if I didn't. I explained to him that I had a $2,500 vet bill [and] that I believed it was from his hand, and if he wanted to pay for that, I'd gladly pay for the rent. He refused to pay, so I in turn refused to pay him." The prosecutor asked Dan: "Did you say anything to him about your dog?" Dan responded: "Yeah. I told him I thought that he killed my dog and I didn't appreciate it. He denied it." The prosecutor followed up: "Well, did he – did he tell you he was gonna come over? Was he threatening you?" Dan answered: "Oh, yeah. He was definitely threatening me with physical violence if I didn't pay him. I told him he knew where I was at. I never saw him."

## 3. Bishop's Own Dogs

The prosecutor also asked Dan about the way Bishop treated his own dogs, two "large" boxers. Dan said "[t]hey roughhoused," but Bishop did not, by any means, beat them. The prosecutor asked whether Bishop had ever accused Dan of abusing Bishop's dogs. Dan said that Bishop did accuse him, explaining: "We were very intoxicated, and we'd been drinking at the house, and he got upset with me and accused me of abusing one of his dogs, and confronted me in the garage, a lot of hollering and screaming, throwing some things around. Kind of ironic, his dog was hiding behind me the entire time." The prosecutor followed up: "So his dog was hiding behind you?" Dan replied: "Absolutely. His dog was frightened of him."

28

### 4. Bishop Removed from Rugby Team

Dan briefly played on a rugby team with Bishop; they overlapped for less than a season. The prosecutor asked whether rugby was "a pretty violent [sport]?" Dan responded: "No, it's not violent. It's physical." The prosecutor asked for details regarding Bishop's participation on the team. Dan answered: "His attitude was unanimously voted to be not in line with the team's views. So he had been asked to be removed by a couple of the – the president of the club or whatever. Then a number of us, myself included, actually had [his] back and asked if that was a good idea. He was a good player. A lot of us liked him at the time. So we ended up having a vote. A number of us, myself included, voted for him. But he was ultimately voted off the team."

### 5. Bishop's Behavior with Katie

The prosecutor questioned Dan about whether he was aware of any altercations between Bishop and Katie. Dan said: "I heard things. After the first month or so, I stopped hanging out in the common area of the house. I was just kind of reclusive with myself in the room. I didn't really feel welcome out front. He was kind of a slovenly person, left clothes and everything all over the couches that he wasn't sprawled all over. I didn't have room to sit in the front, so I sat in my room watching TV." The prosecutor and Dan then had the following exchange:

"Q. Did you hear things going on?

"A. Of course.

"Q. What?

"A. Hollering, things getting smashed, whatever.

"Q. Did you ever see the defendant treat Katie with a demeaning-type attitude?

"A. He treated everyone with a demeaning attitude, so yeah, I did."

29

### 6. Bishop's Aggression and Destructive Conduct

The prosecutor questioned Dan about Bishop's temperament and whether he would pick fights with others. The prosecutor asked: "When you would see the defendant get mad, was it a progressive type of anger?" Dan responded: "Absolutely not. It was like a light switch on and off. He would be happy-go-lucky one minute, fun, barbecuing, having a good time. The next minute flipping out, punching holes in the wall."

Subsequently, the prosecutor asked: "And was he – did you ever see him become destructive around the house?" Dan answered: "All the time. When I first moved in there was a picture that was put in an odd place on the wall. I always wondered why it was there. I moved it one day. A big hole right behind it. Through the eight months, we probably placed three or four new pictures at random places throughout the house for that same reason."

### 7. Bishop's Penchant for Picking Fights

The prosecutor questioned Dan about Bishop's aggressive behavior with other people. The prosecutor asked: "Did you ever see the defendant ever get in any physical altercations?" Dan answered: "From time to time." The prosecutor continued: "Where would that normally take place?" Dan responded: "Usually a bar, on the way to a bar, on the way home from a bar, at our house, wherever." Dan described one incident: "Someone was getting jumped. [Bishop] jumped in and beat up the guy that was beating up the other guy."

## II.    The Prosecutor's Use of the Character Evidence at Trial

### A. The Prosecutor's Cross-Examination of Bishop's Medical Expert

The defense called Dr. Robert Rothfeder to testify as a medical expert on Bishop's behalf. Dr. Rothfeder was a veteran emergency room physician; he also had a private practice specializing in traumatic injuries, including brain injuries and injuries arising

from child abuse.  Dr. Rothfeder reviewed all of Jimmy's medical records, autopsy records, medical testimony from the preliminary hearing, and police reports related to the present incident.  Dr. Rothfeder testified that Jimmy had a "closed head injury in that the scalp and the skull were not wounded."  Dr. Rothfeder went on to provide detailed testimony that was very favorable for the defense.

The prosecutor, in her cross-examination of Dr. Rothfeder, repeatedly referenced the evidence of Bishop's bad character and prior bad conduct that was admitted in the prosecution's case.  The prosecutor asked Dr. Rothfeder whether he had considered the history of the case.  Dr. Rothfeder said he had, specifically he had read the police reports. The prosecutor wanted to know whether Dr. Rothfeder had read the transcripts of the testimony concerning Bishop's prior violent acts.  Dr. Rothfeder said:  "I don't know this defendant's history at all."  The prosecutor asked:  "You don't know about his violent past?"  Dr. Rothfeder said:  "I know nothing about his past."  The prosecutor asked: "Well, wouldn't that have helped you in making an assessment on this case?"  Dr. Rothfeder responded:  "Not in terms of what caused the injury.  I wouldn't have – it wouldn't have really changed my analysis.  The injury is the injury."

The prosecutor repeatedly referenced Bishop's history.  She said:  "You're basing [your opinion] on what he says, what the defendant said happened.  Wouldn't it be better to know the full history of this defendant?"  Dr. Rothfeder replied:  "[H]e's given an account of what's happened.…  [¶] … [¶] …  I'm not forming an opinion on whether the account is true or not.  I'm just saying that if the account is true, whether that could have caused the injury."  Dr. Rothfeder iterated that the events the defendant described were consistent with Jimmy's injuries.

However, the prosecutor repeated:  "You don't know [Bishop's] history.  You didn't read the other transcripts.  You don't know about this defendant."  She added: "And you didn't get any transcripts regarding his prior bad acts and violent history[,] right?"  Thereafter, she asked:  "[The] information about prior bad acts, past violent

31

history, that's not going to change your opinion?" Dr. Rothfeder explained: "[W]hat I'm doing is opining on whether [Bishop's] statements are consistent with a potential cause of the injury."

## B. The Prosecutor's Cross-Examination of Bishop

Bishop testified in his own defense at trial. The prosecutor heavily relied on the large quantity and wide range of bad character and prior bad conduct evidence that had been admitted in the prosecution's case.

The prosecutor began her cross-examination by asking Bishop about Cherilynn O. Defense counsel objected on grounds the line of questioning was beyond the scope of the direct examination, but the court overruled the objection. Thereafter the prosecutor asked Bishop detailed questions about every aspect of the respective testimony of all the character witnesses, starting with Cherilynn.

For example, with respect to Cherilynn's testimony, the prosecutor asked [Bishop] the following questions: "And you moved in with her after a month?"; "And she paid for everything?"; "And you were also verbally and physically abusive toward her[,] right?"; "And let's see, you would hold her hands very tight and restrain her from leaving the house or her room[,] correct?"; "What about your temper? Is it instantaneous like she said?"; "Did you have anger issues back then?"; "Did you punch holes in the walls and throw dishes at her?"; "Did you punch the wall?"; "Is that the night that you had her make dinner for all your friends and she didn't clean up fast enough, so you hit her up against the wall?"; "Was she lying the whole time [she testified]?"; "Did you spit in her face?"; "Scream in her ears and call her a bitch and a whore?"; "You never called her a bitch or a whore?"; "You called her a fucking bitch[?]"; "And then the night you came home drunk from the bar and you demanded that she have sex with you, and she told you no, so then she went downstairs and that's when you pulled out the gun on her[,] right?"; "You didn't pull out a gun on her?"; "Didn't hold her – the gun at her for about four

32

minutes or so?"; "And she didn't call her mother or the police?"; "Was … that the night that [you] held the gun at her and then she called the police so you took off?"; "What about the night you came back and tried to kick the door in?"; "Everything that she testified [about] did not happen?"; "Cheated on her.  Is that when you slept with somebody in the boat?"; "[Cherilynn] was right downstairs, right?"

The prosecutor continued her focus on guns, asking the following questions: "And then that's the night – that's the time you spit in her face?"; "How many guns did you have at that time?"; "And you kept them loaded?"; "And you kept them downstairs in a closet?"; "So you don't have an anger issue?"; "But she did take out a restraining order on you and had you served?"; "[S]he said you were a manipulative person, is that right?"; "Smooth talker?"; "You said [in an email to her that] you went completely overboard and you had anger issues[?]"; "Did you or did [you] not write, 'I have anger issues?' "; "And you said … the only reason for all that crazy behavior was because I love you so much[?]"; "Is that when you were pointing the gun at her?"; "And let's see. Did you ever get ahold of [the anger management counselor you mentioned in your email]?"; "Showing you People's 6, this photo [photograph of Bishop and friends holding guns with confederate flag backdrop].  What's that a photo of?"; "Holding that gun?"; "Okay.  And she said that that's the rifle that you held at her, pointed at her for about four minutes?"; "Is that the gun she said you pointed at her?"; "She said in this photo this was the gun[?]";  "Is that the one you aimed at her?";  "Which one did you aim at her, then?"; How many letters did you write her?"; "You said, 'Wow that's fucking nuts.  I'm so sorry that I don't know what came over me.'  Is that the night you pointed the gun at her?"; "Were you stalking her afterwards?"

The prosecutor next questioned Bishop in the same kind of detail about every aspect of Katie's testimony.  She asked Bishop about him texting with other women while he was dating Katie and other women sending photographs of themselves to him. The prosecutor asked:  "What about the time … [Katie] came to the house on the

33

weekend and found all the black hair all over the bedroom?" The prosecutor questioned Bishop closely about slapping Katie across the face, coming at her with both hands to get to her throat, grabbing her and throwing her across the room and into a wall, spitting in her face, screaming at her, calling her names, and taking her car keys. Next she questioned Bishop about drinking and going to bars. She started to question Bishop about disagreements he had at work and reasons he was let go from a job, but the court sustained an objection to that line of questioning.

The prosecutor questioned Bishop about beating his two boxers in his backyard. The prosecutor said: "You would go out and beat them over and over [for] about five minutes, come back in and then go back out and do it again." The prosecutor then questioned Bishop in detail about Chloe. She said: "And then what about Chloe? The poor little pug." Bishop said: "I didn't hurt the dog. I have two dogs myself." The prosecutor responded: "Well, you beat those, too." The prosecutor said Katie had said Bishop beat Chloe "three separate times." She asked: "You took Chloe's face and rammed it into poop or pee in the carpet?" The prosecutor asked several more questions with regard to Bishop abusing Chloe.

Thereafter, the prosecutor moved on to questioning Bishop about beating Jason T. She asked: "And I guess Jason [T.], that didn't happen, either, where you beat him almost – beat him to death?" Bishop stated: "He had used my truck and ran it out of gas. And then in the process, had thrown up on the passenger side and just left it. As far as a physical fight, no. I was yelling. I was upset. I don't think anybody wouldn't be in that situation, but as far as beating him up, that's not how it went." The prosecutor continued: "So Katie [O.] isn't standing there watching you beat him up while he's begging for his life?" She added: "Do you remember Jason [T.] begging for his life, begging for you to stop hitting him?" Bishop responded: "We had an argument. If that would've happened, I believe Jason or Katie would've called the police if I was doing that." The prosecutor went on: "Well, you kind of had a habit of stalking people, didn't you? In fact, you

34

[stalked] Katie [O.] for about two years after she broke up with you." The prosecutor also asked: "And [Katie] also tried to have you served with a restraining order, didn't she?"

The prosecutor next questioned Bishop in detail about the incident that occurred, as described by Katie, when Bishop went to Katie's house in Redding to retrieve the refrigerator he had stored in her garage. The prosecutor asked: "Well, you've had a refrigerator at her house[,] right? Had one in her garage?" The prosecutor went on: "And she kept asking you to remove it, but you wouldn't?" The prosecutor continued: "And while you're at the house, you pulled a gun out on her." She added: "In fact, then you also charged at her mother that night, didn't you?" She further asked: "And … the police came, didn't they?" The prosecutor then asked whether Bishop remembered "punching in [Katie's] walls" and "smashing all the glasses." She returned to the subject of drinking to ask, "Had you been drinking that night?" She also asked several questions about guns at that point: "The gun is not true?"; "But then you – the gun you pointed at her is not true?"; "Did you point the gun at Cherilynn?"; "Did you spit in Katie's face?" Thereafter, she asked: "You didn't beat up Jason [T.] and he ended up in the emergency?"[16]

The prosecutor moved on to the subject of Bishop being kicked off his rugby team, as described by Dan. The prosecutor asked Bishop several questions in this regard: "Well, you used to play rugby[,] right?"; "In fact, you're on a team?"; "And you played with Dan [N.]?"; "You got voted off the team, didn't you?"; "But you got voted off the team because you're too aggressive and violent [even for rugby]?"; "That must say a lot, huh?"

---

**16** No evidence was introduced to the effect that Jason T. went to the emergency room.

The prosecutor then addressed Bishop's taste in women. She asked several questions in this vein: "Well, what was it you told the detective you used to date whores and bikini dancers?"; "You used to date bikini dancers in clubs?"; "[W]ell, you said right here, 'They're all stripper-looking and they wore skimpy stuff and they looked like whores.' " She also asked: "What were you doing bathing a 16-month [old] little girl and a three-year-old little boy?" Bishop answered: "That is how [D.H.] did it."[17] The prosecutor went on: "I'm asking why were you doing that? Why were you bathing another man's 16-month old little girl?"

## C. The Prosecutor's Closing and Rebuttal Arguments

The prosecutor argued Bishop was guilty of first degree murder and fatal assault on a child. She said: "When [Bishop and the kids] get home, something happens. For Jimmy to receive that subdural hematoma, we know it's inflicted. It's not based on a short fall. It didn't happen because he's throwing him up in the air because he's been vomiting. It didn't happen that way." She went on: "When you think about it, something happened that set [Bishop] off. Based on the other testimony, it doesn't take much to set this guy off. His anger is instantaneous. It's from zero to a hundred. There is nothing in between. He could be sitting there laughing with you, and the next thing, boom, on the turn of a dime he is angry." She argued: "The defendant wasn't disciplining Jimmy. That's not what was going on. I'm upset. And as he's grabbing and looking at him. And then at that one point, he's like I'm just gonna kill you, and he slams him down."

The prosecutor then extensively addressed the evidence of bad character and prior bad conduct admitted in the People's case. Her argument is excerpted below. The

---

**17** D.H. was Bishop's girlfriend and Jimmy's mother. D.H., Bishop, Jimmy, and Jimmy's little sister lived together.

36

excerpt is long because the prosecutor exhaustively discussed the evidence of bad character traits and prior bad conduct; the discussion of this evidence constituted a major part of her closing argument. As will be apparent from the excerpt, the prosecutor marshalled such evidence to portray Bishop as an indiscriminately violent, gun-using, manipulative, and promiscuous person:

> "Now, the witnesses, you had Cherilynn [O.], Katie [O.], Dan [N.]. These three people were from Redding. The thing about what they all pretty much testified to, and you have to remember Katie [O.] and Dan [N.] knew each other, but Cherilynn [O.] didn't know them and they didn't know her. *They all testified that this defendant had an instantaneous temper. There was nothing in between. It's just instantaneous. And they all said he's also manipulative and he's violent.*

> "When you had Cherilynn [O.], they first went out, he was very charming, very nice. He's a good-looking guy. And so within a month, now they've moved in together. Then the real Trevor Bishop starts to come out. And she told you that, you know, she's got his friends over and she makes them all dinner. She goes out and serves them and the next thing he's running in the kitchen because the kitchen's not clean, slams her up against the wall yelling at her. He likes to spit in her face, screaming [in] her ear, 'You fucking bitch. You're an embarrassment to me, goddamn it. Look at this place. Those are my friends out there. You just served us but you didn't do the dishes.'

> "You have to think about that. Cherilynn and Katie don't know each other, but Katie testified the same way. She said he did the same thing to her. Spit in my face, pinned me down, spit in my face, screamed in my ears. He did it to both of them, and he also pulled a gun on each one of them. They don't know each other. They didn't sit there and compare testimony. So that should tell you something about him. Their testimony is pretty much lined up even though they don't even know each other.

> "And Cherilynn [O.], she says that it was constant with him. She didn't know how he was gonna act. She wants to get rid of him. One night she's out at the boat, out at the Shasta Lake where he had worked, and that she says he's upstairs having sex with some other girl while she's downstairs. In fact, that was the night, apparently, when she confronts him and he comes down and he spits in her face and starts yelling at her. Now it's funny, because that was the only thing he admitted doing, was yeah, I

37

had sex with this girl.  Think about that.  Denies everything else, because he says they're all lying.

"Then she says that that one night he comes home and he is drunk and then he's demanding that she has sex with him.  She doesn't want to.  Next thing -- she goes downstairs.  Next thing she's got a gun pointed at her.  She says he has it pointed at her for about four minutes, and he was making his threats that he was gonna kill her.[18]

"She talked him out of it, and she calls her mother.  She wants to get out of there, and he denies it.  You heard him.  Denies it.  That didn't happen.  Nothing happened.  As far [as] he's concerned, everybody's a liar but him except that he did have sex with that other girl.

"And then you had Katie [O.]  Now, I'll tell you, she was a little different up on the stand.  I think she kind of was – I think it kind of felt good for her to just get it out, and I think that she was a little different up there on the stand versus Cherilynn, because you could barely hear Cherilynn, kept telling her to speak up.  She just kind of would say one word.

"But with Katie, I think once she got going, I think she's kind of like maybe it freed her.  I want to get this out.  Don't forget Cherilynn finally got that restraining order on [him].  She was lucky enough to get [him] served.  It still didn't stop [him], because he was still showing up at places, e-mailed her, you know, things that he did.  Showing up at the bank, doing all that, whatever, sending her letters.

"And then Katie, she says she has her suspicions about this guy.  Photos going back and forth.  She doesn't see him until the weekend, because she drives a truck for her family business and drives hay.  So she would see him on the weekends.  She says she comes back and sees all this black, long, curly hair all over the bed, the pillow, the floor.  And when she asks him about it, well, that's all it took.  Now he's mad.  It doesn't take much, so he grabs her.

"I know, maybe you don't believe this part.  I don't know.  But when she says that she had gone to that academy and that she gets him in that choke hold and that he's starting to go limp, then she thinks well, he could pass out, I don't know.  I'm gonna let go.  And when she does that, that's

---

**18**    Cherilynn did not testify that Bishop was threatening to kill her.

her big mistake, because now he goes ballistic, grabs her, picks her up, throws her across the room into the wall and slams her down on the ground.

"She said he shook her. He's pinning her down and he's spitting in her face and screaming in her ear. That's what he does. That lines up [with] just how he treated Cherilynn. Then she's like, you know, and I suppose you're thinking why didn't she get the hell out of there, you know? And she tried, but he kept her keys and her purse. They all said that.[19]

"And I sat there and wondered, the first time, just get out of there. But they both said *he's so manipulative* and the way he does things that he's got them believing, well, maybe there's something wrong with me, you know. Maybe he's right. And he really believed that about himself. This goes on. Six months for Cherilynn, seven or eight months for Katie. She says I know there's something wrong. I've got to get away from this guy, but I've got to be really careful about it. He just doesn't let up. He's obsessed with these people. He tries to control their lives.

"Then after that, she testifies that he's got the two dogs. Now he's got the two boxers. She says -- and I'd have to say why would you make that up? She says he's out there beating these dogs, and he's beating them and beating them and beating them. He comes back in, about five minutes later. He's right back out. [*He's*] *beating these dogs for no reason, just because it feels good to him.*

"There's no reason for her to make that up. But then he would treat them good. Then he would be really good to these dogs, get them good food, get them nice pillows and this and that. It's kind of how he was with Jimmy with all those photos that they wanted to show you, where's smiling.

"Then she tells you about Chloe, 20-pound little pug that … belonged to Dan [N.], the roommate. This time she sees this defendant. Pick up that little pug … and shake it and punch it and kick it three different times. I asked her, the third time that you saw it, what was the time frame from that beating to when he died? Three days later. And you heard Dan [N.] testify that he took Chloe to the vet, and they were going to have the surgery and she died. She didn't get hit by a car. I seriously doubt that this defendant was running down the street chasing her. He had to get – they had to get some man from Redding to get him all the way up here to tell you that he helped him get down the street to Chloe. It's a busy street.

---

**19** Katie testified to the effect that Bishop would keep her keys, etc., but Cherilynn did not.

Probably got hit by a car.  That's how she died.  Well, she didn't die that way.

"The other incident that [Katie] saw was with this Jason [T.].  We had him subpoenaed.  He didn't testify here, but she told you that he comes – he's staying at the house, and she says that the defendant [and he] are like childhood friends and the defendant is trying to help him a little bit.  She says he comes up, pulls up on a bike, and lays the bike down.  That's all it took to show disrespect to this defendant, that he laid down the bike on the front yard.

"She said he comes in the house, and then she says that defendant says to her, could you just go in my room?  So she says I'm thinking he just wants to talk to him.  Next thing all hell breaks loose.  She hears what's going on, that he's beating him, and he's beating him.  She says it sounded like somebody hitting a wet sponge and throws him into a wall – through a wall by the garage.  She hears all this.  She hears him pleading for his life.  And she goes out and then she sees what's going on, too.  She's telling him to stop, but he's not.  He just continues to beat this guy.  She said there was blood all over the place.  He manages to escape and he goes to the emergency.[20]  Then you don't hear from him again.

"Then you can probably ask yourself how come no one is calling the police on this guy?  They're all terrified of him.  He doesn't let up on people.  He stalks them.  He doesn't let up.  He makes their life miserable.  They testified to that.

"And then you had Jason [T.]  Then you had Dan [N.]  And he testifies that he's his roommate.  [He] goes to work.  Chloe, loves Chloe.  He says that that dog – I loved that dog.  She was important to me.  She was special to me.  I cared about her.  And I kept her in my room.  Does that sound like an old dog that's overweight?  Apparently.

"I never had a pug, so I'm not sure.  But apparently overweight, old,[21] couldn't get up on the bed because he said it was too high.  She could never jump up on that bed.  But [Dan] said when he comes home that day, she's on the bed.·  And there is the defendant waiting for him.  Oh, she doesn't look good.  I don't think she feels good.  So he says I check her, I feel her.  And she's kind of whiney.  She's not moving.  He waits a day or

---

**20**    Katie did not testify that Jason went to get emergency treatment; nor was this fact otherwise in evidence.

**21**    Dan testified Chloe was three or four years old.

two and then he feels her stomach is swelling up, and then gets her to the vet, and then she dies.

"And [Dan] says he had his suspicions all along that this defendant was hurting her, and because she was scared of him. [He] said [the defendant] would be yelling[,] aggressive. Chloe was scared of this defendant. [¶] He also told you that he waited for [the defendant] that day. He had a golf club. And he was waiting for him to come home, because he probably wanted to kill him. That was [Dan's] dog. And I don't know, most dog owners, they are very protective of their animals. A lot of times if you have a dog, they treat them like they're your child, especially when your kids get grown and they move away, you know. That's what you do. [¶] They're [a] very important part of the family. Chloe was his family. And he was waiting for [the defendant]. Then he says I called my brother and my brother raced down from Sacramento to tell me, you know, come and get me and got him out of there. And he didn't -- he said it's stupid. Don't do that.

"[The brother] gets [Dan] out of there.· And [Dan] says the next thing he's getting calls from the defendant. [The defendant is] threatening him. You know, you pay part of the rent and this and that or else. And [Dan's] like, you killed my dog. He's saying that. The defendant is threatening him because he wants his money.

"What I also left out about Katie [O.] is she says her last straw with the defendant is they had broken up and she wants him to get his refrigerator out of her garage. So he's gonna come over and get it, but it doesn't go – it's not easy. He starts all these issues there, starts punching her walls in, breaking up her stuff, pulls a gun out on her, pulls a gun on her and he's gonna kill her. She says I was scared to death. I thought he was gonna kill me in my own house.

"Then she says her mother comes in. Her mother is parked down the street, because she says I told my mom, look, it's better if you just stay out of the house. I just want to let's get him, get the refrigerator and go. She didn't want him in her home, but he barged right in. He pushed her out of the way and went right in her house and started destroying the house, breaking things, punching things. That's where he pulled out the gun on her.

"The mom shows up and she told you that her mom is trying to tell him, you know, hey, get out of here. What does he do? Charges at the mom. What does he do again? [Pins] her up against the wall and spits in

41

her face. That's one of his favorite things.  I think it's a disrespect type of thing, spits in her face.**22**

    "The police come.  You saw him up there.  He's denied everything.  Everybody up there is a liar.  And I thought that was pretty good when he told me yesterday that you got a police report on that, which I didn't have at that time.  I didn't have it in my possession, but he's like you don't have a police report, huh?  So the first thing this morning, what did I show him?  Here, remember, he said how the police weren't there.  I came and got my refrigerator, and that was it.  Well, that's not what happened.  The police were called and they were there.  I don't know if you saw him when I showed this to him.  The wheels were spinning.  He's up there reading and he's getting mad and his cheeks are getting red and he's trying to think what am I gonna say.  What did he say, 'well, I didn't get arrested.'

    "The other thing is when I first started my examination of him yesterday, and I was asking him do you have anger issues.  I kept asking him that.  No, no, no, no, I don't.  Everybody is a liar.  I don't.  We had our issues, Cherilynn and I, but I don't have an anger problem.

    "In his own words, he sends an e-mail to her.  And in his e-mail, you can read it – it's in evidence -- and he says right here, you know, in it I do know that I have anger issues.  I'm gonna go talk to that [counselor] guy, not because I'm obsessed or anything, but I've got anger issues.

    "When I show him this, it's still – he's always -- well, if you say so.  No, I don't say so.  You wrote it.  Not me.  He's always deflecting.  Everything I question him on, he deflected.  Deflect, deflect, deflect.  That's what he does, because he wants to be in control, just like he wanted to be in control of his girlfriends.  Anything that bothers him, he's gonna take care of it.  That's what he did with Jimmy.  [¶] … [¶]

    "Katie [O.], she tried to serve him with a restraining order, but she couldn't get him served.  So I don't know.  He's sitting there saying they're all lying, *but there's a pretty good common scheme and plan.  There's a jury instruction on that.*  It's the preponderance of the evidence."  (Italics added.)

Among the prosecutor's final words to the jury as she wrapped up her closing

argument were the following:  "We know [the defendant has] beat dogs.  He's beat a

---

**22**  There was no evidence in the record that Bishop spat in the face of Katie's mother.

man.  He beats women.  *There's no – there is no boundaries with him.*  It doesn't matter.
He's gonna do whatever he wants to do."  (Italics added.)

The prosecutor returned to these same themes in her rebuttal argument.  She addressed the testimony about Chloe, the pug, at some length.  She said:

> "You have to remember Dan [N.], who was the owner of this poor little
> Chloe, says that, you know, first of all, she's overweight.  She's an old dog.
> But he loved her.  And that she had – you know, he said she had hip
> problems.**23**  And he said she couldn't get on his bed because of her hips
> and that she stayed in his room.  [¶]  And then we had Katie [O.], say, well,
> you know, [Chloe] would come out in the living room sometimes.  But he's
> scared, you know, because the defendant – if he pooped or peed on the
> carpet, then the defendant would take him and, you know, rub his face in it
> and pick him up and shake him and then start punching him and kicking
> him.  [¶]  And she saw it three times.  You know, so I thought, well, that's a
> little farfetched that you're going to see this defendant running down the
> street because he really cares about this dog.  [¶]  But then I thought, well,
> you know what?  This poor little dog has been beaten enough times by this
> guy, maybe – you know, I would be running too if he was coming after me.
> [¶]  So maybe that did happen at one point.  He was probably running to get
> away from him."

Towards the very end of her rebuttal argument, the prosecutor argued:  "And then just the last thing I wanted to tell you was that you have this jury instruction.  The Judge is going to read it again, but it's just about the – it's Jury Instruction 375, 'Evidence of *An Uncharged Offense* to Prove the Common Scheme or Plan.' "  (Italics added.)  She emphasized:  "[I]f you read the instruction, you'll understand why those witnesses were important, so on Katie [O.]. Dan [N.], and Cherilynn [O.]"

### III.   The Evidence of Bad Character and Uncharged Offenses Introduced at Trial Was Not Admissible, in Its Present Form, Under Any Evidentiary Theory

Here, the trial court admitted the evidence of Bishop's bad character and uncharged offenses under section 1101, subdivision (b), to show common scheme or plan.  Accordingly, the jury was instructed pursuant to CALCRIM No. 375, regarding

---

**23**    Dan did not testify that Chloe had hip problems.

43

evidence of uncharged offenses to prove common scheme or plan. On appeal, we review the trial court's rulings under section 1101 for abuse of discretion. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1114.) Here, it is abundantly clear that the trial court erred in admitting the evidence of bad character and prior bad behavior under section 1101, subdivision (b).

## A. Trial Court Admitted the Prior Act Evidence to Show Common Plan

The People filed a motion in limine to admit evidence of prior bad acts under sections 1101, subdivision (b) and 352. As reflected in the in limine motion, the People sought to introduce narrative testimony from Cherilynn, Katie, and Dan, among others, regarding many types of violent, threatening, and unsavory behavior on the part of Bishop with people and dogs, as well as general descriptions of, or opinions about, his personality, temperament, and character. The defense filed a motion in limine to exclude, under sections 1101 and 352, the evidence of bad character and temperament and prior bad behavior proffered by the People; the defense also asked for a section 402 hearing before any evidence was admitted under section 1101, subdivision (b).

The People's motion explained that the proffered prior bad act evidence was admissible under sections 1101, subdivision (b), because it related to character traits and behaviors that were reflected in the charged offenses as well. Specifically, the motion noted: "Statements from those who knew defendant described him as: aggressive, angry, explosive, violent, scary, threatening, bad temper[ed], and Dr. Jekyl[l] and Mr. Hyde. Defendant would snap, rage, punch, hit, and kick." The People's motion suggested that evidence reflecting the listed traits and behaviors was admissible under section 1101, subdivision (b), because the charged crimes reflected similar tendencies on the part of the defendant. In this regard, the motion noted: "Similarly, defendant admitted that he was aggressive when he played or 'roughhoused' with Jimmy. The prior injuries and the injuries Jimmy died from were inflicted in an aggressive and violent manner by

44

defendant." The People's motion concluded: "Defendant's attributes as noted by those who knew him, are the same attributes that resulted in Jimmy's death. Defendant's *predisposition to criminality* is admissible to prove his motive, opportunity, intent, common scheme, plan, identity, and absence of mistake or accident, in the murder of Jimmy." (Italics added.)

The defense opposed the People's motion, arguing, in its written motion to exclude, that the type of evidence the People sought to introduce, that is prior bad act evidence showing " '[d]efendant's predisposition to criminality,' " was precisely the type of evidence that was "explicitly prohibited" by section 1101, subdivisions (a) and (b).

As mentioned, the trial court ruled the proffered testimony of Cherilynn, Katie, and Dan was admissible under section 1101, subdivision (b) to show common scheme or common plan. The trial court concluded the evidence was admissible under this theory because "[i]t shows a pattern." More specifically, the court ruled: "It shows a pattern of common plan or scheme under [the] theory, I believe, of living with people of the opposite sex and having these pretty intense outburst[s] that are either actual violence or threats of violence, threats of violence with a gun, actual violence, the slapping, the throwing in of the wall, the dogs." The trial court subsequently indicated it would admit prior bad act evidence that related to "a pattern [of violence] with people [Bishop has] lived with," because this showed Bishop had a common plan or scheme.

Defense counsel pointed out that the prosecutor had not proffered "any specific incident … that is so similar under [section] 1101[, subdivision] (b) that it would be probative of any issue in this case." Defense counsel added: "What I don't understand is when you talk about common scheme or plan, to me that's somebody is committing a gang robbery, where they're intentionally planning out how to do something. This seems to be a characterization of someone's personality." Regarding Katie's proffered testimony, defense counsel similarly noted: "My question about her proposed testimony is –I think her interview was something like 71 or 72 pages long. It's a really wide-

45

ranging interview.  She's talking about different aspects of their relationship and my client's personality and so on.  So if the Court is going to allow anything in from her, I would ask that the Court be very specific about what it is she's testifying to."  Later, defense counsel reiterated this point, trying to ascertain which specific incident or incidents the court found admissible.  The trial court ignored defense counsel's concerns in this regard.

The jury was subsequently instructed (as reflected in the clerk's transcript):  "The People presented evidence of other acts by the defendant[:]  that the defendant commonly committed violent acts against others with whom he lived that were not charged in this case."  The jury was further instructed that the uncharged act evidence could be considered "for the limited purpose of deciding," based on "the similarity or lack of similarity between the uncharged acts and the charged offenses," whether "[t]he defendant had a common scheme or plan to commit the alleged acts in this case."  (See CALCRIM No. 375.)  The court further instructed the jury to "not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."  (See CALCRIM No. 375.)

**B.  Admission of the Prior Act Evidence to Show Common Plan Was Error**

On appeal, the People do not dispute the court erred in admitting the evidence to show a common scheme or plan.

"[E]vidence of a common design or plan is admitted … to prove that the defendant engaged in the conduct alleged to constitute the charged offense."  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 399 (*Ewoldt*).)  Such evidence establishes that a plan used in committing various uncharged offenses was also used to commit the charged offense.  Stated differently, it proves that the defendant committed the charged offense "pursuant to the same design or plan used in committing the uncharged criminal acts."  (*Ibid*.)  In

46

short, the existence of a common plan tends to show that the defendant committed the unlawful act alleged. (*Id.* at p. 394, fn. 2.)

"[E]vidence of a defendant's uncharged misconduct is relevant where the uncharged misconduct and the charged offense are sufficiently similar to support the inference that they are manifestations of a common design or plan." (*Ewoldt*, *supra*, 7 Cal.4th at pp. 401-402.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*Id*. at p. 403.) Furthermore, the "evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, *but such a concurrence of common features* that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Id*. at p. 402, italics added.)

Here, the prior bad act evidence admitted at trial was not only extensive, it was wide-ranging, encompassing descriptive evidence about different types of conduct (hitting, screaming, shouting misogynistic epithets, spitting, throwing objects, punching holes in walls, stalking, picking fights, rubbing dogs' noses in feces, making threats in order to collect rent, etc.); opinion and descriptive evidence regarding Bishop's temperament, personality, and attitudes; and irrelevant and inflammatory details about guns, infidelity, failure to share household expenses, posing with the confederate flag, etc. There was an utter lack of specific and particularized common features to connect the evidence admitted under section 1101, subdivision (b) *with the charged crimes*, so as to show the defendant had utilized the same plan each time as opposed to simply committing disparate and spontaneous violent or unsavory acts. (See *People v. Cramer* (1967) 67 Cal.2d 126, 129-130[24] [evidence of a prior crime offered to prove common

---

**24**      *People v. Cramer* was "impliedly disapproved" on other grounds by *People v. Thompson* (1980) 27 Cal.3d 303, 317, as noted in *People v. Tassell* (1984) 36 Cal.3d 77, 89, footnote 8.

scheme or plan is admissible when "there is some clear connection between that offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other"]; *People v. Ward* (1968) 266 Cal.App.2d 241, 255.)

Here, not only was it impossible to discern a common plan of which both the uncharged conduct and charged crimes were manifestations but, given the quantity of the character and prior bad act evidence and its nature, the function served by this evidence devolved into nothing more than showing Bishop's bad character and propensity to commit violence in general. Indeed, the People's motion in limine to admit this evidence under section 1101 expressly stated—startlingly—that the evidence was admissible because it tended to show Bishop's general "predisposition to criminality." In short, the character and prior act evidence admitted here constituted precisely the kind of evidence that is prohibited by section 1101, subdivision (a). It did not, by any stretch, meet the relatively stringent "similarity" requirement that must be satisfied in order for it to be relevant and admissible to show a common scheme under section 1101, subdivision (b).[25]

Accordingly, the trial court abused its discretion in admitting this evidence under section 1101, subdivision (b), to show a common scheme. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238-239 [misapplication of applicable legal principles constitutes an abuse of discretion]; *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298 [discretion is delimited by the applicable legal standards, a departure from which

---

[25] Our Supreme Court has explained the tension between section 1101, subdivisions (a) and (b) as follows: "The purpose of [section 1101, subdivision (a)] is to avoid placing the accused in a position of having to defend against crimes for which he has not been charged and to guard against the probability that evidence of other criminal acts having little bearing on the question whether defendant actually committed the crime charged would assume undue proportions and unnecessarily prejudice defendant in the minds of the jury, as well as promote judicial efficiency by restricting proof of extraneous crimes. [Citations.] [¶] However, under certain limited circumstances, when the evidence is sufficiently relevant, it may be admitted [under section 1101, subdivision (b),] even though it embraces evidence of the commission of another crime." (*People v. Kelley* (1967) 66 Cal.2d 232, 238-239.)

48

constitutes an abuse of discretion].)  Indeed, as noted above, on appeal the People do not dispute the court erred in admitting the evidence to show a common scheme or plan.

### C. The Character and Prior Bad Act Evidence Was Not Admissible to Show Lack of Accident Under Section 1101, Subdivision (b)

While implicitly acknowledging the trial court erred, the People contend the character and prior bad act evidence was nonetheless admissible to show absence of accident (or, in other words, intent).  This contention lacks merit.

The People's theory was that Bishop was guilty of first degree murder and fatal assault on a child because he slammed three-year-old Jimmy's head into the floor, with premeditation and deliberation, to kill him.  Bishop suggested there were innocent explanations for Jimmy's condition and that the prosecution had not proven how Jimmy's condition developed.  Importantly, Bishop never acknowledged committing any act that would reasonably have caused Jimmy's condition, such that intent would be the only issue in contention.  He therefore did not open the door to admission of evidence under section 1101, subdivision (b), to show intent or lack of accident.  (See *People v. Guerrero* (1976) 16 Cal.3d 719, 726 (*Guerrero*).  In any event, the evidence at issue was inadmissible for this purpose.

The discretion to admit prior act evidence to show intent is broad, but not unbounded.  "The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent.  [Citation.]  '[T]he recurrence of a similar result ... tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act ....'  [Citation.]  *In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance."  '  "  (*Ewoldt*, supra*, 7 Cal.4th at p. 402, italics added.)

49

As noted above, there was very little, if any, similarity between the present offense and the range of incidents, opinions, and extraneous details addressed in the character and prior act testimony, and certainly none that would allow a fact finder to infer anything about Bishop's conduct in the present case based on his prior actions, "other than [through] improper reliance on the evidence as character or propensity evidence." (*People v. Williams* (2018) 23 Cal.App.5th 396, 418 (*Williams*).) Without more, a "*defendant's tendency toward violence ... is not a proper reason for admission*" under section 1101, subdivision (b). (*Id.* at p. 421 [evidence of defendant's prior conviction for shooting with intent to kill his former mother-in-law was not properly admitted under § 1101, subd. (b), and absence of accident theory, to show defendant killed his current wife with premeditation and deliberation] (italics added).)

The *Williams* court explained: " 'In ascertaining whether evidence of other crimes has a tendency to prove the material fact, the court must first determine whether or not the uncharged offense serves " 'logically, naturally, and by reasonable inference' " to establish that fact. [Citations.] The court "must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong." [Citation.] *If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.*' " (*Williams*, *supra*, 23 Cal.App.5th at pp. 419-420; *People v. Daniels* (1991) 52 Cal.3d 815, 856 [same].) *Williams* further cautioned: "And even to negate accident or mistake (that is, to show criminal intent), although the 'least degree of similarity' is required [citation], the incidents must be similar enough to support the inference that the defendant probably bore the same intents each time." (*Id.* at p. 420; see *United States v. Miller* (9th Cir. 1989) 874 F.2d 1255, 1269 ["when prior crimes are used to establish '... absence of mistake or accident,' such evidence simply

lacks probative value unless it is sufficiently similar to the subsequent offense. [Citation.] This is true because, if the prior act is not similar, it does not tell the jury anything about what the defendant intended to do in his later action"].)

In *Williams*, the defendant stabbed and killed his wife when she tried to leave him; he argued it was done in the heat of passion. (*Williams*, *supra*, 23 Cal.App.5th at pp. 400-401, 406-407.) The prosecutor presented evidence to the effect that, long before the charged crime, the defendant shot his former mother-in-law during an argument with his estranged then-wife (not the victim), and argued that the uncharged crime proved the charged crime was premeditated and deliberated. (*Id.* at pp. 401, 407.) The Court of Appeal held admission of the uncharged crime evidence was an abuse of discretion: "Apart from the fact that a troubled marriage was involved in both cases, they are completely different kinds of incidents." (*Id.* at p. 420.) In *Williams*, the People argued "the two incidents were sufficiently similar because both 'involved a domestic violence situation.'" (*Ibid.*) *Williams* rejected that assertion, explaining that "[a]pplication of [a] broad 'domestic violence' theory would allow any prior assault against any family member to be admitted in a subsequent prosecution for an assault against another family member. Section 1101, subdivision (b) does not stretch so far." (*Id.* at pp. 420-421.)

Here, the prior act evidence was even less similar to the charged offenses, and in turn, less relevant, than the prior act evidence at issue in *Williams*; furthermore, here, a lot of evidence of Bishop's bad character traits and volatile temperament was admitted. It cannot be said that the character and prior act evidence at issue here sheds any light on whether Bishop acted with the requisite specific intents to commit first degree murder and fatal assault on a minor child, without relying on improper inferences of a generally violent propensity on his part. The People's argument that the prior act evidence was relevant because it showed that Bishop had repeatedly harmed his cohabitants fails for the same reason the People's reliance on a similar theory failed in *Williams*. The fact that the evidence is probative of a tendency to commit violence is not a proper reason to admit

51

it.  "Admission to prove a penchant for violence or conduct in conformity is expressly disallowed."  (*Williams*, *supra*, 23 Cal.App.5th at p. 421; see § 1101, subd. (a).)  "Again, the evidence must be relevant for a *proper purpose*, not merely relevant to a tendency to behave badly."  (*Williams*, *supra*, at p. 421.)

The character and prior act evidence admitted here was in the form of lengthy narratives that encompassed a range of disparate violent, aggressive, and unsavory behaviors and bad personality traits; it was even more descriptive and reflective of a generalized propensity to engage in violent acts and outbursts than was the limited prior act evidence at issue in *Williams*.  The character and prior act evidence admitted here was simply not relevant for purposes of section 1101, except to show a generally violent propensity.  (See *Guerrero*, *supra*, 16 Cal.3d at p. 724 [" 'It has frequently been recognized … that because of the sound reasons behind the general rule of exclusion, the relevancy of evidence of other crimes, and therefore its admissibility, must be examined with care.' "]; *Williams*, *supra*, 23 Cal.App.5th at p. 416 [speculative inferences from evidence are *not relevant* to establish the speculatively inferred fact].)  In sum, there was no proper purpose for admission of this type of character and prior act evidence under section 1101, subdivision (b).

### D. The Trial Court Further Failed to Apply Properly Section 352 in the Context of Section 1101, Subdivision (b); Consequently, Admission of the Character and Prior Uncharged Offense Evidence Was An Abuse of Discretion Under Section 352 As Well As Under Section 1109, Subdivision (b)

In the context of section 1101, subdivision (b), " ' "[t]here is an additional requirement for the admissibility of uncharged crimes:  The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." ' "  (*People v. Thomas* (2011) 52 Cal.4th 336, 354; *People v. Kipp* (1998) 18 Cal.4th 349, 371 [same]; *People v. Lewis* (2001) 25

Cal.4th 610, 637 [" ' "[Evidence of uncharged crimes] is so prejudicial that its admission requires extremely careful analysis" ' and to be admissible, ' "such evidence must not contravene other policies limiting admission, such as those contained in Evidence Code section 352." ' "].)

When viewed through the lens of section 1101, subdivision (b), *as the trial court did here*, the character and prior uncharged offense evidence was also inadmissible under section 352.  On the one hand, the prior uncharged offense evidence, given its dissimilarity with the charged offenses, had minimal relevance and correspondingly marginal probative value for purposes of showing a common plan or scheme or intent or lack of accident.  (See *Williams*, *supra*, 23 Cal.App.5th at pp. 421-422 [dissimilarities between current offense and prior uncharged acts offered under § 1101, subd. (b), strongly limits the probative value of the prior uncharged acts for purposes of § 352]; *People v. Alcala* (1984) 36 Cal.3d 604, 631 [all doubts about the probative value of other act evidence must be resolved in the defendant's favor].)

On the other hand, the character and prior uncharged act evidence was extremely inflammatory in light of its lengthy, narrative form and the profusion or irrelevant details that were admitted; thus, there was a grave danger it would unduly inflame, confuse, and mislead the jury.  (*Harris*, *supra*, 60 Cal.App.4th at p. 737 [evidence is unduly prejudicial under § 352 if it invites the jury to prejudge " ' "a person or cause on the basis of extraneous factors" ' "]; *People v. Karis* (1988) 46 Cal.3d 612, 638 [" 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' "]; *People v. Sam* (1969) 71 Cal.2d 194, 206 ["In short, defendant was made to appear to be an antisocial individual of generally bad character.…  Certainly a substantial showing of probative value was required to justify admission of this prejudicial and inflammatory evidence."].)

As noted, much of the character evidence admitted here did not concern prior uncharged offenses at all; rather, it was in the form of descriptions of Bishop's violent, volatile, and generally bad personality and temperament. This evidence served only to support an inference of a criminal disposition and bad character and was inadmissible out of the gate, under both sections 1101 and 352, as it gave rise to an improper inference that Bishop would act in conformity with those character traits. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1147 (*Carter*) [" 'Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition.' "]; § 1101, subds. (a) [evidence of prior bad acts "is inadmissible when offered to prove [the defendant's] conduct on a specified occasion"] & (b) [evidence of uncharged acts is admissible only "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident …) other than [the defendant's] disposition to commit such an act"].)

In light of the range and volume of the character evidence and prior act evidence at issue, and the profusion of graphic and inflammatory details provided by the character witnesses, it is painfully obvious that the trial court did not properly conduct the requisite section 352 balancing inquiry, in the context of section 1101, subdivision (b), in admitting this evidence. The court denied defense counsel's request for a section 402 hearing and did not parse out the subcomponents of the character and prior act evidence the prosecution sought to introduce through each character witness. The court *did not hear any argument* whatsoever, from either party, on the application of section 352 to the large amount of character evidence proffered by the People. Although several aspects of the character and prior act evidence at issue were extremely inflammatory and obviously prejudicial (for example, the graphic descriptions of the abuse of pet dogs, sexual infidelity, and possession of loaded guns), and a lot of the proffered evidence related to Bishop's bad personality traits and bad temperament, the court admitted all of this

54

evidence under section 1101, subdivision (b), to show a common plan or scheme, *without a single reference to section 352 in relation to any of the admitted evidence*. (See *Ewoldt*, supra, 7 Cal.4th at p. 404 [uncharged act evidence is inherently prejudicial, and the question of its admissibility requires " 'extremely careful analysis' "] (italics added.).)

Furthermore, there is no indication in the record that the court assessed the prejudicial impact of the character and prior act evidence taken collectively, which analysis was required here because the character and prior act evidence was voluminous and wide ranging, and reflected a variety of violent conduct and multiple bad personality traits. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1098 (*Baker*).)

There is no way any of the evidence at issue could have been admitted upon a proper application of section 352, in the context of section 1101. The court clearly abused its discretion in admitting this evidence under these statutes. The People's section 1101, subdivision (b), motion in limine describes the proffered testimony of multiple character witnesses; each character witness's proffered testimony related to multiple incidents, various negative personality traits exhibited by Bishop, and numerous irrelevant and inflammatory details. It was not possible for the court to properly apply section 352 without carefully parsing every aspect of the testimony of each character witness, for example, by holding a section 402 hearing, as requested by the defense. The court, however, declined to hold a section 402 hearing and admitted the evidence without the parsing that was required to properly apply section 352.**26** (See *Baker*, *supra*, 10 Cal.5th at p. 1098.)

---

**26** As noted above, at the motion in limine hearing, defense counsel stated: "What I don't understand is when you talk about common scheme or plan, to me that's somebody is committing a gang robbery, where they're intentionally planning on how to do something. This seems to be a characterization of someone's personality." Regarding Katie's proffered testimony, defense counsel similarly noted: "My question about her proposed testimony is –I think her interview was something like 71 or 72 pages long. It's a really wide-ranging interview. She's talking about different aspects of their relationship and my client's personality and so on. So if the Court is going to allow

As noted above, the People's section 1101, subdivision (b), in limine motion explicitly put the court on notice that the People were seeking admission of evidence reflecting Bishop's "predisposition to criminality." The People expressly sought to introduce evidence showing Bishop was "aggressive, angry, explosive, violent, scary, threatening, bad temper[ed], and Dr. Jekyl[l] and Mr. Hyde." The People argued in the motion: "Defendant's attributes as noted by those who knew him, are the same attributes that resulted in Jimmy's death. Defendant's *predisposition to criminality* is admissible to prove his motive, opportunity, intent, common scheme, plan, identity, and absence of mistake or accident, in the murder of Jimmy." (Italics added.)

It was thus abundantly clear that the People were seeking to introduce evidence of Bishop's character traits to show he was a generally violent and volatile person. The court should therefore have been alerted that a careful evaluation of the evidence was in order. The court failed properly to assess the evidence, and at trial the prosecutor used it to make the argument reflected in her section 1101, subdivision (b), in limine motion, i.e., that Bishop was predisposed to criminality and was indiscriminately violent, and had therefore committed the charged offenses.

In summary, the character and prior act evidence at issue here was inadmissible under sections 1101, subdivisions (a) and (b), as well as under section 352 applied in the context of section 1101. Admission of this evidence under these statutes represents a clear abuse of discretion.

---

anything in from her, I would ask that the Court be very specific about what it is she's testifying to." Later, defense counsel reiterated this point, trying to ascertain which specific incident or incidents the court found admissible. However, the court did not parse the proffered testimony of the character witnesses as requested by defense counsel.

### E. The Character and Prior Bad Conduct Evidence, in Its Present Form, Was Not Admissible Under Sections 1109 and 352

The People change course on appeal to argue that the character and prior uncharged offense evidence was admissible under sections 1109 and 352. As discussed below, this theory of admissibility was strategically waived by the People in the trial court. The majority nevertheless affirms Bishop's convictions on the theory that virtually all of the character evidence was admissible under section 1109, and any residual inadmissible evidence cannot be challenged or was simply harmless. Even if we could properly consider its admissibility under sections 1109 and 352 for the first time on appeal, the broad swath of character evidence, laden with inflammatory details, admitted here was not admissible under these statutes.

Section 352 plays a constitutionally required gatekeeping role with respect to section 1109, a role that is even more important than the role this statute plays in the context of section 1101. As explained above, the trial court abused its discretion under both sections 1101 and 352 in admitting the character evidence at issue here. Similarly, when section 352 is applied consistent with its constitutionally required gatekeeping role in the context of section 1109, it is inconceivable that the character and prior bad act evidence, given its narrative form and the way it was deployed by the prosecutor, can properly be found to be admissible under these statutes. As discussed below, this conclusion is dictated by relevant case law, including *Falsetta*, *supra*, 21 Cal.4th 903, and *People v. Disa* (2016) 1 Cal.App.5th 654 (*Disa*).

### F. The People Knowingly and Strategically Waived Admission of the Character and Uncharged Offense Evidence Under Section 1109

The trial court heard the parties' in limine motions on April 11, 2017. In light of the April 11, 2017 hearing date, the People filed, on March 8, 2017, an in limine motion to admit character and prior act evidence act evidence under section 1101, subdivision (b). In the in limine motion, the prosecutor proffered character evidence from Katie, Cherilynn, Jason, and Dan, among several other people, including Bishop's work

57

colleagues and other acquaintances.  The proffered evidence was wide ranging, including numerous details that did not constitute prior uncharged offenses or prior domestic violence, including descriptions of Bishop's temper, drinking, drug use, problems at work on account of hostile behavior, aggressive behavior on a rugby team, stalking behavior, actions causing property damage (as in kicking in a garage door and punching holes in walls), cursing, making of demands for money, receipt of texts from various women, gun possession and general "hitting problem."  The motion in limine also sought to admit evidence to the effect that Cherilynn and Katie obtained restraining orders against Bishop.

The motion in limine stated:  "Statements from those who knew defendant described him as:  aggressive, angry, explosive, violent, scary, threatening, bad temper[ed], and Dr. Jekyl[l] and Mr. Hyde."  It further asserted:  "Defendant allowed his anger to possess his actions and he acted upon his need for physical violence."  It added: "Multiple witnesses stated that defendant would snap – he would go from 0 to 100 immediately.…  He would fly off the handle.…  Defendant's temper would explode over something that was very minor.…  Clearly defendant had the ability for violence."  The in limine motion concluded:  "Defendant's predisposition to criminality is admissible to prove his motive, opportunity, intent, common scheme, plan, identity, and absence of mistake or accident, in the murder of Jimmy."  The defense filed a responsive motion on April 7, 2017, seeking to exclude "irrelevant and prejudicial propensity evidence" and requesting "a 402 hearing prior to the admission of any 1101(b) testimony."[27] (Unnecessary capitalization omitted.)

---

[27]    As noted above, at the in limine motion hearing, defense counsel repeatedly asked the trial court, in light of the range of incidents and multiple descriptions of personality traits encompassed in the character evidence proffered by the People, to differentiate and separately address each incident and aspect of the character evidence proffered by the People.  Counsel also asked the court to hold a section 402 hearing for this purpose. However, the court inexplicably declined to do so.  (See fn. 24, *ante*.)

The day before the hearing on in limine motions, on April 10, 2017, the People filed a relatively minimalistic motion addressing the admissibility of character and prior act evidence under section 1109. This in limine motion sought admission of evidence of *only* "defendant's prior uncharged acts," although it did not specify or describe the uncharged acts at issue. The People's motion to admit character and prior uncharged offenses under section 1101, subdivision (b), was far broader in scope as compared to the relatively narrow request for admission of a subset of evidence under section 1109.

At the hearing on in limine motions, the prosecutor exclusively focused on admission of character *and* prior uncharged offense evidence under section 1101, subdivision (b), and refrained from obtaining a ruling admitting the evidence under section 1109. The prosecutor did not raise or mention section 1109 at the hearing on motions in limine, choosing to argue only that the character and prior act evidence was admissible under section 1101, subdivision (b). The court granted the People's motion to admit the proffered character and prior uncharged offense evidence under section 1101, subdivision (b), to show a common plan or scheme.

Significantly, at trial, the prosecutor elicited testimony about many aspects of Bishop's personality as well as prior conduct in a variety of situations to highlight the point that he was a generally violent, volatile, and unsavory character. For example, with reference to Dan's testimony, the prosecutor questioned Bishop about being ejected from his rugby team: "But you got voted off the team because you're too aggressive and violent [even for rugby]?"; "That must say a lot, huh?" The prosecutor also asked Bishop, with reference to an incident described by Katie: "In fact, then you also charged at her mother that night, didn't you?" In addition, the prosecutor questioned Bishop about drinking to excess; frequenting bars; posing for a photograph with a group of men holding guns in front of a confederate flag; directing misogynistic epithets such as "bitch" and "whore" at his girlfriends; stalking his ex-girlfriends; cheating on his

59

girlfriends; and dating, in his own words, "whores," "bikini dancers in clubs," and "stripper-looking [women in] skimpy clothes."

In her closing argument, the prosecutor took the same approach. She argued: "Now, the witnesses, you had Cherilynn [O.], Katie [O.], Dan [N.].… They all testified that this defendant had an instantaneous temper. There was nothing in between. It's just instantaneous. *And they all said he's also manipulative and he's violent*." (Italics added.) In addressing the evidence of Bishop's abuse of his own dogs, the prosecutor said: "[He's] beating these dogs *for no reason*, just because it feels good to him." (Italics added.) At another point, the prosecutor argued: "We know [Bishop has] beat dogs. He's beat a man. He beats women. There's no – there is no boundaries with him. It doesn't matter. He's gonna do whatever he wants to do."

In contrast, the words "domestic violence" do not appear *anywhere* in the prosecutor's closing argument. For that matter, the words "domestic violence" do not appear anywhere in the *entire* reporter's transcript of this matter. Rather, the prosecutor's trial strategy was consistent with the strategy outlined in her section 1101, subdivision (b), motion in limine, in which she contended that the character and prior bad conduct evidence was relevant to show that Bishop was "predisposed to criminality" and had the "ability to be violent" across the board.

The record is clear that the prosecutor strategically prioritized admission of the character and prior act evidence under section 1101, subdivision (b), to further her trial strategy, and chose not to obtain a ruling regarding admission of a limited subset of prior uncharged domestic violence offenses under section 1109. As reflected in the two relevant in limine motions regarding the character and uncharged offense evidence, the prosecutor evidently believed that a far broader swath of character and prior act evidence was admissible under section 1101, subdivision (b), as compared to under section 1109. Her trial strategy—painting Bishop as a generally violent, volatile, and unsavory individual— was aligned with the broad swath of character evidence described in her

section 1101, subdivision (b), in limine motion. Again, the prosecutor did not mention section 1109 at the in limine motions hearing; her minimalist section 1109 in limine motion was filed at the last minute; she did not bring it to the court's attention at the motions in limine hearing or obtain a ruling thereon. Indeed, there is no indication that the court or defense counsel were even aware of this last-minute filing. Rather, the record indicates that the section 1109 in limine motion was filed by the prosecutor as a backup, should the court deny the section 1101, subdivision (b), in limine motion. This record reasonably reflects that the prosecutor knowingly waived admission of the evidence under section 1109, in order to further her misguided trial strategy of making Bishop out to be a generally violent and unsavory individual.

In furtherance of this trial theory, the prosecutor went so far as to introduce at trial, evidence that the court had in fact excluded at the in limine proceeding. For example, the prosecutor ignored the court's ruling excluding evidence pertaining to Bishop's attack on Katie's mother and questioned Katie about the attack on her mother anyway. The prosecutor then highlighted the evidence about Bishop's attack on Katie's mother in closing argument. Similarly, the prosecutor also attempted to question Bishop about problems he had at work (the court sustained a defense objection to that line of questioning on unrelated grounds).[28] Although the court admitted the prior bad act and

---

[28]     The prosecutor's in limine motion seeking admission of character and prior act evidence under section 1101, subdivision (b) set forth a wide variety of incidents and personality traits that the prosecutor sought to admit pursuant to this statute. Bishop objected to the full range of character and prior act evidence the prosecution sought to admit pursuant to section 1101, subdivision (b), and asked for a section 402 hearing to enable the court to exclude evidence related to personality traits and limit the scope of the evidence admitted under section 1101, subdivision (b) to specific incidents. As noted, the trial court admitted the broad swath of character and prior uncharged offense evidence proffered by the prosecution but excluded a limited amount of the proffered evidence. At trial, the prosecutor introduced a large amount of character and prior bad act evidence, *including much of the evidence that had been excluded*.

61

other character evidence to show a common scheme or plan, the prosecutor used the evidence to paint Bishop as a generally volatile and indiscriminately violent individual, who had acted in conformity with those broad personality traits in committing the charged offenses.

In raising, on appeal, the question of the admissibility of the character and prior bad act evidence under section 1109, after having knowingly waived the issue at trial, the People want to have their cake and eat it too. On the instant record, given the broad swath of character and prior act evidence that was admitted and the way it was used against Bishop—i.e., to paint him as a generally violent and unsavory person—section 1109 cannot serve as a means to affirm admission of this evidence. The People made their bed and now must lie in it.

In this respect, this case is entirely distinguishable from *People v. Jones* (2012) 54 Cal.4th 1, 50-51 & fn. 12 (*Jones*) (*Jones* concerned section 1108, the companion statute to section 1109, applicable to prior uncharged sex offenses), on which the majority relies. In *Jones*, it was the trial court itself that declined to apply section 1108 to admit evidence of a prior uncharged sex offense because the constitutionality of that statute was then pending review in the California Supreme Court, and instead admitted the prior uncharged offense evidence under section 1101, subdivision (b). There was no question of a strategic waiver on the part of the prosecution in *Jones*; nor does it appear that the

---

The majority claims Bishop cannot complain about the prosecutor's introduction of evidence the trial court had excluded. This contention is contrary to settled law, under which a party's objection to admission of evidence in an in limine proceeding preserves the objection for purposes of appeal. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171.) Indeed, the People concede as much in their briefing. Moreover, even as to the excluded evidence, a defendant's objection at the in limine proceedings sufficiently preserves his ability to challenge the prosecutor's use of it at trial. Here, such a vast amount of character and prior act evidence was admitted that placing the burden on Bishop to monitor the prosecutor's compliance with the court's rulings only goes to show the massive distraction the erroneous admission of this evidence was for the defense, which was already grappling with a complex and serious case.

prosecution in *Jones* made improper use of the *very limited* prior uncharged offense evidence that was admitted there. Logically, the specific record in *Jones*, including the trial court's section 352 inquiry there, ultimately permitted the appellate analysis in that case. Under the circumstances applicable here, the People have waived any contention on appeal that the character and prior bad act evidence introduced at trial was admissible under section 1109.[29]

### G. The Character and Prior Uncharged Offense Evidence, in the Form Presented Here, Was Not Admissible Under Section 1109

Here, the testimony of the character witnesses wove together evidence of some potential prior uncharged domestic violence offenses with evidence of clearly inadmissible incidents and personality traits and a profusion of irrelevant, inflammatory details. A look at the prosecutor's cross-examination of Bishop and the prosecutor's closing argument—neither of which are addressed in any depth, if at all, in the majority opinion—reveals the extent to which the prosecutor relied on and highlighted clearly inadmissible aspects of this testimony at trial.

Some of the most inflammatory evidence admitted here involved Bishop's abuse of his own dogs and his roommate's dog. Bishop's abuse of his own dogs and his roommate's dog did not constitute domestic violence for purposes of section 1109 and was not admissible under that provision, as there was no suggestion that Bishop would abuse the animals to terrorize *people*, or as prelude to harming *people*. On the contrary, Katie described Bishop's abuse of his own dogs as "routine." As for Chloe (Dan's pug), Bishop did not even admit to Dan that he had anything to with Chloe's injuries, when Dan returned home from work to find that Chloe was acting strange. Furthermore, there

---

[29] The majority contends I rely on a "novel theory of prosecutorial waiver without acknowledging that a direct waiver claim is factually contradicted," and asks for authority on the point. (Maj. opn. *ante*, p. 3.) The majority appears to overlook the well-worn distinction between the doctrines of implied waiver and forfeiture. I rely merely on the standard doctrine of implied waiver, as opposed to forfeiture.

was no testimony to the effect that anyone who witnessed the abuse of dogs understood Bishop to be abusing the dogs as an implicit threat to the person in question. *People v. Kovacich* (2011) 201 Cal.App.4th 863, 893-895, cited by the People on appeal and by the majority, is clearly distinguishable from the present case on this basis. In *Kovacich*, the defendant killed the family dog in order to terrorize his wife, whom, shortly thereafter, he also killed, in part because, after he killed the dog, she nonetheless worked up the courage to leave him. (*Id.* pp. 870-871, 893-896.) In contrast, here the People contended at trial that Bishop would abuse the dogs "*for no reason*," merely because "it fe[lt] good to him." (Italics added.)

The majority's treatment of this issue is notably cursory and couched in generalized terms. The majority simply states that animal abuse may constitute domestic violence to the extent "section 1109, subdivision (d)(3), includes abuse that intentionally or recklessly places the victim 'in reasonable apprehension of *imminent serious bodily injury* to himself or herself, or another,' " where the victim is, inter alia, a cohabitant or a person with whom the defendant is having or has had a dating relationship. (Italics added.) (Maj. opn. *ante*, at pp. 43, 45.) The majority then adds: "Under that definition, appellant's abuse of his own dogs and Dan's dog in Katie's presence constitutes domestic violence to the extent it instilled in her a fear of harm, and she testified to that effect." (Maj. opn. *ante*, at p. 45.)

However, Katie did not testify to the effect that she was in "reasonable apprehension of imminent serious bodily injury to … herself" at any time that Bishop abused the dogs, let alone every time. Indeed, she described Bishop's abuse of his own dogs as "routine," and explained "[t]his is [just] what he did." She further noted: "It's like – that was his form of punishment. That's how he was trying to teach the dog that you don't do this." She indicated she would just sit there when it happened. She was frightened only in the limited sense that she found Bishop's behavior "wasn't normal." Regarding Dan's pug, Katie testified that she was afraid for the dog and would challenge

64

and admonish Bishop when he would abuse it. The most she said as to herself was that she would retreat to Bishop's room during these episodes. In short, Katie's graphic testimony about Bishop's "routine" abuse of his own dogs and abuse of Dan's pug on multiple occasions was not admissible under section 1109.

Dan's testimony about the death of his pug was similarly inadmissible under section 1109 (he did not witness the acts that led to the death of the dog). In addition, Dan testified about an incident in which Bishop was voted off a rugby team because of his aggressive attitude. He testified about finding numerous holes in the walls of Bishop's house that had to be hidden by hanging pictures over them. Dan also testified that Bishop would get into fights all the time, usually on the way to a bar or the way home from a bar, and had once interceded in a fight among other people. Dan's testimony in all these respects was clearly inadmissible under section 1109 as well.

Furthermore, the copious evidence that was admitted regarding Bishop's bad temperament and unsavory personality traits was also inadmissible under section 1109, and, just like the evidence about animal abuse, was extremely inflammatory and prejudicial. Section 1109 permits admission only of evidence of prior uncharged domestic violence offenses, but here evidence was admitted about Bishop's habit of keeping multiple, loaded guns around, manipulative personality, evident affinity for the confederate flag, habit of punching holes in walls, penchant for picking fights with strangers, generally disrespectful attitude, runaway temper, illicit liaisons with women, and his preference for dating "stripper-looking" women in skimpy clothes, among other things. (See *Jones*, *supra*, 54 Cal.4th at p. 40; maj. opn. *ante*, at p. 46.) Given the interwoven and narrative nature of the character and prior uncharged offense evidence admitted at trial, it is an overwhelming task to separate out any evidence that would potentially be admissible under section 1109 from evidence that was clearly inadmissible under that provision. It is hard even to characterize this evidence because of its detailed and narrative nature.

65

Other evidence presented to the jury was also inadmissible under section 1109. Such evidence included testimony from Cherilynn about Bishop getting into fights with random people and Katie's testimony about Bishop's attack on her mother and calling her mother a "bitch." Although the trial court had excluded the evidence about the incident involving Katie's mother, the prosecutor introduced it anyway. As noted above, Bishop had objected to admission of this evidence at the in limine stage, whereby his objection to admission of this evidence is preserved for purposes of appeal.

This is not a situation where evidence of one or more prior uncharged domestic violence offenses, in streamlined form, was admitted, as is generally the case when section 1109 is utilized to admit propensity evidence. Rather, here the devil lies in the details. Moreover, as discussed below, the prosecutor highlighted clearly extraneous and inadmissible aspects of this evidence, such as Bishop's infidelities and possession and use of weapons, in questioning the character witnesses and in cross-examining Bishop, and during her closing arguments.

While a sanitized version of prior, uncharged, domestic violence offenses may well have been admissible under section 1109, here an undifferentiated mass of evidence of personality traits, various irrelevant and inflammatory details, and prior bad conduct was admitted. The majority cites no case where a similar admission of the quantity of character and propensity evidence, given its range (i.e., incidents involving romantic partners, multiple animals, male friends, roommates, and strangers, including rugby teammates and random people) and the interwoven form in which it was admitted here, was upheld on appeal. Rather the majority downplays the amount, scope, and narrative form of this evidence, as well as the use of it by the prosecutor at trial. I cannot agree with the majority's characterization of the nature and import of the character and prior bad conduct evidence admitted here. In addition to the fact that several aspects of this evidence, such as the evidence related to defendant's abuse of his own dogs and Dan's pug and the other evidence referenced above, was inadmissible under section 1109, it

would appear, given the interwoven and narrative form in which the character and prior uncharged offense evidence was presented here, that much of the evidence of prior uncharged acts was inadmissible in its present form, interwoven as it was with inadmissible details.

In short, I disagree with the majority's attempts to justify admission of this evidence, after the fact, under section 1109. The prosecutor strategically prioritized admission of this evidence under section 1101, subdivision (b), and did not use it within the strictures of section 1109. Rather, the prosecutor used the evidence to paint Bishop as a generally violent, volatile, and unsavory person. The jury was not instructed pursuant to section 1109, and in light of the prosecutor's use of the evidence to show Bishop had a criminal disposition, the section 1101, subdivision (b) instruction it was given was inadequate to ensure that the jury considered the evidence for proper purposes.[30] Bishop was on notice only that the evidence was admitted under section 1101, subdivision (b),

---

[30] The jury was instructed to consider the evidence of uncharged acts to decide whether "[t]he defendant had a common scheme or plan to commit the alleged acts in this case." It was further instructed to "not conclude from this evidence that the defendant has a bad character or is disposed to commit crime." However, the latter limiting instruction had little value because the relevant character testimony revealed a disparate array of violent, threatening, and/or unsavory behaviors, of varying severity, without an obvious connection to the charged crimes, whereby the evidence did not speak to the existence of a common plan in any way except by giving rise to an improper inference of bad character, in terms of a propensity to commit violence in general, on Bishop's part. Had the jury been instructed with CALCRIM No. 852A, which addresses evidence of uncharged domestic violence admitted under section 1109, the odds that the jury would have sifted through the mass of evidence of bad character and prior misconduct admitted here so as to draw legally proper inferences would have been somewhat better. However, defense counsel did not have a meaningful opportunity to request CALCRIM No. 852A because the evidence was admitted under section 1101, subdivision (b), and the prosecutor did not rely on the evidence to show a propensity to commit domestic violence on Bishop's part. Indeed, given how the prosecutor used the evidence of bad character and prior misconduct throughout the trial, i.e., to show that Bishop had a bad character and criminal disposition, even CALCRIM No. 852A would have been inadequate to ensure the jury did not draw improper inferences from this evidence.

not section 1109.  Not only did the defense not have the opportunity to litigate the issue of admissibility of the prior act evidence under section 1109 in the trial court,[31] but, had the defense known, before trial, that the prior act evidence was admitted to prove Bishop's propensity to commit child abuse as a form of domestic violence, it would reasonably have affected defense counsel's trial strategy, choice of witnesses, and closing argument.

For example, had Bishop been on notice that the evidence was being admitted under section 1109 to show a propensity to commit domestic violence, defense counsel could have marshalled time and resources to counteract this evidence by investigating and developing evidence of Bishop's good character within the sphere of his domestic relationships.  With the evidence admitted under section 1101, subdivision (b), counsel would have been foolish to deploy scarce resources to develop such evidence, for the legitimate fear that presenting such evidence would open the door to the deployment of general propensity arguments by the prosecution.  As it turned out, the prosecution

---

[31]    Had Bishop had the opportunity to litigate, in the trial court, admissibility, under section 1109, of the prior uncharged offense and other character evidence proffered by the prosecution, the question of the status of Jason could have been clarified.  The majority assumes, based on Katie's testimony, that Jason was Bishop's roommate or cohabitant.  However, Katie's testimony on the point was ambiguous.  She testified Bishop took Jason in when the latter fell on hard times; the implication of her testimony was that it was a temporary situation.  To the extent Jason was merely a short-term guest at Bishop's house, it would not be accurate to characterize him as a roommate.  In turn, the evidence pertaining to Jason, would have been categorically inadmissible.  However, because the issue was not litigated in the trial court, Jason's status was not properly established.

The majority contends the evidence involving Jason, and for that matter, Dan, was admissible under the broader definition of domestic violence set forth in Family Code section 6211.  However, before any evidence may be admitted with reference to Family Code section 6211, the court is *required* to "hold a hearing conducted pursuant to section 352, "which shall include consideration of any *corroboration* and remoteness in time." (§ 1109, subd. (d)(3) (italics added).)  Such a hearing did not occur here.

improperly deployed general criminal propensity and criminal disposition arguments anyway, while Bishop was hamstrung in terms of his ability to fight back. The playing field was thus already tilted against Bishop in this regard.

Significantly, the character and prior uncharged offense evidence that was admitted was wide ranging and detailed. The evidence played an important role in the prosecution's case, as reflected in the trial testimony and the prosecutor's closing argument. The evidence was not in the form of relatively sanitized descriptions of discrete incidents, as section 1109 evidence generally tends to be. The prosecutor also did not use the evidence within the parameters of section 1109. Rather, consistent with the purpose set forth in her section 1101, subdivision (a) motion in limine, the prosecutor used the evidence to argue that Bishop was generally disposed to criminality and had acted in conformity with that general disposition.

In light of all the above considerations, it is wholly inappropriate to resort, after the fact, to section 1109 to find all the character evidence at issue properly admitted and used at trial.

### H. The Character and Prior Uncharged Offense Evidence Was Not Admissible Under Section 352, When Applied in Tandem with Section 1109

Here, the trial court applied section 352 in the context of section 1101.[32] As explained above, the court abused its discretion in admitting the evidence under sections 1101 and 352. It is undisputed that the court did not consider admissibility of the evidence under sections 1109 and 352. Accordingly, in order to find the evidence admitted here was admissible under sections 1109 and 352, this court must conduct the requisite inquiry, including the weighing process under section 352, for the first time on

---

[32] Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

69

appeal. The majority's framing of its role as "reviewing" the trial court's analysis pursuant to sections 1109 and 352 under an abuse of discretion standard of review is analytically incorrect in this instance. In contrast to *Jones*, *supra*, 54 Cal.4th at p. 50, where the trial court had at least considered the admissibility of the evidence under section 1109 before admitting it under section 1101, subdivision (b), the trial court here undisputedly did not consider section 1109 and did not conduct, in the first place, a section 352 inquiry for purposes of admitting the evidence under section 1109.

The section 352 inquiry is not identical in the case of evidence proffered under sections 1101, subdivision (b), and evidence proffered under section 1108 or 1109. (See, e.g., *People v. Mullens* (2004) 119 Cal.App.4th 648, 666 (*Mullens*) ["the risk of serious prejudice is greater in a case … in which propensity evidence is admitted under section 1108 [or 1109], than in a case in which evidence of prior bad acts is admitted under section 1101[, subd.] (b)"].) Accordingly, in this instance, there is no analysis under sections 1109 and 352 for us to review. It is clear, however, that the broad array of character and prior uncharged offense evidence admitted here, in its present form, was not admissible under sections 1109 and 352. Thus, had the trial court evaluated this evidence under section 352 in tandem with section 1109 and found it to be admissible in its present form, its ruling would have been an abuse of discretion.

As noted above, evidence of a person's prior conduct, is generally inadmissible to prove the person's conduct in conformity therewith on a specified occasion. (§ 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 (*Villatoro*).) "The Legislature has ... created specific exceptions to the rule against admitting character evidence in cases involving sexual offenses (§ 1108, subd. (a)), and domestic violence, elder or dependent abuse, or child abuse (§ 1109, subd. (a)(1)-(3))." (*Villatoro*, *supra*, at p. 1159.) The constitutionality of sections 1108 and 1109 stems from the landmark *Falsetta* case, *supra*, 21 Cal.4th 903, in which the California Supreme Court upheld the constitutionality of section 1108. (*Baker*, *supra*, 10 Cal.5th at p. 1090 & fn. 6.)

*Falsetta* held that section 1108 passes constitutional muster because "the provision preserves trial court discretion to exclude the evidence [of prior uncharged sexual offenses] if its prejudicial effect outweighs its probative value" under section 352. (*Falsetta*, *supra*, 21 Cal.4th at p. 907, 917-918 [§ 1108 is saved from due process defects because "section 352 affords defendants a realistic safeguard in cases falling under section 1108"].) As another court put it, "both sections 1108 and 1109 limit the admissibility of evidence of prior misconduct if its probative value is substantially outweighed by its prejudicial effect. (§[§] 352, 1108, subd. (a), 1109, subd. (a).) The specific retention of the power to exclude evidence under section 352, found in both sections 1108 and 1109, provides 'a realistic safeguard that ensures that the presumption of innocence and other characteristics of due process are not weakened by an unfair use of evidence of past acts.' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1334; see *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1119 (*Nguyen*) ["[t]he *Falsetta* court saved section 1108 from constitutional infirmity by … assuming the trial court would" apply section 352 to ensure that inflammatory evidence of limited probative value was not presented to the jury]; *Harris*, *supra*, 60 Cal.App.4th at p. 737 [§§ 1108 and 1109 pass constitutional muster if and only if § 352 preserves the accused's right to be tried only for the current offense].)

Since section 352 stands between sections 1108/1109 and unconstitutionality (*Falsetta*, *supra*, 21 Cal.4th at pp. 917-918), in applying section 352 in the context of sections 1108/1109, a trial court must do more than simply rubber stamp the admission of evidence of prior uncharged offenses the prosecution proposes to introduce. (See *Harris*, *supra*, 60 Cal.App.4th at p. 737.) Rather, in exercising discretion, " 'because other-crimes evidence is so inherently prejudicial, its relevancy is to be "examined with care," ' " (*ibid*.), and it is to be received with the "utmost caution." (*Mullens*, *supra*, 119 Cal.App.4th at p. 666.) "To be admissible under … section 1108 [or 1109], 'the probative value of the evidence of uncharged crimes "must be substantial and must not be

71

largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." ' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274 (*Hollie*).)

The *Falsetta* court emphasized, in the context of section 1108 and the admission of evidence of prior uncharged sex offenses, the care with which trial courts must evaluate propensity evidence under section 352: "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta*, *supra*, 21 Cal.4th at pp. 916-917.) *Falsetta*'s directives are equally applicable to section 1109. (See *Harris, supra,* 60 Cal.App.4th at p. 737.) Here, the trial court obviously did not consider any of these so-called *Falsetta* factors or limit the admission of the prior uncharged offense and other character evidence in line with them, because the court was not concerned with section 1109. Indeed, there was no discussion of the *Falsetta* factors at the motions in limine hearing at which the court admitted the prior uncharged offense and other character evidence at issue here.

In addition to the fact that the trial court did not consider the *Falsetta* factors, the trial court did not properly conduct the section 352 inquiry for purposes of section 1109 in other ways as well. The factors to be considered by a trial court in conducting the section 352 weighing process depend upon "the unique facts and issues of each case." (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097-1098 (*Miramontes*).) However, "five factors stand out as particularly significant in an Evidence Code section 1108 [or 1109] case. These factors are[:] (1) whether the propensity evidence has

probative value, e.g., *whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense*; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*Nguyen*, *supra*, 184 Cal.App.4th at p. 1117, italics added.) "A trial court balances this first factor, i.e., the propensity evidence's probative value, against the evidence's prejudicial and time-consuming effects, as measured by the second through fifth factors." (*Ibid*.)

Significantly, sections 1108 and 1109 permit admission of evidence of uncharged sexual and domestic violence offenses respectively, subject to exclusion under section 352, "as proof of the defendant's *disposition to commit the charged offense*." (*Miramontes*, *supra*, 189 Cal.App.4th at p.1097, italics added.) Therefore, the similarity of the prior misconduct to the charged offense is critical to the probative value of the uncharged offense evidence and, in turn, to the weighing process mandated by section 352, within the context of sections 1108 and 1109. (See *People v. Johnson* (2010) 185 Cal.App.4th 520, 531 (*Johnson*) [in assessing the probative value of uncharged crimes act evidence for purposes of §§ 1108 and 1109, "the principal consideration [is] the similarity of the uncharged act to the charged offense"]; (*Hollie*, *supra*, 180 Cal.App.4th at p. 1274 [" 'The principal factor affecting the probative value of an uncharged act [under sections 1108, 1109, and 352] is its similarity to the charged offense.' "]; *Falsetta*, *supra*, 21 Cal.4th at p. 917 [for purposes of § 1108, the probative value of other sex crimes evidence depends on the relative similarity between the charged and uncharged offenses]; *People v. Lewis* (2009) 46 Cal.4th 1255, 1285 ["the degree of similarity is relevant to the evaluation of whether the probative value of the evidence outweighs its

73

prejudicial effect under Evidence Code section 1108"]; *People v. Earle* (2009) 172 Cal.App.4th 373, 397 (*Earle*) [" ' "A defendant with a propensity to commit *acts similar to the charged crime* is more likely to have committed the charged crime than another." ' "].)

Simply put, the purpose of sections 1108 and 1109 "was to relax the traditional limits, not abolish them." (*Earle*, *supra*, 172 Cal.App.4th at p. 397.) Under sections 1108 and 1109, it is no longer necessary to admit evidence of prior crimes pursuant to a " ' " ' "non-character" purpose for which it is relevant.' " ' " *People v. Britt* (2002) 104 Cal.App.4th 500, 506. Nonetheless, under sections 1108, 1109, and 352, the probative value of such evidence must still be carefully assessed in terms of its tendency to show the defendant was guilty of committing the conduct encompassed in the charged offense. (*Miramontes*, *supra*, 189 Cal.App.4th at p. 1097; *Earle*, *supra*, 172 Cal.App.4th at p. 397; *Villatoro, supra,* 54 Cal.4th at p. 1163 [under § 1108, " 'sex offenses … may be dissimilar enough … that the trial court could apply the criteria of section 352 and determine that it is not proper for the jury to consider' " evidence of an uncharged offense " 'as evidence that the defendant likely committed … the … charged offenses' "]; *People v. Branch* (2001) 91 Cal.App.4th 274, 285 [for purposes of §§ 1108, 1109, and 352, "if the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses"]; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316 (*Jennings*) [uncharged offense evidence had high probative value for purposes of section 1109, viewed through the lens of § 352, where "[t]he similarity of the earlier events to the offense charged in this case was quite remarkable"].)

In assessing the probative value of evidence under sections 1109 and 352, the court may also consider, to a lesser degree, close temporal proximity between the prior events and the charged offense and the extent to which the source of the evidence of prior events is independent of the charged offense. (*Hollie*, *supra*, 180 Cal.App.4th at p.

1274.) The probative value of the prior offense evidence is weighed against its potential for prejudice. More specifically, we weigh the probative value of the uncharged offense evidence against its inflammatory nature, remoteness, the risk of confusing the jury, and the time required to present the evidence. (*Nguyen*, *supra*, 184 Cal.App.4th at p. 1117.)

Here, the incidents that the character witnesses testified about entailed conduct that was qualitatively distinct from the conduct encompassed in the charged offenses, i.e., first degree (premeditated and deliberated) murder of a child and fatal assault on a child. Cherilynn's testimony, for one, encompassed incidents that bore no resemblance to the context of the charged offenses. Cherilynn and Bishop lived together for three months in 2006 (the events underlying the present charges occurred in 2013). Cherilynn testified about a prior incident in which Bishop pulled a gun on her. The prosecutor began by asking Cherilynn whether, back in 2006 in Redding, Bishop owned any weapons, the type of weapons, and the number of weapons. Cherilynn said Bishop owned four guns; later she noted she believed the guns "were always loaded." The prosecutor asked Cherilynn: "Was there an incident one time with the defendant and one of his guns?" Cherilynn said, "Yes." The prosecutor continued: "Would you tell the jury what happened?" Cherilynn explained: "I would not have sex with him one night, and he held me at gunpoint." The prosecutor and Cherilynn then had a detailed exchange about this incident, with an emphasis on the loaded guns that Bishop kept around.

The prosecutor then showed Cherilynn a photograph that showed Bishop and four other men holding long guns while standing on a boat flying the confederate flag. Cherilynn confirmed that, in the photograph, Bishop was holding the gun he had pointed at her. After the photograph was admitted into evidence and published to the jury, the prosecutor asked Cherilynn, once again, to describe what it depicted, and again had Cherilynn identify Bishop in the photograph. The prosecutor then circled back to ask, once more, for emphasis: "And that's the gun that he held to you for about four minutes or so?" Cherilynn responded: "I believe so."

75

The prosecutor next asked Cherilynn to describe an incident in which Bishop "was spitting in [her] face." Cherilynn responded: "We were out on a houseboat for his birthday. He slept with another woman on top, and the next morning I asked him to get his stuff out of the house, and he spit in my face." The prosecutor then further confirmed that Cherilynn had actually seen Bishop sleeping with the other woman. Cherilynn confirmed she had gone upstairs to look for Bishop and saw him sleeping with the other woman.

The rest of Cherilynn's testimony encompassed irrelevant incidents and details, that add up to pain an extremely derogatory picture of Bishop. For example, Cherilynn testified, inter alia, that her roommate moved out because Bishop was "drunk and violent"; Bishop kicked a door frame; Bishop had a big ego; Bishop would go around picking fights with random people for no reason; Bishop would say other people were peasants and lower than him; Bishop was bad tempered; Bishop would drink a lot; Bishop would call Cherilynn names like "fucking bitch"; Bishop did not support the household; Bishop had a job but still asked Cherilynn for money; after they broke up; Bishop came up to Cherilynn's car at a drive-thru; after they broke up, Bishop sent Cherilynn numerous unwanted texts, emails, and letters apologizing for his behavior.

Cherilynn's testimony concerned Bishop pulling a gun on her when she, as his romantic partner, refused to have sex with him, and, a quarrel in which Bishop spat on her after she confronted him about sleeping with another woman (an event she confirmed she saw with her own eyes). Spitting on Cherilynn had no tendency to show that Bishop would murder and fatally assault anyone, let alone a child, while the context of this incident, i.e., Bishop sleeping around and cheating on Cherilynn was irrelevant and prejudicial, which context was belabored by the prosecutor and the focus of her questions. As for the incident in which Bishop pointed a gun at Cherilynn when she refused to have sex with him, this incident is also markedly different than the context of, and conduct at issue in, the current offenses and, moreover, was highly inflammatory

76

given the focus on guns, with the prosecutor showing Cherilynn a photograph of Bishop in a group of men holding guns and repeatedly asking Cherilynn to identify Bishop and confirm that the gun he was holding in the picture was the gun he had pointed at her. This is especially so given that there was no allegation of weapon use in the instant case. The prosecutor also elicited from Cherilynn numerous general, but inflammatory, details that had no relevance to his propensity to commit the charged offenses. When Cherilynn's testimony is carefully parsed, it is clear that the bulk of her testimony consists of inflammatory details that were not particularly probative of Bishop's propensity to commit the type of conduct at issue in the charged offenses. Therefore, in its present unsanitized form, most of Cherilynn's testimony was inadmissible under sections 1109 and 352.

This conclusion is supported by *Disa*, *supra*, 1 Cal.App.5th 654. In *Disa*, the defendant confessed, in a videotaped interrogation, to choking his girlfriend to death during an argument. (*Id.* at pp. 658, 660.) He was charged with murder and corporal injury on a cohabitant. (*Ibid.*) At the time, he was on parole for having previously attacked his ex-girlfriend. (*Id.* at p. 669.)

At Disa's trial, a police officer testified about his prior violent conduct with the ex-girlfriend. (*Disa*, *supra*, 1 Cal.App.5th at p. 662, 663.) "[The officer] testified that [the] defendant waited over 12 hours in his former girlfriend's apartment—including more than six hours spent hiding in a closet—and then attacked her and her new partner in the middle of the night with a knife he had brought to the apartment and kept with him while he waited in the closet. The attack left [the former girlfriend's new partner] covered in blood and the bedroom spattered with blood." (*Id.* at p. 670.) Prior to trial, defense counsel had asked "whether there was a way 'to sanitize [evidence of the prior incident] so it isn't highly prejudicial.' " (*Id.* at p. 669.) Counsel "was concerned that the prior incident of domestic violence involved, first, lying in wait and, second, the use of a weapon, which made the past conduct 'radically different' from the current case." (*Id.* at

77

p. 669.) The trial court admitted the evidence of the prior attack, stating "the prosecutor would be able to 'bring in the fact that the defendant … came into the apartment when the victim was not home, waited until she and her new partner were asleep and came out and attacked them." (*Id*. at p. 673.) The court's ruling as to the defendant's use of a knife and other details regarding that incident was ambiguous. "[T]he prosecutor took advantage of the ambiguity, eliciting many details of the offense from [the officer]." (*Id*. at p. 674.)

The Court of Appeal reversed the defendant's conviction for first degree murder on grounds the trial court should have excluded the evidence of lying in wait and that the jury should not have heard the evidence regarding the defendants' use of a knife, as such evidence was not "specifically relevant" for the purpose of showing "a propensity to do violence to a partner or former partner," but "was highly inflammatory." (*Disa*, *supra*, 1 Cal.App.5th at p. 674.) The Court of Appeal suggested the details that the defendant "brought a knife to the apartment and used it, and that the attack left [the former girlfriend's new partner] covered in blood and [her] bedroom spattered with blood," were too inflammatory, and there was a danger that the jury would have used the evidence to infer the defendant premeditated the strangulation of his current girlfriend. (*Id*. at p. 674.)

Just as the details surrounding the prior uncharged offense at issue in *Disa* (i.e., lying in wait and bringing and using a knife) were not necessarily relevant to show a propensity to commit domestic violence and were too inflammatory, so too were the details the prosecutor elicited from Cherilynn here, about Bishop's use of guns, habit of keeping loaded guns around, and sleeping around. These details should have been sanitized in presenting evidence of Bishop's misconduct with Cherilynn. Rather than limiting the inflammatory details, here the prosecutor highlighted and belabored them, both in her examination of Cherilynn and in her closing argument, to bolster her improper

78

contention that Bishop was a generally violent and unsavory individual.[33]  In the form in which it was presented here, the bulk of Cherilynn's testimony was inadmissible under sections 1109 and 352.

Much of Katie's testimony was also inadmissible under sections 1109 and 352, applied in tandem.  Katie testified about an incident when Bishop got irritated when she did not move his laundry from the washer to the dryer.  She talked about the fact that Bishop would get racy text messages from women on his phone, spurring arguments with Katie.  She talked about finding another woman's hair in Bishop's bed, which sparked a massive argument that turned physical (this was the only time Bishop got physical with her).  Katie testified in graphic detail about Bishop's abuse of his own dogs as well as of his roommate's pug.  She testified about Bishop punching and hitting his friend, Jason T., resulting in blood spattering all over the place.  Katie testified at length about Bishop's temperament and "insane" temper.  She said Bishop was a "smooth talker" and had a manipulative personality.  She noted that Bishop needed to go to church because it would take God to turn him into a good person.  She said:  "He was really good at getting me to believe that he was someone he's not or that he was gonna change and be a good person when it was just a lie."

Katie also testified about an incident that occurred after Katie and Bishop had broken up.  Bishop came to Katie's house to retrieve some items.  He was upset about the breakup and pulled out a loaded gun that he first held to his own head, then pointed at Katie.  The prosecutor asked Katie:  "He held the gun.  He pointed it at you?"  Katie

---

[33]    In *Disa*, "the jury received limited-use instructions on the prior domestic violence evidence and … the prosecutor did not argue in closing that the prior incident showed planning or premeditation." (*Disa*, *supra*, 1 Cal.App.5th at pp. 674-675.)  However, the Court of Appeal concluded:  "The limited-use instruction could not erase the image of defendant hiding in a closet with a knife waiting for the moment to attack his former girlfriend and her boyfriend, and a jury would not need closing argument to remember it." (*Id*. at p. 675.)

replied, "Yes." Bishop then "lowered the gun" and "just kind of start[ed] to sob." Katie pulled him into her bedroom, into the "master bath area," and "talked him into handing [the gun] over to [her], [she] sat the gun down and emptied the bullets out of it right away." The prosecutor asked: "What kind of gun was it, if you know?" Katie responded: "It was like a revolver." The prosecutor asked: "Like a handgun?" Katie replied, "Yeah, a handgun." The prosecutor asked, "And you removed – was it loaded?" Katie answered, "Mm-hmm." Katie added that Bishop proceeded to damage her house and property and she called the police. On cross-examination, Katie said she did not tell the police that Bishop had pulled a gun on her. When asked why, she responded she did not "want to make an issue" of it.

Katie's testimony spanned a range of very different types of incidents and encompassed many irrelevant, inflammatory details. At a minimum, the testimony relating to Bishop's personality, the abuse of Bishop's own dogs and the roommate's pug, and the incident where Bishop pointed a gun at himself and then at Katie was inadmissible under sections 1109 and 352, as substantially more prejudicial than probative. As discussed above, the incidents with the dogs fell outside the scope of section 1109, and therefore were inadmissible to begin with. Moreover, given the dissimilarity of the dog incidents to the present offenses, coupled with the highly prejudicial nature of these incidents, this evidence was inadmissible under section 352. (See *Baker*, *supra*, 10 Cal.5th at p. 1098 [in case involving murder and rape charges, trial court properly excluded, under § 1109, evidence to effect that the defendant poisoned the cat of a former romantic partner, nearly killing it, and killed a puppy in the presence of his wife and two-year-old son because he was angry with her].) Furthermore, Katie's testimony about Bishop pointing a gun first at his own head and then at her, was inadmissible under the *Falsetta* factors and section 352 as more prejudicial than probative.

The testimony of the final character witness, Dan, was also largely inadmissible under sections 1109 and 352. Dan testified about an incident in which he came home from work to find his pug was acting strange; the pug turned out to be injured and later died. Dan believed Bishop had killed his pug. Dan also testified that Bishop's dogs would hide behind Dan when Bishop was mad. This evidence was clearly inadmissible under section 1109, as it did not address domestic violence within the meaning of section 1109—even the majority does not appear to contend that Dan's description of these incidents was admissible; it was also inadmissible under section 352 on the basis of dissimilarity with the conduct at issue in the charged offenses and high potential for prejudicing the jury against Bishop.

Dan next testified about an incident in which Bishop was voted off a rugby team because of his aggressive attitude. Dan also testified that Bishop would get into fights all the time, usually on the way to a bar or the way home from a bar. Dan's testimony in both these respects was clearly inadmissible under sections 1109 and 352. The majority appears to agree this evidence is inadmissible.

Dan then testified that after he had moved out, and no longer lived with Bishop, Bishop would call him and harangue him to pay rent that Dan still owed him. Bishop would threaten Dan with physical violence in these phone calls, should Dan fail to pay the outstanding rent. This evidence is also inadmissible under sections 1109 and 352. It is far from clear that this evidence relates to domestic violence, and furthermore it is far too dissimilar to the charged offenses to have any probative value. (See *Earle*, *supra*, 172 Cal.App.4th at p. 397 [section 1108 "cannot infuse an uncharged offense with relevance or probative value it cannot rationally be found to possess"].)

Dan also testified about Bishop's temperament and aggression, as a general matter. Subsequently, the prosecutor asked: "And was he – did you ever see him become destructive around the house?" Dan answered: "All the time. When I first moved in there was a picture that was put in an odd place on the wall. I always wondered

81

why it was there. I moved it one day. A big hole right behind it. Through the eight months, we probably placed three or four new pictures at random places throughout the house for that same reason." This evidence was clearly inadmissible under sections 1109 and 352, as it neither constituted domestic violence, nor was it similar to the conduct at issue in the charged offenses. (see *Hollie*, *supra*, 180 Cal.App.4th at p. 1274 ["[t]o be admissible under … section 1108 [or section 1109], 'the probative value of the evidence of uncharged crimes "must be substantial" ' "].)

Thus, Dan's testimony was inadmissible under sections 1109 and 352 in its entirety.

To the extent the majority refers to patterns of domestic violence referenced in *Baker*, *supra*, 10 Cal.5th at p. 1099, and *People v. Kerley* (2018) 23 Cal.App.5th 513, 535-536, those cases addressed the concept of a pattern of domestic violence in the context of romantic relationships and a far narrower range of prior incidents, with a far greater degree of similarity between the prior uncharged incidents and the charged offenses. It is well understood that patterns of domestic violence in the context of romantic partnerships often transfer from relationship to relationship and tend to escalate over time, underpinning, in part, the rationale underlying sections 1108 and 1109. However, the evidence admitted here, such as Bishop's beating of his friend, Jason; Bishop's threatening phone calls to his ex-roommate, Dan, to collect outstanding rent after Dan had moved away; defendant's treatment of his dogs; Bishop's behavior on a rugby team, and Bishop's aggression in everyday interactions with a variety of people, concerns conduct that is not necessarily subsumed under that rationale.

Furthermore, *Falsetta* instructs: "[T]he prejudicial impact of the [prior uncharged offense] evidence is reduced if the uncharged offenses resulted in actual *convictions* and a prison term"; conversely, the prejudicial impact *increases* where the defendant has gone unpunished for the uncharged conduct. (*Falsetta*, *supra*, 21 Cal.4th at p. 917; *Jennings*, *supra*, 81 Cal.App.4th at p. 1315 [the jury's "knowledge that appellant had already

pleaded no contest and been punished for his prior transgressions substantially mitigates the kind of prejudice usually associated with the introduction of prior bad act evidence"].) Here, it was clear Bishop had not been punished for any of the prior conduct that was admitted into evidence, thereby increasing its prejudicial impact. The prosecutor amplified the potential for prejudice in this regard by highlighting in her closing argument that Bishop had escaped punishment for his prior misdeeds because people were too afraid of him to call the police. In addition, prejudicial impact increases where the defendant's history involves multiple victims. (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1029 [evidence of a "defendant's history of similar conduct against the same victim," admitted under section 1109, is generally "highly relevant and probative" and less inflammatory than it would be if it involved separate victims].) Again, here the prior misconduct admitted into evidence revealed Bishop's attacks on numerous people and dogs, rendering it highly inflammatory.

As noted above, the trial court did not consider the admissibility of the prior uncharged offenses and other character evidence under section 1109 in tandem with section 352. The court therefore neither considered the *Falsetta* factors, nor the other factors that are central to the required analysis. Under sections 1109 and 352, most of the respective testimony of Cherilynn and Katie, and all of Dan's testimony, was inadmissible. Nonetheless, a tremendous amount of trial time was expended on the admission of all of this evidence and the prosecutor relied heavily on this evidence to cross-examine Bishop and in her closing argument. There is no doubt that admission of this evidence placed a heavy burden on the defense's ability to address other, critical issues in the case, and distracted the jury from rationally assessing the relevant evidence in the case. (*People v. James* (2000) 81 Cal.App.4th 1343, 1357 ["The oft-cited observation that prior offense evidence 'proves too much' does not mean it is strong evidence of the charged offense. Rather, it means the evidence proves much about the

defendant's history that poses a danger of distracting the jury from its task – determining whether the charged offense was proven beyond a reasonable doubt."].)

## IV.  The Erroneous Admission of Character Evidence Was Prejudicial

The prior bad act and other character evidence was admitted under section 1101, subdivision (b), in error, as it did not go to show a common plan or scheme or even intent; instead, it was relevant only to show Bishop's criminal disposition.  Furthermore, the evidence was largely inadmissible under sections 1109 and 352, applied in tandem, as well.  With respect to section 1109, section 352 provides a constitutional safeguard that, when properly applied, " 'ensures that the presumption of innocence and other characteristics of due process are not weakened by unfair use of evidence of past acts.' " (*People v. Brown* (2000) 77 Cal.App.4th 1324, 1334; *Jennings*, *supra*, 81 Cal.App.4th at pp. 1313-1314 [in determining whether to admit propensity evidence pursuant to § 1109, "[a] careful weighing of prejudice against probative value under [section 352] is essential to protect a defendant's due process right to a fundamentally fair trial"].)[34]  Here, that safeguard failed.

The erroneous admission of the prior bad act and other character evidence was prejudicial under the *Watson* standard of prejudice applicable to evidentiary error under state law.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  Further, the erroneous admission of the prior bad act and other character evidence violated the defendant's right to due process and was prejudicial under the *Chapman* standard of prejudice applicable to constitutional violations as well.  (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)  I will first address why reversal is warranted under the

---

[34]    Also see *Miramontes*, *supra*, 189 Cal.App.4th at p. 1097 ["because … section 1108 conditions the introduction of uncharged sexual misconduct or offense evidence upon whether it is admissible under … section 352, any valid objection to such evidence, as well as any derivative due process claim, necessarily depends on whether the trial court sufficiently and properly evaluated the proffered evidence under that section"].

"reasonably probable" *Watson* standard, and thereafter discuss why the erroneous admission of the evidence in question amounted to a violation of federal due process, requiring reversal under *Chapman*.

### A. Evidentiary Error Was Prejudicial Under *Watson* Standard of Prejudice

Here, the People's case, while relatively strong, did not compel a guilty verdict. The People's case was complicated by stark conflicts in the testimony provided by Dr. Ian Johnson, the neurosurgeon who operated on Jimmy, and Dr. Frederic Bruhn, the People's medical expert, respectively. The medical evidence was clearly central to unraveling the puzzle as to the cause of Jimmy's death. Consequently, the conflict in the medical evidence—specifically, the irreconcilable differences in the testimony of the two principal witnesses *called by the People* to address the medical evidence, i.e., Drs. Johnson and Bruhn—was a critical weakness in the People's case. These differences were important because there was no swelling, bruising, or other injury to Jimmy's scalp and associated soft tissues, or to his skull, and therefore there was no hard medical evidence supporting the People's theory of the case, which was that Bishop had bashed Jimmy's head into the ground and caused the subdural hematoma.

The People's theory of the case was that Jimmy suffered a sudden, severe subdural hematoma shortly after 1:00 p.m., when Bishop and the children returned home from a trip to Walmart and McDonald's (they had left the house for the outing sometime after 11:00 a.m.). The prosecutor argued the subdural hematoma was caused all at once when Bishop slammed Jimmy's head into the ground with massive force.

In line with the People's theory, the People's medical expert, Dr. Frederic Bruhn, definitively opined Jimmy suffered blunt force trauma—"There had to be an element where Jimmy was slammed onto the floor to produce this injury this quickly"—likening the force required to that generated in a "[h]igh velocity car wreck." Dr. Bruhn reiterated that "a good slam on the floor" would have been required to produce Jimmy's condition.

85

However, Dr. Bruhn's theory was undercut by the fact that there was no swelling, bruising, or injury to Jimmy's scalp and associated soft tissues, or to his skull. Indeed, Dr. Bruhn acknowledged that a CT scan of Jimmy's head had confirmed "*there [was] no evidence of skull fracture, no evidence of impact/swelling on the scalp*." (Italics added.) Dr. Bruhn further acknowledged there was no evidence of a scalp hematoma or any bleeding in the scalp from trauma. Rather, the only bleeding was under the dura; hence the hematoma was subdural.

Dr. Johnson's testimony on the cause of Jimmy's condition was starkly different. Dr. Johnson was equally definitive in his testimony as Dr. Bruhn, but to opposite effect, that is, that Jimmy's condition was *not* caused by *any* kind of "external trauma." Dr. Johnson noted that while a subdural hematoma typically occurred in scenarios where there was some type of generated force, he clarified that in this case he had "*no earthly idea how the subdural hematoma got there.*" (Italics added.) He added: "*What I do know is that it didn't get there from an external trauma. That's about all we can report on, because that's what our physical exam, what the facts are telling us*." (Italics added.) Dr. Johnson continued that there was "an absence of findings" for purposes of figuring out how Jimmy's condition developed.

Dr. Johnson explained that, given the severity of the subdural hematoma, had it been caused by an external trauma, the trauma would have had to be so forceful that it necessarily would have led to unmistakable bruising and "real big" swelling on the outside of the head. But Jimmy's head, which Dr. Johnson carefully examined for signs of external trauma, displayed no evidence of the kind of massively forceful trauma that would result in a subdural hematoma.

Dr. Johnson further looked at the CT scan of Jimmy's head for evidence of bruising on the outside of the brain that would have appeared on the scan had Jimmy suffered an external trauma. Dr. Johnson testified: "And I went back and reviewed the CT scan, and I did not find the things that you should see." Dr. Johnson's conclusions in

86

this regard were echoed by Dr. Hightower, a radiologist who interpreted the CT of Jimmy's head conducted at 2:01 p.m. at the emergency department of Kaweah Delta Hospital. Dr. Hightower noted that the CT scan did not show any swelling to the soft tissue overlying the brain or any skull fracture. Dr. Hightower further explained: "Well, if you see an intracranial bleed, you worry that something could have happened outside the skull to cause the skull fracture or soft tissue swelling. So I didn't appreciate any of that on there." As mentioned, even Dr. Bruhn agreed on this point. In addition, another doctor who attended Jimmy, Dr. Hyden, also concluded Jimmy did not suffer blunt force trauma as there was no sign of external trauma on his scalp.

Notably, while Dr. Johnson said that subdural hematomas are usually seen in car accidents or when somebody is being abused, *he never testified that what happened to Jimmy was non-accidental*.[35] Dr. Johnson said that typically a super concentrated shaking could cause a subdural hematoma in a young child. He acknowledged, however, that shaken baby syndrome is seen more in infants than children and emphasized that he was not saying that shaken baby syndrome had in fact occurred in this case. Specifically, as to the shaking theory he said: "Did that happen here? I don't know."

In another twist, Dr. Bruhn, the prosecution's medical expert, ruled out the possibility that Jimmy's hematoma was caused by shaking, noting that in children of Jimmy's age, shaking would *not* cause the type of condition Jimmy had suffered. Dr. Bruhn explained: "Shaken baby is usually babies in the first – most of them are in the first year of life. So Jimmy would be [too] old to have a shaken baby." Dr. Bruhn emphasized: "I've never called this case a shaken baby [case]." Dr. Bruhn also acknowledged that, at the preliminary hearing, he similarly testified this was not a shaken baby case.

---

[35] The prosecutor argued in closing argument that Dr. Johnson agreed that Jimmy's condition was the result of "nonaccidental trauma." Her argument had no basis in the record.

Defense counsel asked Dr. Bruhn about Dr. Johnson's testimony that Dr. Johnson was looking for a major injury to the external part of the head, such as a large external hematoma or large swollen bruise (not a surface bruise) but did not find one. Dr. Bruhn responded, "I don't remember him saying that." Dr. Bruhn added: "I don't think he's wrong, because I don't know exactly. I wish he was here right now. We could discuss this. But he's a well trained neurosurgeon with lots of experience, so I'm not sure what he means. I know he didn't say the baby – this was all shaken. He didn't say that, if that's what you're looking for." Dr. Bruhn then asked defense counsel whether Dr. Johnson had actually said "it wasn't blunt force trauma?" Defense counsel responded that was exactly what Dr. Johnson had said; counsel added that Dr. Johnson had also suggested shaking can cause this kind of hematoma. Defense counsel offered to find it in the transcript, noting "we all heard it." Dr. Bruhn said: "I don't think he said it wasn't blunt force trauma. I mean, there's – I don't know what to say about that." Dr. Bruhn said he was not in court to hear Dr. Johnson's testimony.

Dr. Bruhn further acknowledged that medical opinions as to what happened to Jimmy ultimately represented "judgment call[s]," based on many sources, and represented assessments as to the relative likelihood that his condition arose from an inflicted injury.

The dissonance in the respective testimony of the prosecution's principal medical witnesses, and the lack of evidence of a clear causal mechanism for Jimmy's condition, created a space for jurors to question the strength of the prosecution's case and to entertain a reasonable doubt as to Bishop's guilt. The prosecutor's unusually heavy reliance on prior act evidence in this matter suggests the prosecutor herself was hyper aware of, and concerned about, the lack of hard medical evidence to support her theory, as well as the contradictions in the respective testimony of her star witnesses.

Other evidence also potentially contradicted the prosecution's theory that Jimmy suffered a massive subdural hematoma *all at once* because Bishop slammed his head into

88

the ground with massive force or did some other super forceful thing. Indeed, the evidence supported one of the defense's theories to the effect that Jimmy's bathtub fall or an underlying condition had initiated Jimmy's condition, which was exacerbated when Bishop dropped Jimmy headfirst later that day. Dr. Hightower, the radiologist who interpreted the CT scan of Jimmy's head conducted at Kaweah Delta Hospital's Emergency Department, noted the CT scan showed evidence of older bleeding as well as fresher bleeding, suggesting that the subdural hematoma had developed over time. Similarly, Dr. Walter, who conducted the autopsy on Jimmy's body, observed that the fact that the subdural hematoma was in a single bridging vein in Jimmy brain would indicate a slow bleed rather than a fast one, as veins are low pressure vessels (arteries are high pressure vessels).[36] Dr. Johnson's report confirmed that in Jimmy's case, only a single bridging vein was bleeding.

Dr. Bruhn also agreed that a bleed in one vein accompanied by a large amount of blood leakage would suggest a slow bleed over time (however, he pointed out that Jimmy's condition deteriorated very fast after Bishop and the kids returned from the trip to Walmart and McDonald's). In addition, evidence was presented that Dr. Bruhn acknowledged at the preliminary hearing that he could not actually say whether one or more events led to Jimmy's condition, nor could he identify the timing of those of events. At the preliminary hearing, Dr. Bruhn was asked whether it was possible that Jimmy suffered a subdural hematoma when he fell in the bathtub and that there was a secondary

---

[36] Dr. Walter had testified that the size of the hematoma would suggest either a rapid bleed over a short period or a very small bleed over a longer period. He noted, however, that he was led to believe, by investigative information from the police, that the event that caused the hematoma occurred "in close proximity" to the time the CT scan was performed at Kaweah Delta Hospital. To the extent the CT scan was performed relatively close in time to the event that caused the bleed, the large hematoma reflected on the scan would suggest a rapid bleed.

injury that afternoon that caused a rebleeding of that hematoma.  Dr. Bruhn's answer

was, " 'That's a possibility, yeah.  I cannot dispute that.' "  At trial, Dr. Bruhn added that

the video from Walmart "kind of rules out anything significant" in the morning.

However, when asked whether a person could suffer a subdural hematoma and not

become immediately symptomatic, he responded:  "Yes, small ones, sure."  He also

agreed that a child could suffer a subdural hematoma without having apparent symptoms

immediately.  Finally, Dr. Bruhn noted that subdural hematomas could occur

spontaneously, although that did not happen very often.

In short, there was plenty of evidence that undercut the prosecution's theory of the

case to the effect that the subdural hematoma was caused suddenly and solely by a

deliberate, super-forceful bashing of Jimmy's head into the ground by Bishop.  Given the

divergent theories posited by the primary prosecution witnesses, as well as Dr. Bruhn's

acknowledgement that the medical evidence was inconclusive in the end, the defense's

argument that the true medical cause of Jimmy's condition had not been properly

explored had a modicum of appeal.  This confusing backdrop possibly explains why the

prosecutor found it necessary to focus heavily on the inadmissible prior act evidence in

this case.[37]  The prior act evidence created an avenue for the jury to resolve potential

---

[37]    It is telling that in this case, the prosecutor violated the court's evidentiary rulings
to the extent the court had excluded some prior bad act and other bad character evidence,
and highlighted aspects of such evidence the court had admonished her to minimize.  In
addition, the prosecutor said, in both her opening statement and closing argument, that
*Jimmy had suffered retinal hemorrhages*, evidently to show he was the victim of abuse.
However, there was *no* evidence adduced at trial to the effect that Jimmy had suffered
retinal hemorrhages.  In fact, the autopsy report that is part of the record in the case,
clarified as to both the left and right eyes that, "[t]he retina is unremarkable without any
evidence of hemorrhage."  Dr. Bruhn, the People's medical expert, testified at the
preliminary hearing that an initial test had revealed one or two retinal hemorrhages "way
back" in the "back, posterior pole" of one eye, which were "insignificant."  He explained
that, in order to be "significant," retinal hemorrhages would have to manifest in all layers
of the retina, "way out to the ora serrata," which was *not* the case here.  Dr. Bruhn

90

doubts by considering Bishop's unsavory character and his violent behavior across the board, even with a small and helpless pet pug, and to conclude, based thereon, that he would not hesitate to grievously hurt a child.

As for Bishop's statements to the police, although he clearly provided sharply inconsistent descriptions of the events that occurred once he and the children returned home from Walmart and McDonald's, he never confessed to deliberately hurting Jimmy or slamming him into the ground with the *type of force* required to cause a subdural hematoma (as discussed by Drs. Johnson and Bruhn). While Bishop eventually told the police and testified at trial that Jimmy slipped from his hands and hit his head on the ground when they returned home from Walmart, he said, both times, that the devastating condition that developed was not commensurate with the fall and was not explainable. Bishop had made a similar statement to the social worker who took a history from him when he arrived at Kaweah Delta Hospital's Emergency Department (Jimmy was taken by ambulance to the hospital from the urgent care center to which Bishop had rushed him). Bishop explained that his initial lack of candor with the police stemmed from his fear of being blamed for Jimmy's condition and being jailed.

In addition, Bishop said Jimmy had fallen in the bathtub that morning, and vomited several times thereafter, while also appearing more lethargic than usual. These statements were supported by other evidence, such as evidence that Jimmy's shirt had a stain down the front and the presence, by the laundry machines in the garage, of a blanket that Bishop had used to wipe Jimmy off.[38] The evidence also showed that when Jimmy

confirmed that in Jimmy's case, "an eye exam [was] done later down the road and everything was normal, and at autopsy his eyes were normal."

[38] At the preliminary hearing the People introduced evidence showing Bishop had *called* D.H. at 10:21 a.m. that morning to alert her that Jimmy had fallen in the bathtub. The People called Visalia Police Officer William Brokhoff as a witness at the preliminary hearing. Brokhoff testified he was dispatched to Kaweah Delta Hospital at around 2:00 p.m. on March 21, 2013, in response to a call from Lynn Badger, a medical counselor there. While Brokhoff was at Kaweah Delta, he took a statement from D.H., in a hospital

fell unconscious, Bishop quickly communicated that fact to D.H. and rushed to get medical attention for Jimmy.**39**

To the extent Bishop's final statements and trial testimony suggested that Jimmy's headfirst fall that afternoon potentially exacerbated an underlying or inchoate condition, or an injury from that morning's bathtub fall, the jury would surely have assessed Bishop's credibility in this regard against the background of the extensive evidence of

conference room. Brokhoff testified: "[D.H.] stated that she went to work at approximately 0700. She received a call [at] approximately 1021 hours from her boyfriend Trevor Bishop, stating that *her son fell in the bathtub.* [¶] … [¶] She said Trevor Bishop told her that the juvenile was all right." Brokhoff further testified that D.H. said "the juvenile later went to Walmart." D.H. also said the child had vomited and [Bishop] took him home to change his clothing. This evidence was not introduced at trial. Rather a contrary picture was presented. In questioning Detective Ramona Whaley, who had participated in Bishop's interrogations, the prosecutor elicited testimony to the effect that Bishop *did not text* D.H. to tell her that Jimmy had fallen in the bathtub, and, on cross-examination, Whaley testified she did not recall Bishop saying he had told D.H. about Jimmy's fall.

**39**      For completeness, a few points should be noted. As the majority notes, Bishop had put concealer over a bruise on Jimmy's face before they left for the store on the morning of the events underlying the charges. (Maj. opn. *ante*, p. 9.) During his police interrogation, Bishop explained that D.H. was in a battle with her ex-husband over their kids and, given this context, did not want the children to be seen in public with any bruises. At the preliminary hearing in this matter, a police officer who had questioned D.H. on the day that Jimmy was taken to the hospital, testified that D.H. acknowledged it was her idea to put concealer on Jimmy that day.

The majority also notes that Bishop mentioned, during his police interrogation, that D.H. bruised very easily, and that Jimmy was the same way. One of the officers interrogating Bishop had also, earlier, questioned D.H. This officer confirmed that D.H. had separately told him that "she bruises easy, but she's never really had an official diagnosis."

Finally, during his police interrogation, Bishop referred to D.H. and her ex-husband battling over the kids. He said, when the kids came back from their father with any marks on them, D.H. took pictures; when the kids went to their father, he took similar pictures. D.H. and Bishop also documented any bruises suffered by Jimmy in other contexts. Photos of Jimmy with various bruises were found on Bishop's phone as well as on D.H.'s phone.

prior misconduct that was admitted here.  In the absence of the prior act evidence as presented here, the jury, or at least one juror, may well have had a more favorable view of Bishop's testimony, especially in light of the conflicts in the medical evidence and the universally-acknowledged fact of a lack of evidence of trauma to the outside of Jimmy's head.

The prosecutor spent a lot of time eliciting the prior act evidence, emphasizing its most inflammatory and graphic aspects.  The prosecutor also dwelled on the prior act evidence at length in cross-examining Bishop and discussed it in depth in her closing arguments.  She expressly drew the jury's attention to the fact that Bishop had not been punished for his prior misconduct, arguing:  "*Then you can probably ask yourself how come no one is calling the police on this guy?  They're all terrified of him.*  He doesn't let up on people.  He stalks them.  He doesn't let up.  He makes their life miserable.  They testified to that." (Italics added.)  The prosecutor's aggressive use of the prior act evidence suggests she viewed the detailed and broad ranging evidence of Bishop's past misdeeds as an essential element of her case.  (See *People v. Diaz* (2014) 227 Cal.App.4th 362, 384 ["A prosecutor's reference to evidence that should not have been presented to the jury increases the potential for prejudice flowing from the error."].)

While the medical evidence presented in the case was confusing and far from consistent, the prior bad act evidence was a dominant feature of the trial and painted a consistent picture of Bishop as wildly out of control and indiscriminately violent.  Thus, while a rational juror could have entertained a reasonable doubt about Bishop's guilt based on the evidence regarding the current incident alone, the prior act evidence would reasonably allow a juror in that position to resolve any lingering doubts as to Bishop's guilt, especially since Bishop had escaped *any* retribution or punishment for prior misconduct spanning several years.  In this way, the prior act evidence served as an effective tool to neutralize, and shift the focus away from, the conflicts in the medical evidence that undermined the prosecution's theory of the case.

93

On this record, there is a reasonable chance that, had the prior act evidence (in the amount and form at issue here) been excluded and the related "common plan" jury instruction omitted, the result of the proceeding would have been more favorable to Bishop.  (See *People v. Wilkins* (2013) 56 Cal.4th 333, 351 [application of *Watson* standard requires an " ' " ' "examination of the entire cause," ' " ' " including the evidence, instructions, and arguments of counsel]; *People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918 [probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility"]; *People v. Soojian* (2010) 190 Cal.App.4th 491, 521 [indicating that, for purposes of *Watson* standard, "a hung jury is a more favorable result than a guilty verdict," and, in turn, that the standard is met when there is a reasonable chance the absence of error would change a *single* juror's mind]; see also *Disa*, *supra*, 1 Cal.App.5th at p. 675 ["The evidence at trial supported, but did not compel, a finding of first degree premeditated murder.  Under these circumstances, it is reasonably probable the result would have been more favorable to defendant had the jury not heard [the] extensive, inflammatory evidence of defendant's prior incident of domestic violence."].)

## B.  Evidentiary Error Resulted in Violation of Due Process

Too much prior bad act and other character evidence was erroneously admitted in this case, taking up a significant portion of the trial.  The evidence was used by the prosecutor to show that Bishop was a generally violent and bad person, who committed the charged crimes in conformity with those traits.

The jury was shown a photograph of Bishop with a group of men with everyone holding guns standing in front of the confederate flag and told many details about Bishop's negative personality traits, extraneous details about his infidelities and taste in women, along with irrelevant and inflammatory details related to his prior conduct.  In addition, the evidence related to prior bad acts involved Bishop's misconduct in a variety

94

of contexts, including with girlfriends, a girlfriend's mother, male friends and roommates, his own and others' dogs, rugby teammates, and perfect strangers, such that it painted a picture of Bishop as generally out of control, nasty, and violent. Under these circumstances, there was a grave danger that the jury would have used the evidence to convict Bishop because of who he was, rather than what he did, thereby vitiating the presumption of innocence and Bishop's right to be tried for the current offenses, and, in turn, undermining the fairness of the trial in violation of due process. (See *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378;[40] *Harris, supra,* 60 Cal.App.4th at p. 737 [" 'A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is.' "]; *Garceau, supra,* 6 Cal.4th at p. 186 [use of prior crimes and other character evidence may violate due process by diluting the presumption of innocence], overruled on other grounds by *People v. Yeoman, supra,* 31 Cal.4th at pp. 117-118.); *People v. Partida* (2005) 37 Cal.4th 428, 439 [the erroneous admission of evidence results in a violation of a criminal defendant's right to due process if it makes a trial fundamentally unfair].)

The prior bad act and other character evidence was a major aspect of the trial. In addition to the testimony of the three character witnesses, Bishop's prior misconduct featured in the prosecutor's cross-examination of Dr. Rothfeder (the defense's medical expert), it was a focus of the prosecutor's cross-examination of Bishop himself, and it

---

[40] In *McKinney v. Rees*, the victim's throat was slit by a knife and the murder weapon was never found. The prosecution introduced evidence that the defendant, the victim's son, had a knife collection, was fascinated with knives, and had scratched "Death is His" on his closet door. Defendant sought habeas corpus relief on the ground that the admission of this "other acts" evidence deprived him of a fair trial. The Ninth Circuit found that most of this evidence was probative only of the defendant's character. It found the prohibition against use of character evidence "is based on … a 'fundamental conception of justice' and the 'community's sense of fair play and decency,' " and that the admission of this evidence deprived defendant of a fair trial. (*Id*. at p. 1384.) "It is part of our community's sense of fair play that people are convicted because of what they have done, not who they are." (*Id*. at p. 1386.)

was a significant element in the prosecutor's closing arguments. As for Dr. Rothfeder, the prosecutor repeatedly questioned his conclusions on grounds he was not aware of, and had not taken into consideration, Bishop's "violent history." Dr. Rothfeder explained: "[W]hat I'm doing is opining on whether [Bishop's] statements are consistent with a potential cause of the injury." The prosecutor responded: "You don't know [Bishop's] history. You didn't read the other transcripts. You don't know about this defendant." She added: "And you didn't get any transcripts regarding his prior bad acts and violent history[,] right?" Thereafter, she asked: "[The] information about *prior bad acts*, *past violent history*, that's not going to change your opinion?" (Italics added.) The prosecutor's questioning was effective precisely because the prior bad act evidence— given its large volume, broad scope, and profusion of inflammatory details—was extremely disturbing and painted Bishop as an indiscriminately violent person.

Next, the prosecutor cross-examined Bishop about every incident, major and minor, described by Katie, Cherilynn, and Dan, to highlight his history of out of control behavior with girlfriends, male friends, roommates, rugby teammates, Katie's mother, complete strangers, and even his own and others' pet dogs. For example, with reference to Dan's testimony, the prosecutor questioned Bishop about being ejected from his rugby team: "But you got voted off the team because you're too aggressive and violent [even for rugby]?"; "That must say a lot, huh?" The prosecutor also asked Bishop, with reference to incidents described by Katie: "In fact, then you also charged at her mother that night, didn't you?" and "Do you remember Jason [T.] begging for his life, begging for you to stop hitting him?" The prosecutor also asked numerous questions regarding Bishop's possession and use of guns, and the separate incidents in which he threatened Katie and Cherilynn with a loaded gun.

In addition, the prosecutor questioned Bishop about his prior conduct as described by the character witnesses, including drinking to excess; frequenting bars; posing for a photograph with a group of men holding long guns in front of a confederate flag; spitting

96

at his girlfriends; directing misogynistic epithets such as "bitch" and "whore" at his girlfriends; cheating on his girlfriends; stalking his ex-girlfriends; and dating, in his own words, "whores," "bikini dancers in clubs," and "stripper-looking [women in] skimpy clothes." The prosecutor thus effectively deployed the broad swath of prior act and other character evidence to suggest Bishop was a generally despicable person, thereby undermining his credibility in the eyes of the jury.

In her closing argument, the prosecutor recapitulated the testimony of all three of the character witnesses. She argued: "Now, the witnesses, you had Cherilynn [O.], Katie [O.], Dan [N.] … They all testified that this defendant had an instantaneous temper. There was nothing in between. It's just instantaneous. *And they all said he's also manipulative and he's violent*." (Italics added.) The prosecutor highlighted the details woven into the testimony of these witnesses, such as references to Bishop pulling guns on Cherilynn and Katie and fatally injuring Chloe (Dan's pug), and added some extra-record details of her own, such as that Jason T. needed emergency medical treatment after he was beaten by Bishop.[41] In addressing the evidence of Bishop's abuse of his own dogs, the prosecutor said, "[He's] beating these dogs for no reason, just because it feels good to him." Among the prosecutor's final words to the jury as she wrapped up her closing argument was the following contention: "We know [Bishop has] beat dogs. He's beat a man. He beats women. There's no – there is no boundaries with him. It doesn't matter. He's gonna do whatever he wants to do."

The prosecutor thus posited there were no limits to the use of violence by Bishop, as he had beaten dogs, women, and a man; picked fights with random strangers; and was too violent even for a rugby team. This amounted to an improper propensity argument to the effect that Bishop's broad-ranging violent history showed he had violent tendencies

---

**41** No evidence was introduced at trial to the effect that Jason needed emergency medical treatment after this incident.

across the board, thereby encouraging the jury to infer that violently slamming Jimmy's head on the ground, leading to a sudden subdural hematoma in Jimmy's brain and eventually Jimmy's death, was in keeping with Bishop's general character, easing the path to conviction.

The jury was instructed to consider the evidence of uncharged acts to decide whether "[t]he defendant had a common scheme or plan to commit the alleged acts in this case." It was further instructed to "not conclude from this evidence that the defendant has a bad character or is disposed to commit crime." However, the latter limiting instruction had little value because the relevant character testimony revealed a disparate array of violent, threatening, and/or unsavory behaviors, of varying severity, without an obvious connection to the charged crimes, whereby the evidence did not speak to the existence of a common plan in any way except by giving rise to an improper inference of bad character, in terms of a propensity to commit violence in general, on Bishop's part. When this wide-ranging evidence was amplified by and combined with the prosecutor's closing argument, there was no way to interpret the evidence of prior misconduct other than to infer that Bishop was a bad person who was predisposed to acting violently in a multiplicity of situations or as a general matter. Under these circumstances, as well as in view of the inflammatory nature of the evidence, the jury instructions given here were not an effective check on the jury's susceptibility to inferring a propensity to commit indiscriminate violence from the evidence presented. (See *People v. Dellinger* (1984) 163 Cal.App.3d 284, 300 ["the courts have recognized that limiting instructions are frequently inadequate to protect the accused"]; see *Williams, supra,* 23 Cal.App.5th at p. 423; *Disa*, *supra*, 1 Cal.App.5th at p. 675.)

Furthermore, as noted above, admission of this evidence engendered a real danger that the jury would improperly infer that Bishop had gotten away with committing numerous uncharged crimes and would continue his vicious and violent ways in the future, and therefore merited punishment and exclusion from society, regardless of his

role in Jimmy's death.  In short, given the improper inferences arising from the prior bad act and other character evidence admitted here, as well as the conflicts in the medical evidence that were difficult to resolve, the prior act evidence could "only have served to cloud [the jury's] resolution of the issues."  (*People v. Albarran* (2007) 149 Cal.App.4th 214, 230 (*Albarran*).)

"This case presents one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair."  (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.)  Prejudice arising from a due process violation is assessed under the *Chapman* test, under which reversal is required unless the state proves, beyond a reasonable doubt, the error did not contribute to the verdict.  (*Chapman*, *supra*, 386 U.S. at p. 24; *Albarran*, *supra*, 149 Cal.App.4th at p. 229.)  On the instant record, it cannot be said, beyond a reasonable doubt, that the due process violation resulting from the erroneously admitted prior bad act and other character evidence did not contribute to the jury's verdict.  (See *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [the *Chapman* inquiry is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error"].)

Reversal of Bishop's convictions and remand for a new trial is therefore required.**42**

SMITH, J.

---

**42**     Finally, here, even had the prior uncharged offenses and other character evidence been properly admitted, there would still be a strong case for finding a due process violation in this case.  First, the prosecutor made improper arguments in the course of her closing argument, including that Bishop was manipulative and violent across the board.  She also suggested that Bishop had not been punished for his prior misconduct because people were too afraid of him to report him to the police, thereby inviting the jury to consider the fact he had gone unpunished in determining whether to convict him for the charged offenses.  She improperly questioned the character witnesses to elicit and highlight inflammatory details, when, at a minimum, more succinct questioning was in order.  She improperly questioned the defense's medical expert and Bishop himself, on cross-examination, based on the character evidence introduced in the case.  She told the jury, without a basis in the record, that Dr. Johnson had opined that Jimmy's condition was the result of "nonaccidental trauma."  She told the jury in opening and closing arguments that Jimmy had suffered retinal hemorrhages, without any basis in the record, and when that was not the case.  She embellished the testimony of the character witnesses, for example, when she said that Jason had sought treatment at the emergency room after Bishop beat him, although no witness had testified to this effect.  She elicited misleading testimony from Detective Whaley to suggest that Bishop had not informed D.H. of the bathtub fall, when evidence presented at the preliminary hearing revealed that Bishop had done so.  The prosecutor's actions severely undermined the fairness of the trial.  This record begs the question why, had the prosecutor been as confident in her case as the majority evidently is, she would have resorted to tactics that vitiated the fairness of the proceeding.